No. 21-1255

(1:20-cv-03495-JKB)

# In The United States Court of Appeals
## For the Fourth Circuit

DOMINIC BIANCHI, an individual and resident of Baltimore County; DAVID SNOPE, an individual and resident of Baltimore County; MICAH SCHAEFER, an individual and resident of Anne Arundel County; FIELD TRADERS LLC, a resident of Anne Arundel County; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; CITIZENS COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

*Plaintiffs – Appellants*,

v.

BRIAN E. FROSH, in his official capacity as Attorney General of Maryland; COL. WOODROW W. JONES, III, in his official capacity as Secretary of State Police of Maryland; R. JAY FISHER, in his official capacity as Sheriff of Baltimore County, Maryland; JIM FREDERICKS, in his official capacity as Sheriff of Anne Arundel County, Maryland,

*Defendants – Appellees*.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

# BRIEF OF PLAINTIFFS-APPELLANTS

Raymond M. DiGuiseppe
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

Adam Kraut, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
F: (215) 525-4437
akraut@fpclaw.org

David H. Thompson
Peter A. Patterson
Tiernan B. Kane
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

JURISDICTION..............................................................................2

ISSUE PRESENTED ........................................................................3

STATEMENT OF THE CASE..............................................................3

I.      Maryland's Semiautomatic Rifle Ban ...........................................3

II.     The Ban's Effect on Plaintiffs-Appellants ......................................4

III.    Course of Proceedings .............................................................5

SUMMARY OF THE ARGUMENT .......................................................6

ARGUMENT ................................................................................7

I.      The Second Amendment Protects "Arms" That Are in Common Use. ..........8

        A.      Common Use Among Present-Day, Law-Abiding Citizens
                Nationwide Is Determinative.  ...........................................8

        B.      *Kolbe*'s "Military Service" Test Is Incompatible with *Heller*. ...........12

II.     The Rifles Banned by Maryland's Semiautomatic Rifle Ban Are in
        Common Use. ...................................................................... 15

        A.      Semiautomatic Rifles Are in Common Use. .......................15

B.  Banned Semiautomatic Rifles Are Not Materially Distinguishable from Other Semiautomatic Rifles. ...................................................... 18

C.  Banned Firearms Are Typically Possessed for Lawful Purposes. ..... 20

III.  A Ban on Protected Arms Is Flatly Unconstitutional. ...................................25

A.  *Heller*'s Test Is Clear and Categorical. ...............................................25

B.  Means-End Scrutiny May Be Limited. ...............................................27

IV.  Maryland's Ban Fails Any Potentially Applicable Standard of Scrutiny. ... 28

A.  Strict Scrutiny Is Applicable. .............................................................28

B.   The Ban Withstands No Form of Heightened Scrutiny. ................... 30

CONCLUSION ........................................................................................................42

# TABLE OF AUTHORITIES

**Cases**                                                                **Page**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*,
  910 F.3d 106 (3d Cir. 2018) ...............................................20

*Billups v. City of Charleston*, 961 F.3d 673 (4th Cir. 2020) ............................32, 33

*Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011) ...............................................29

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016)...........................32, 33, 34

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ............... 1, 8, 11, 12, 14, 24, 26

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
  982 F.3d 258 (4th Cir. 2020) ...............................................7

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)...............................................28, 29

*City of Los Angeles v. Alameda Books, Inc.*,
  535 U.S. 425 (2002)...............................................31

*City of Renton v. Playtime Theatres, Inc.*,
  475 U.S. 41 (1986)...............................................31

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................. 1, 2, 8, 9, 10, 11, 12, 13, 14, 25, 29, 35

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) ...............................21, 29

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020)...................14, 15, 20, 29, 30

*Eriline Co. S.A. v. Johnson*, 440 F.3d 648 (4th Cir. 2006)...............................7

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................8, 22, 27, 30

*Friedman v. City of Highland Park*,
  68 F. Supp. 3d 895 (N.D. Ill. 2014)...............................22, 23

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ...............................................22

*Grace v. District of Columbia*,
  187 F. Supp. 3d 124 (D.D.C. 2016)...............................30, 31, 32

iii

*Gun Owners of Am., Inc. v. Garland*,
No. 19-1298, 2021 WL 1138111 (6th Cir. Mar. 25, 2021) ..........................16, 17

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)...............17, 20, 21

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015).......................31, 32

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)...................................................14, 15

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ...................... 2, 6, 8, 12, 13, 14, 15, 28, 30, 34, 35

*McCullen v. Coakley*, 573 U.S. 464 (2014) .....................................................32, 33

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................2, 7, 10, 25, 26, 28

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ....................................27, 30, 42

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ...............................................................................20

*Nat'l Rifle Ass'n of Am., Inc. v. BATFE*,
714 F.3d 334 (5th Cir. 2013) ...............................................................................29

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)............................29

*People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013)...........................................................30

*People v. Webb*, 131 N.E.3d 93 (Ill. 2019)............................................................26

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018)......................................26

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ............................28

*Shew v. Malloy*, 994 F.Supp. 2d 234 (D. Conn. 2014) ..........................................23

*Staples v. United States*, 511 U.S. 600 (1994)............................................16, 17, 18

*Stenberg v. Carhart*, 530 U.S. 914 (2000)........................................................15, 16

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002)........................................34

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).........................................27

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ..........................................30

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)........................................35, 36

*Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018).....................................18

iv

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019)................................................18, 22

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .................27, 31, 32

## **Constitution and Statutes**

U.S. Const. amend. II ................................................................................8, 25

18 U.S.C. §

   § 921(a)(20) ...........................................................................................4
   § 922(g)(1) ............................................................................................4

Cal. Penal Code

   § 30600.................................................................................................17
   § 30605.................................................................................................17

D.C. Code Ann.

   § 7-2501.01(3A)....................................................................................18
   § 7-2502.02(a)(6)..................................................................................18
   § 7-2505.01...........................................................................................18
   § 7-2505.02(a).......................................................................................18
   § 7-2505.02(c).......................................................................................18

Haw. Rev. Stat. § 134-8 ............................................................................17

Md. Code Ann., Crim. Law

   § 4-301 .............................................................................................3, 15
   § 4-301(h).........................................................................................3, 15
   § 4-302 .................................................................................................4
   § 4-303 ..........................................................................................3, 4, 15
   § 4-303(a).............................................................................................4
   § 4-303(b)(2).........................................................................................4
   § 4-303(b)(3).........................................................................................4
   § 4-303(b)(4)–(5)...................................................................................4
   § 4-304 .................................................................................................4
   § 4-306(a).............................................................................................4

Md. Code Ann., Pub. Safety

   § 5-101(g)(3)..........................................................................................4

§ 5-101(r)(2)................................................................3, 15

§ 5-133(b)(1)....................................................................4

§ 5-205(b)(1)....................................................................4

Mass. Gen. Laws ch. 140, § 131M ................................17, 18

<u>N.J. Stat.</u>

<u>§ 2C:39-5(f)</u>..................................................................18

§ 2C:39-9(g)..................................................................18

N.Y. Penal Law

§ 265.02(7)....................................................................18

§ 265.10(1)–(3)..............................................................18

Criminal Procedure – Firearms – Transfer,
2018 Md. Laws Ch. 251 (H.B. 1646) ...............................33

Firearm Safety Act of 2013, 2013 Md. Laws Ch. 427 (S.B. 281)...........33

## **<u>Other Authorities</u>**

Amicus Curiae Br. of the Nat'l Shooting Sports Found. in Supp. of Pet'rs,
*Friedman v. City of Highland Park*, No. 15-133, <u>2015 WL 5139321</u> ..............22

Mariel Alper, Ph.D., and Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, U.S. Dep't of Just., Off. of Just. Progs., Bureau of Just. Stats. (<u>Jan. 2019</u>), https://bit.ly/31VjRa9 ....................24

Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, Fortune (June 20, 2018), https://bit.ly/2OJC72H ...............................21

D'Vera Cohn et al., *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware*, Pew Rsch. Ctr. (May 7, 2013), https://pewrsr.ch/3qwE94l..............36

Frank H. Easterbrook, *Abstraction and Authority*,
59 U. Chi. L. Rev. 349 (1992) .....................................11

*Educational Attainment in the United States: 2019*, U.S. Census Bureau (Mar. 30, 2020), https://bit.ly/3qBy077............................22

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, Crime in the United States, 2019, FBI, U.S. Dep't of Just., https://bit.ly/31WmQ1V ...............................23

*First-Time Gun Buyers Grow to Nearly 5 Million in 2020*,
  NSSF (Aug. 24, 2020), https://bit.ly/37xFH6F ....................................................22

James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving
  Beyond Newtown*, 18 Homicide Studies 125 (2013) ..................................36, 37

Dan Gross, *I Helped Lead the Gun Control Movement. It's Asking the Wrong
  Questions.* N.Y. Times (Apr. 8, 2021), https://nyti.ms/3uLsznE .................36, 38

Dan Haar, *America's Rifle: Rise of the AR-15*,
  *Hartford Courant* (Mar. 9, 2013), https://bit.ly/2NFDxuD ...............................21

Robert A. Hahn et al., *Firearms Laws and the Reduction of Violence:
  A Systematic Review*, 28 Am. J. Prev. Med. 40 (2005) ......................................40

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the
  Right To "Bear Arms,"* 49 L. & Contemp. Probs. 151 (1986)....................41, 42

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the
  Abortion Analogue*, 60 Hastings L.J. 1285 (2009) .............................................21

Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*,
  82 Va. L. Rev. 1 (1996) ......................................................................................11

Gary Kleck & Mark Gertz, *Armed Resistance to Crime: The Prevalence and
  Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Crim'y 150 (1995),
  https://bit.ly/2Zv7lgj ...........................................................................................42

Gary Kleck, *Targeting Guns: Firearms and their Control* 112 (1997)...................23

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
  20 J. Contemp. L. 381 (1994) ..............................................................17, 19, 20

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault
  Weapons Ban: Impacts on Gun Markets and Gun Violence,
  1994-2003,* Rep. to the Nat'l Inst. of Just., U.S. Dep't of Just.
  (June 2004).......................................................................................38, 39, 40, 41

Christopher S. Koper, *America's Experience with the Federal Assault
  Weapons Ban*, *1994–2004*, *in* Reducing Gun Violence In America:
  Informing Policy with Evidence and Analysis
  (Daniel W. Webster & Jon S. Vernick eds., 2013)..................................36, 39, 40

vii

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Crim'y & Pub. Pol'y 147 (2020) ..................................................................18

Walt Kuleck & Greg King, *The New AR-15 Complete Owner's Guide* (2014)..................................................................................................................20

Memorandum from Assoc. Director (Compliance Operations), BATFE, to Director, BATFE, re: Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles (July 6, 1989), https://bit.ly/2M5TGcm..........................................................16

Frank Miniter, *The Future of the Gun* 35 (2014)..............................................18, 23

National Research Council, *Firearms and Violence: A Critical Review* (Charles F. Wellford et al. eds., 2005)..................................................................40

NSSF, *Industry Intelligence Reports: Firearm Production in the United States* 7 (2020), https://bit.ly/3blGybB ..................................................................21, 24

Anthony J. Pinizzotto et al., *Violent Encounters* (U.S. Dep't of Just. 2006)........41

*Rifle Marksmanship: M16-/M4-Series Weapons*, Dep't of the Army (2008), https://bit.ly/3pvS3SW ............................................17

Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 (Final Report)* 79 (Mar. 13, 1997), https://urbn.is/3u91ACW ......................................................39

*Shared Micromobility in the U.S.: 2018*, Nat'l Ass'n of City Transp. Offs., https://bit.ly/3dHb2rF ......................................................................................21

P.K. Stefanopoulos et al., *Wound Ballistics of Firearm-Related Injuries— Part 2: Mechanisms of Skeletal Injury and Characteristics of Maxillofacial Ballistic Trauma*, 44 Int'l J. of Oral & Maxillofacial Surgery 67 (2015) ....18, 19

Josh Sugarmann, *Assault Weapons and Accessories in America*, Conclusion (Violence Policy Center 1988), https://bit.ly/2Zx7mjH ......................................16

Task Force on Community Preventive Services, *Recommendations To Reduce Violence Through Early Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*, 28 Am. J. Prev. Med. 6 (2005)..............................40

Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim'y & Pub. Pol'y 171 (2020) ............................................................37, 38

James D. Wright & Peter H. Rossi, *Armed & Considered Dangerous* (2d ed. 2017) ............................................................................................41

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1255__        Caption: _Dominic Bianchi v. Brian Frosh_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Dominic Bianchi, an individual and resident of Baltimore County_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.  Does party/amicus have any parent corporations? ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?            ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?            ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: s/David H. Thompson          Date:      03/17/21

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1255__    Caption: __Dominic Bianchi v. Brian Frosh__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__David Snope, an individual and resident of Baltimore County__
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations? ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                   ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: s/David H. Thompson                        Date:         03/17/21

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1255__        Caption: Dominic Bianchi v. Brian Frosh _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Micah Schaefer, an individual and resident of Anne Arundel County _____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                           ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
    other publicly held entity?                                              ☐YES ☑NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/David H. Thompson                    Date:        03/17/21

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1255__      Caption: __Dominic Bianchi v. Brian Frosh__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Field Traders LLC, a resident of Anne Arundel County__
(name of party/amicus)

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.    Does party/amicus have any parent corporations? ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/David H. Thompson _____          Date: _____ 03/17/21 _____

Counsel for: Appellants _____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1255__     Caption: __Dominic Bianchi v. Brian Frosh_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Firearms Policy Coalition, Inc._____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                             ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                 ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?        ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: **s/David H. Thompson**                    Date:          **03/17/21**

Counsel for: **Appellants**

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-1255_    Caption: _Dominic Bianchi v. Brian Frosh_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Second Amendment Foundation_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.  Does party/amicus have any parent corporations? ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                ☐YES☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                ☐YES☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: s/David H. Thompson                    Date:        03/17/21

Counsel for: Appellants

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-1255__     Caption: __Dominic Bianchi v. Brian Frosh_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Citizens Committee for the Right to Keep and Bear Arms_____
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                      ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:



3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                    ☐YES ☑NO
     If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/David H. Thompson      Date:    03/17/21

Counsel for: Appellants

- 2 -

Print to PDF for Filing

# INTRODUCTION

Maryland bans its law-abiding citizens from protecting themselves, their families, and their homes with semiautomatic rifles it inaccurately and tendentiously deems to be "assault weapons." Under *District of Columbia v. Heller*, the State can justify its Semiautomatic Rifle Ban only by proving that the prohibited firearms are not " 'in common use' . . . for lawful purposes like self-defense," but rather are "highly unusual in society at large." 554 U.S. 570, 624, 628 (2008) (quoting *United States v. Miller,* 307 U.S. 174, 179 (1939)); *see also Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) ("The pertinent Second Amendment inquiry is whether [the banned arms] are commonly possessed by law-abiding citizens for lawful purposes today.").

That is a hopeless task. The semiautomatic rifles the State misleadingly calls "assault weapons" include some of the nation's most common firearms. Indeed, millions of Americans possess the rifles banned by this act for lawful purposes. These arms are no more powerful than rifles that are not banned, and they fire at the same rate as all semiautomatics—one round for each pull of the trigger. To the extent the features that make a rifle an "assault weapon" make a functional difference at all, they promote accuracy and hence make a firearm safer and more effective for self-defense. The banned rifles are in common use, therefore, and the Second Amendment applies to them.

Because the Second Amendment "applies to" the banned rifles, it follows under *Heller* that "citizens must be permitted to use [them] for the core lawful purpose of self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010) (cleaned up). Laws banning protected firearms are "off the table," *Heller*, 554 U.S. at 636, and Maryland's ban of such arms is therefore categorically unconstitutional.

To be sure, Appellants acknowledge that the result they seek is contrary to *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), and that a panel of this Court is bound by that decision to rule in the State's favor. Appellants submit, however, that *Kolbe* was wrongly decided, and they therefore continue to pursue this litigation to vindicate their Second Amendment rights and seek to have *Kolbe* overruled by a court competent to do so.

## JURISDICTION

Appellants allege that provisions of Maryland law violate the United States Constitution. JA 21–23 ¶¶ 64–73. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this case involves a constitutional challenge to state law. The district court entered judgment on March 4, 2021, and Appellants noticed their appeal on March 5, 2021. JA 42, 44. The appeal is from a final judgment that disposes of all parties' claims. *Id.* This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

2

## ISSUE PRESENTED

Whether Maryland's ban on commonly possessed rifles that the State mischaracterizes as "assault weapons" violates the Second Amendment, as incorporated against the State of Maryland by the Fourteenth Amendment.

## STATEMENT OF THE CASE

### I.     Maryland's Semiautomatic Rifle Ban

The State of Maryland deems scores of common semiautomatic rifles "assault weapons"—and bans them outright. Md. Code Ann., Crim. Law §§ 4-301, 4-303; *id.*, Pub. Safety § 5-101(r)(2). The State also has banned any "copy" of the enumerated rifles, *id.*, as well as the following "copycat weapon[s]":

> (i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
>> 1. a folding stock;
>> 2. a grenade launcher or flare launcher; or
>> 3. a flash suppressor;
> (ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;
> (iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches.[1]

*Id.*, Crim. Law § 4-301(h).

Maryland's broad ban on transporting, possessing, offering to sell, transferring, purchasing, or receiving any "assault" rifle applies to everyone who

---

[1] Maryland also prohibits certain semiautomatic pistols and shotguns. On appeal, Plaintiffs-Appellants challenge only Maryland's ban on semiautomatic rifles.

3

does not fall into one of a few, specific, narrow categories—primarily on-duty military personnel, law enforcement officers, and certain other government officials. *See id.*, Crim. Law §§ 4-302, 4-303(b)(2), (4)–(5).

Ordinary citizens may transport or possess "assault" rifles, including "copycat weapon[s]," only if they possessed, purchased, or applied to purchase them on or before October 1, 2013. *Id.* § 4-303(a), (b)(3).

If an ordinary, law-abiding citizen keeps or bears a rifle that does not fall into this grandfathered category, and Maryland's Semiautomatic Rifle Ban has dubbed that arm an "assault weapon," Appellees or their agents may seize and dispose of that arm, regardless of whether it is in common use. *See id.* § 4-304. Moreover, any ordinary, law-abiding citizen who possesses such "assault weapons," or transports them into the State, commits a criminal offense and is subject to severe sanctions, including imprisonment for up to three years for the first offense. *Id.* §§ 4-303, 4-306(a). Further, under both state and federal law, conviction under these provisions results in a lifetime ban on possession even of firearms that have not been prohibited as "assault weapons." *See id.*, Pub. Safety §§ 5-101(g)(3), 5-133(b)(1), 5-205(b)(1) (Maryland law); 18 U.S.C. §§ 922(g)(1), 921(a)(20) (federal law).

## II.   The Ban's Effect on Plaintiffs-Appellants

Dominic Bianchi, David Snope, and Micah Schaefer are ordinary, law-abiding, adult citizens of Maryland. *See* JA 7 ¶¶ 9–11. None has been convicted of

a felony or adjudicated mentally incompetent, nor is any of them otherwise prohibited under Maryland or federal law from purchasing, acquiring, and possessing operable firearms. *See id.* Each individual wants to acquire a banned firearm for self-defense and other lawful purposes but has been barred from doing so by Maryland's Semiautomatic Rifle Ban. JA 17–18 ¶¶ 40–42; JA 19 ¶ 48. And Firearms Policy Coalition, Inc., Second Amendment Foundation, and Citizens Committee for the Right to Keep and Bear Arms each have numerous members in Maryland who, like the individual plaintiffs in this case, are otherwise eligible to acquire banned firearms and would do so, but for the Ban. JA 18–19 ¶¶ 45–48.

Finally, Field Traders LLC is likewise injured by the Semiautomatic Firearm Ban. Field Traders is a licensed firearm dealer in Maryland that has been forced to forgo numerous firearm sales to lawful purchasers because of the Ban. JA 7 ¶ 12; JA18 ¶¶ 43–44.

## III.   Course of Proceedings

On December 1, 2020, Appellants filed this action for declaratory and injunctive relief in the U.S. District Court for the District of Maryland, JA 23–24, alleging that Maryland's categorical ban on the possession of common semiautomatic firearms tendentiously and inaccurately labelled "assault weapons" was facially unconstitutional under the Second Amendment, which is applicable to Maryland under the Fourteenth Amendment. JA 21–22. Appellants' Complaint

5

conceded that their Second Amendment claim was foreclosed at the district-court level by this Court's decision in *Kolbe*, 849 F.3d 114, which upheld Maryland's Semiautomatic Rifle Ban against an earlier Second Amendment challenge. JA 6 ¶ 5.

Noting this concession, on February 16, 2021, the district court ordered Appellants to show cause why their case should not be dismissed *sua sponte* for failure to state a claim upon which relief may be granted. JA 40–41. In response, Appellants again acknowledged that *Kolbe* is controlling, but argued that it was wrongly decided and should be overruled by a court competent to do so. Pls.' Resp. to the Ct.'s Order To Show Cause, Doc. 27 (Feb. 19, 2021). On March 4, 2021, the court dismissed Appellants' complaint, finding "no discretion but" to do so because "Plaintiffs' theory is foreclosed by the Fourth Circuit's opinion deciding *Kolbe v. Hogan*." JA 42.

On March 5, 2021, Appellants timely noticed their appeal. JA 44.

## SUMMARY OF THE ARGUMENT

The Second Amendment guarantees law-abiding citizens the right to possess and use firearms. Maryland infringes this right by prohibiting its citizens from possessing popular semiautomatic rifles that it labels "assault weapons." Like the District of Columbia's handgun ban, Maryland's ban would fail either under *Heller*'s categorical test or under any standard of heightened constitutional scrutiny. Although *Kolbe* bound the district court to rule as it did, it was error to find that

6

Maryland's ban does not violate the Second Amendment. *Kolbe* should be overturned by a court competent to do so.

## ARGUMENT

This Court "review[s] a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) de novo, 'assuming as true the complaint's factual allegations and construing all reasonable inferences in favor of the plaintiff.' " *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 260 (4th Cir. 2020) (quoting *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *see also Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 (4th Cir. 2006) (reviewing *sua sponte* dismissal *de novo*).

At the heart of this case is a simple question: Are the semiautomatic rifles banned by Maryland "Arms" protected by the Second Amendment? If they are, their prohibition is flatly unconstitutional. This necessarily follows from the Supreme Court's decision in *Heller*, which established that law-abiding citizens are entitled to own firearms that are in common use, full stop. Under *McDonald*, moreover, the Second Amendment applies against the states via the Fourteenth Amendment, 561 U.S. at 749, 778, thus binding Maryland.

But in *Kolbe*, the Fourth Circuit failed to apply *Heller*'s common-use test. Instead of applying the test prescribed by Supreme Court precedent, *Kolbe* applied a test of its own devising and held that the banned arms are constitutionally

unprotected because they purportedly are "like" arms that are most useful in military service. *Kolbe*, 849 F.3d at 137. The *Kolbe* majority departed from *Heller* a second time in an alternative analysis, applying a tiers-of-scrutiny balancing test advocated by Justice Breyer's *dissent* in *Heller*, but rejected by the Court. And *Kolbe* further erred in applying the tiers-of-scrutiny test that *Heller* set aside, since under any standard of heightened constitutional scrutiny Maryland's Semiautomatic Rifle Ban violates the Second Amendment. Thus, *Kolbe* should be overturned by a court competent to do so, and Appellants' Second Amendment rights should be vindicated.

## I.     The Second Amendment Protects "Arms" That Are in Common Use.

### A.     Common Use Among Present-Day, Law-Abiding Citizens Nationwide Is Determinative.

The text of the Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. *Heller* holds that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582; *accord Caetano*, 577 U.S. at 411. The burden thus falls on the government to demonstrate that a particular type of bearable arm falls outside the Second Amendment's scope. *See Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011) (The government bears the burden to "establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right.").

8

To meet this burden, Appellees must show that an arm is "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see also id.* at 627 (arms "highly unusual in society at large" are not protected). This standard is based on historical practices and "the historical understanding of the scope of the right." *Heller*, 554 U.S. at 625. On the one hand, "[t]he traditional militia" that the Second Amendment was designed to protect "was formed from a pool of men bringing arms in common use at the time for lawful purposes like self-defense." *Id.* at 624 (quotation marks omitted). On the other hand, the right to bear arms coexisted with a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 627.

Courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[w]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* at 629 (emphasis added). Thus, if the government cannot show that a certain type of firearm is "not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, that is the end of the matter—firearms of that type are protected "Arms" and cannot be banned.

9

*McDonald* underscores this point. In dissent, Justice Breyer argued against incorporation of the Second Amendment right because "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make," such as, "What sort of guns are necessary for self-defense? Handguns? Rifles? Semiautomatic weapons? When is a gun semiautomatic?" 561 U.S. at 922–23 (Breyer, J., dissenting). Justice Alito's controlling opinion squarely rejected this argument: "Justice BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions . . . . [W]hile his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion." *Id*. at 790–91 (plurality opinion). When determining which arms are protected, it is the choices commonly made by the American People that matter, not judges' or legislators' assessments of those choices.

It is likewise irrelevant that criminals may prefer to use a certain firearm for the same reasons that law-abiding citizens use it. In *Heller*, Justice Breyer emphasized that "the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous." 554 U.S. at 711 (Breyer, J., dissenting). The majority, by contrast, focused on the choices of law-abiding citizens, not the choices of criminals or the reasons why criminals make those choices. *Heller* thus makes clear that focusing on how criminals might *misuse*

10

firearms is the wrong analytical approach. Instead, the proper question under the Second Amendment is whether *law-abiding citizens* use certain arms for self-defense and other lawful purposes.

To be clear, the Second Amendment looks to the practices of the American People *nationwide*, *see Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*" (emphasis added)). Thus, the Amendment protects those who live in states or localities with a less robust tradition of protecting the right to keep and bear arms from outlier legislation (like Maryland's ban here) that falls short of national standards. In this way, the Second Amendment is similar to many other constitutional guarantees that hold state and local governments to minimum standards that are acceptable nationwide, for "constitutional adjudication frequently involves the justices' seizing upon a dominant national consensus and imposing it on resisting local outliers," Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 Va. L. Rev. 1, 16 (1996). More pithily, the Supreme Court "obliterates outliers." Frank H. Easterbrook, *Abstraction and Authority*, 59 U. Chi. L. Rev. 349, 370 (1992). *Heller*'s common-use test facilitates a similar outcome in the Second Amendment context. *See, e.g.*, *Heller*, 554 U.S. at 629.

11

Finally, the Second Amendment inquiry focuses on the choices commonly made by *contemporary* law-abiding citizens. *Heller* emphasized that the District of Columbia's "handgun ban amounts to a prohibition of an entire class of 'arms' that *is* overwhelmingly chosen by American society" for self-defense, *id*. at 628 (emphasis added), and it rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *id*. at 582. In *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 577 U.S. 411–12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.*

## B.   *Kolbe*'s "Military Service" Test Is Incompatible with *Heller*.

The en banc court in *Kolbe* did not deny that the semiautomatic rifles Maryland bans are in common use. Instead, the court interpreted *Heller* to exclude from Second Amendment protection any firearms that "are 'like' 'M-16 rifles'— 'weapons that are most useful in military service,' " 849 F.3d at 135 (quoting *Heller*, 554 U.S. at 627). This position is a misreading of *Heller*, however, and should be abandoned.

The relevant passage in *Heller* is part of the Court's explanation that "dangerous and unusual weapons" are not "Arms" under the Second Amendment.

12

To that end, the Court notes that "[i]t may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause." 554 U.S. at 627. To the *possibility* that weapons extremely useful in military service may be banned—if, that is, they are "highly unusual in society at large"—the Court responds: "[T]he fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." *Id.* at 627–28.

*Kolbe* seizes on the Court's oblique reference to "M–16 rifles and the like" and transmutes that aside into the key to understanding which firearms the Second Amendment protects. But far from "dr[awing] a 'bright line' . . . between weapons that are most useful in military service and those that are not," *Kolbe*, 849 F.3d at 136–37, *Heller* repeatedly *refused* to draw a line based on the usefulness of weapons in war, *see* 554 U.S. at 581, 624–25. As Justice Alito noted in his concurrence to *Caetano*, "[T]he Second Amendment . . . protects . . . weapons as a class, *regardless* of any particular weapon's suitability for military use." 577 U.S. at 419 (emphasis added).

On this point, *Kolbe* directly contradicts *Heller* and, in the process, threatens to empty the key constitutional term "Arms"—and thus the Second Amendment more broadly—of meaning. As Judge Traxler noted in his dissent, "nearly all

13

firearms can be useful in military service." 849 F.3d at 157 (Traxler, J., dissenting). Certainly, "a settler's musket, the only weapon he would likely own and bring to militia service, would be most useful in military service—undoubtedly a weapon of war." *Id.* at 156 (Traxler, J., dissenting). Indeed, it would be passing strange if usefulness in military service disqualified a firearm from Second Amendment protection, as *Heller* makes clear that a primary *reason* the Second Amendment was included in the Constitution was to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. The Second Amendment would not "assure the existence of a 'citizen's militia' as a safeguard against tyranny" if it left the government free to ban commonly held arms most useful in militia service. *Id.* at 600.

It is no answer to say that only *modern* weapons useful in military service are unprotected, *see Kolbe*, 849 F.3d at 143. Again, "[t]his is inconsistent with *Heller*'s clear statement that the Second Amendment 'extends . . . to . . . arms . . . that were not in existence at the time of the founding.' " *Caetano*, 577 U.S. at 412.

The short of it is this: *Kolbe* is flatly incompatible with *Heller* and *Caetano*. No other circuit has joined its reasoning, and a panel of the Ninth Circuit has explicitly rejected it. *Duncan v. Becerra*, 970 F.3d 1133, 1149 (9th Cir. 2020), *reh'g en banc granted, op. vacated by* 988 F.3d 1209 (2021)[2]; *see also Hollis v. Lynch*,

---

[2] Although the en banc court has vacated the *Duncan* panel's opinion pending its review of the case, the opinion retains its persuasive force and we accordingly cite it for that purpose in this brief.

827 F.3d 436, 445–46 (5th Cir. 2016) (affirming that "protected weapons are 'those in common use at the time,'" even "though that category at times may overlap" with the category of weapons that "are useful in the militia or military"). *Duncan*, not *Kolbe*, correctly identifies "the test announced by the Supreme Court in *Heller* and *Caetano*: Arms are not unusual if commonly owned and typically used by law-abiding citizens for lawful purposes." *Duncan*, 970 F.3d at 1149; *accord Hollis*, 827 F.3d at 446.

## II.    The Rifles Banned by Maryland's Semiautomatic Rifle Ban Are in Common Use.

Maryland bans a list of specifically identified rifles, Md. Code Ann., Crim. Law §§ 4-301, 4-303; *id.*, Pub. Safety § 5-101(r)(2), "cop[ies]" of such rifles, *id.*, and semiautomatic rifles with certain features, *id.*, Crim Law §§ 4-301(h), 4-303. The modern sporting rifle, especially the AR-15, is representative of what Maryland's Semiautomatic Rifle Ban prohibits. *See Kolbe*, 849 F.3d at 120 (4th Cir. 2017). Both these facts—that Maryland targets semiautomatic rifles and that the modern sporting rifle is representative of those firearms—demonstrate that Maryland bans arms protected by the Second Amendment.

### A.    Semiautomatic Rifles Are in Common Use.

There is no class of firearms known as "semiautomatic assault weapons." "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . . ." *Stenberg v. Carhart*,

530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). Anti-gun publicists promoting "assault weapons" bans have sought to exploit "the public's confusion over fully automatic machine guns versus semi-automatic assault weapons" to "increase the chance of public support for restrictions on these weapons." Josh Sugarmann, *Assault Weapons and Accessories in America*, Conclusion (Violence Policy Center 1988), https://bit.ly/2Zx7mjH; *see also* Memorandum from Assoc. Director (Compliance Operations), BATFE, to Director, BATFE, re: Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles at 5–6 (July 6, 1989), https://bit.ly/2M5TGcm ("[I]t is somewhat of a misnomer to refer to [semi-automatic] weapons as 'assault rifles' " because "[t]rue assault rifles are selective fire weapons that will fire in a fully automatic mode.").

While "semiautomatic assault weapons" is not a recognized category of firearms, "semiautomatic" is. And it is semiautomatic rifles that Maryland's "assault weapons" ban targets. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will *not* fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994); *Gun Owners of Am., Inc. v. Garland*, No. 19-1298,

16

2021 WL 1138111, at * 19 (6th Cir. Mar. 25, 2021). There is a significant practical difference between a truly automatic and a merely semiautomatic rifle. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. *Rifle Marksmanship: M16-/M4-Series Weapons*, Dep't of the Army 2-1 tbl. 2-1 (2008), https://bit.ly/3pvS3SW.

There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles. The Supreme Court has held as much, concluding in *Staples* that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 413 (1994). Yet apart from the now-expired ten-year federal "assault weapons" ban, the Federal Government has not banned them. And currently the vast majority of States do not ban semiautomatic "assault weapons."[3]

---

[3] In addition to Maryland, only California, Connecticut, Hawaii, Massachusetts, New Jersey, and New York, as well as the District of Columbia, have enacted bans on "assault weapons," with varying definitions of the prohibited firearms. *See* Cal. Penal Code §§ 30600, 30605; Haw. Rev. Stat. § 134-8; Mass. Gen.

## B.    Banned Semiautomatic Rifles Are Not Materially Distinguishable from Other Semiautomatic Rifles.

It is no answer to say that Maryland bans only a subset of semiautomatic rifles. Indeed, this line of argument is foreclosed not only by *Heller* but also by *Staples*, which identified the AR-15—the archetypal "assault weapon"—as a traditionally lawful firearm. *See* 511 U.S. at 603, 611.

The firearms that Maryland bans are not distinguishable for being more dangerous than rifles that the State does not ban. "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Crim'y & Pub. Pol'y 147, 149 (2020). Indeed, the AR-15 is typically chambered for .223in/5.56mm ammunition, *see, e.g.*, *Worman v. Healey*, 293 F. Supp. 3d 251, 258 (D. Mass. 2018), *aff'd*, 922 F.3d 26 (1st Cir. 2019), which "makes it safer to use as a home-defense gun because this lighter caliber is less likely to travel through walls," Frank Miniter, *The Future of the Gun* 35 (2014). Of course, modern sporting rifles like the AR-15 discharge with high energy, but that is true of rifles generally, as well as many handguns. *See, e.g.*,

---

Laws ch. 140, § 131M; N.J. Stat. §§ 2C:39-5(f), 2C:39-9(g); N.Y. Penal Law §§ 265.02(7), 265.10(1)–(3); D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c)).

P.K. Stefanopoulos et al., *Wound Ballistics of Firearm-Related Injuries—Part 2: Mechanisms of Skeletal Injury and Characteristics of Maxillofacial Ballistic Trauma*, 44 Int'l J. of Oral & Maxillofacial Surgery 67, 68 (2015) ("Military and hunting rifles, as well as Magnum handguns, produce high-energy injuries.). And "[a]bove all, potentially lethal or disabling effects depend more upon the anatomical track of the missile rather than its energy transfer characteristics." *Id.* at 69. Finally, the rifles Maryland bans also fire at the same rate as all other semiautomatics—one round for each pull of the trigger. The features banned by Maryland do not increase the rapidity with which a rifle can be fired.

To the extent the cosmetic features singled out by Maryland's Semiautomatic Rifle Ban make any functional difference, they tend to *improve* a firearm's utility and safety for self-defense and other lawful purposes. For example:

- A folding stock increases maneuverability in tight home quarters, Kopel, *supra*, at 398–99, as well as enabling safe storage of defense instruments in accessible spaces.

- A flash suppressor is a "common accessory" that "reduces the flash of light" from a firearm shot, thus reducing the chance that a home-invader will mark his victim's position, as well as decreasing the homeowner's blindness—"the momentary blindness caused by the sudden flash of light from the explosion of gunpowder." *Id.* at 397.

19

- A semiautomatic centerfire rifle that has an overall length of less than twenty-nine inches, but which meets the federal overall length requirement of twenty-six inches, is helpful in home-defense situations because of its reduced mass at the firearm's least supported position, to those of smaller stature or less strength, and to reduce the length of the barrel to better move around obstacles and through hallways, for example. *See* Walt Kuleck & Greg King, *The New AR-15 Complete Owner's Guide* 81 (2014) (in self-defense, "[t]he shortest practical overall length is usually considered a 'good thing' ").

### C.    Banned Firearms Are Typically Possessed for Lawful Purposes.

Maryland bans firearms with legitimate, safety-improving features law-abiding citizens may prefer to use for self-defense and other lawful purposes. But under *Heller*, of course, the key point is that millions of law-abiding citizens choose to possess firearms with those features. *Duncan*, 970 F.3d at 1147 ("Commonality is determined largely by statistics."); *Ass'n of N.J. Rifle & Pistol Clubs*, *Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are

indeed in 'common use.' "). This is demonstrated by the AR-15 and other modern sporting rifles, which epitomize the firearms that Maryland bans.

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 Hastings L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR-15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, *Hartford Courant* (Mar. 9, 2013), https://bit.ly/2NFDxuD; *see also Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).

Today, the number of AR-rifles and other modern sporting rifles in circulation in the United States approaches twenty million. NSSF, *Industry Intelligence Reports: Firearm Production in the United States* 7 (2020), https://bit.ly/3blGybB. As one contrast, apparently ubiquitous public e-scooters numbered only 85,000 and were available in only 100 U.S. cities, as of 2018. *Shared Micromobility in the U.S.: 2018*, Nat'l Ass'n of City Transp. Offs., https://bit.ly/3dHb2rF (last visited Apr. 13, 2021). According to industry sources, as of 2018, roughly thirty-five percent of all newly manufactured guns sold in America are modern sporting rifles, Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, Fortune (June 20, 2018), https://bit.ly/2OJC72H, and an estimated five million Americans purchased

21

firearms for the first time in 2020, *First-Time Gun Buyers Grow to Nearly 5 Million in 2020*, NSSF (Aug. 24, 2020), https://bit.ly/37xFH6F. Thus, millions more Americans likely own AR-style rifles now than did in 2013, when "nearly 5,000,000 people owned at least one semiautomatic assault weapon." *Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019). Even if ownership had not increased, so-called assault weapons would be more common than either professional or doctoral degrees.[4]

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. In a 2013 survey of 21,942 confirmed owners of such firearms, home-defense followed (closely) only recreational target shooting as the most important reason for owning these firearms. Amicus Curiae Br. of the Nat'l Shooting Sports Found. in Supp. of Pet'rs, *Friedman v. City of Highland Park*, No. 15-133, 2015 WL 5139321, at *13; *see also Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014), *aff'd sub nom. Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). Both purposes are plainly lawful (and also related, as "maintain[ing] proficiency in firearm use [is] an important corollary to . . . self-defense," *Ezell*, 651 F.3d at 708). "An additional survey estimated that approximately 11,977,000 people participated in target shooting with a modern

---

[4] As of 2019, only 4,557,000 noninstitutionalized civilians had doctoral degrees, and still fewer—3,150,000—had professional degrees. *Educational Attainment in the United States: 2019*, U.S. Census Bureau tbl. 1 (Mar. 30, 2020), https://bit.ly/3qBy077.

sporting rifle," *Friedman*, 68 F. Supp. 3d at 904, and indeed the "AR-15 type rifle

. . . is the leading type of firearm used in national matches and in other matches

sponsored by the congressionally established Civilian Marksmanship program."

*Shew v. Malloy*, 994 F.Supp. 2d 234, 245 n.40 (D. Conn. 2014). Overall, AR-style

rifles

> are popular with civilians and law enforcement around the world
> because they're accurate, light, portable, and modular. . . . [The AR-
> style rifle is] also easy to shoot and has little recoil, making it popular
> with women. The AR-15 is so user-friendly that a group called
> 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it
> possible for people who can't handle a bolt-action or other rifle type to
> shoot and protect themselves.

Miniter, *supra*, at 35.

The fact that "assault" rifles are used extremely rarely in crime underscores

that AR-15s and other banned rifles are commonly possessed by law-abiding citizens

for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are

'assault rifles.' " Gary Kleck, *Targeting Guns: Firearms and their Control* 112

(1997). In 2019, only 364 out of 13,927 murders were committed with *any* type of

rifle. *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*,

Crime in the United States, 2019, FBI, U.S. Dep't of Just., https://bit.ly/31WmQ1V

(last visited Apr. 13, 2021). Murder by "hands, fists, feet, etc." was almost twice as

common. *Id.* Even in the counterfactual event that a different modern sporting rifle

had been involved in each rifle-related murder, an infinitesimal percentage of the

23

19.8 million modern sporting rifles in circulation in the United States by 2018 (NSSF, *supra*, at 7)—around .002 percent—would have been used for that unlawful purpose. More broadly, as of 2016, only .8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper, Ph.D., and Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, U.S. Dep't of Just., Off. of Just. Progs., Bureau of Just. Stats. 5 tbl. 3 (Jan. 2019), https://bit.ly/31VjRa9.

Finally, the Supreme Court's decision in *Caetano* further confirms that the arms banned by Maryland are in common use. That case concerned Massachusetts's ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected by the Second Amendment. 577 U.S. at 411. With a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411–12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, *see id.*, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J., concurring) (cleaned up) (citation omitted). Of course, that is far fewer than the millions of semiautomatic rifles sold to private citizens nationwide that Maryland bans.

24

## III.   A Ban on Protected Arms Is Flatly Unconstitutional.

### A.   *Heller*'s Test Is Clear and Categorical.

Given that the Second Amendment extends to the arms that Maryland bans, *Heller* makes the next analytical steps clear. The text of the Second Amendment provides that "the right of the people to keep and bear Arms, *shall not be infringed*." U.S. Const. amend. II (emphasis added). In this light, in *Heller*, the Supreme Court held that the Second Amendment "*elevates above all other interests* the right of law-abiding, responsible citizens to use *arms* in defense of hearth and home." 554 U.S. at 634–35 (emphases added). Thus, all that needs to be done to resolve a challenge to a flat ban on possession of certain rifles is to determine whether they are "Arms" protected by the Second Amendment. Any further evaluation of allegedly competing public-policy considerations is foreclosed by the constitutional text. That text is the "very *product* of an interest balancing by the people," and "[t]he very enumeration of the right [to keep and bear arms] takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.*

*McDonald* confirms this understanding of *Heller*. There, the Court explained that,

> in *Heller*, we held that individual self-defense is the central component of the Second Amendment right. Explaining that the need for defense of self, family, and property is most acute in the home, we found that this right applies to handguns because they are the most preferred

25

> firearm in the nation to keep and use for protection of one's home and family. Thus, we concluded, citizens must be permitted to use handguns for the core lawful purpose of self-defense.

561 U.S. at 767–68 (cleaned up). In short, because the Court found that the Second Amendment "*applies* to handguns," it concluded that "citizens *must* be permitted to use" them. *Id*. (emphases added).

Then in *Caetano*, the Court summarily and unanimously reversed a decision of the Massachusetts Supreme Judicial Court that had departed from this approach in upholding a ban on stun guns. 577 U.S. at 411–12. The Massachusetts court got the message: "Having received guidance from the Supreme Court in *Caetano II*, we now conclude that stun guns are 'arms' within the protection of the Second Amendment. Therefore, under the Second Amendment, the possession of stun guns may be regulated, but not absolutely banned." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). Soon thereafter, the Illinois Supreme Court ruled likewise, holding that, because "stun guns and tasers are bearable arms that fall within the scope of the second amendment," a ban on such weapons "necessarily cannot stand." *People v. Webb*, 131 N.E.3d 93, 97–98 (Ill. 2019). So too here, because the Second Amendment applies to the semiautomatic rifles at issue in this case, Maryland's provision categorically banning those arms necessarily cannot stand.

## B.    Means-End Scrutiny May Be Limited.

Instead of *Heller*'s history-and-tradition approach, however, *Kolbe* in its alternative analysis applied means-end scrutiny, citing its earlier decision in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010). *Chester*, however, involved a challenge to the federal ban on domestic-violence offenders possessing firearms, not a ban on law-abiding citizens owning some of the most popular firearms in the nation. This should have made a difference. For example, the Seventh Circuit, despite typically applying a levels-of-scrutiny inquiry to Second Amendment claims, has recognized that certain laws are so antithetical to the Second Amendment that they are "categorically unconstitutional." *Ezell*, 651 F.3d at 703. Thus, it has held that the State of Illinois's "flat ban on carrying ready-to-use guns outside the home" was flatly unconstitutional. *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012). The D.C. Circuit similarly struck down categorically a District law that had the effect of banning typical citizens from carrying firearms in public under "*Heller I*'s categorical approach . . . even though [the court's] previous cases ha[d] always applied tiers of scrutiny to gun laws." *Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017). As *Heller* demonstrates, a law banning possession of protected arms is the paradigmatic example of a law entirely inconsistent with the Second Amendment, and such laws are flatly unconstitutional regardless of whether a means-ends scrutiny test is applied to less burdensome laws.

27

## IV.    Maryland's Ban Fails Any Potentially Applicable Standard of Scrutiny.

### A.    Strict Scrutiny Is Applicable.

Even if Maryland's Semiautomatic Rifle Ban were not *categorically* unconstitutional, it should at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. *Kolbe*'s application of merely intermediate scrutiny, by contrast, relegates the Second Amendment to "a second-class right." *Id.* at 780 (plurality opinion).

*Kolbe* attempted to justify its milquetoast approach by pointing out that Maryland does not ban all firearms and by denying that so-called "assault weapons" constitute a class of firearms comparable to the class of handguns protected in *Heller*. 849 F.3d at 138. The *Kolbe* court had no authority, however, for the notion that only an absolute or near-absolute ban of all firearms triggers strict scrutiny, a rule that is unimaginable in other constitutional contexts. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (applying

strict scrutiny although plaintiff remained free to perform many religious practices); *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 798 (2011) (applying strict scrutiny although plaintiff remained free to engage in almost all speech).

Certainly, nothing in *Heller* suggests such an approach. There, the Supreme Court applied a test stricter than strict scrutiny to a possession ban on handguns even in the absence of a similar ban on long guns. *See Heller*, 554 U.S. at 629, 635. And *Heller* in no way intimated that the result would have been different had the District banned, not all handguns, but only a subset that included the most popular and reliable models. Again, "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Id*. at 629. As the D.C. Circuit decision affirmed by *Heller* put it, the District's attempt to justify its handgun ban on the grounds that " 'residents still have access to hundreds more' " types of firearm was "frivolous." *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007); *see also Duncan*, 970 F.3d at 1156. Thus, "restating the Second Amendment right in terms of what IS LEFT after the regulation rather than what EXISTED historically, as a means of lowering the level of scrutiny, is exactly backward from *Heller*'s reasoning." *Nat'l Rifle Ass'n of Am., Inc. v. BATFE*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J., dissenting from denial of reh'g en banc) (emphasis in original); *accord Duncan*, 366 F. Supp. 3d at 1157.

Courts do not always apply intermediate scrutiny in Second Amendment cases. As explained above, the Seventh Circuit struck down restrictions on carrying firearms in public as categorically inconsistent with the Second Amendment. *Moore*, 702 F.3d at 940. The Illinois Supreme Court did the same. *People v. Aguilar*, 2 N.E.3d 321, 327–28 (Ill. 2013). And the Seventh Circuit applied a standard "more rigorous" than intermediate scrutiny "if not quite 'strict scrutiny'" to order Chicago's ban on shooting ranges preliminarily enjoined. *Ezell*, 651 F.3d at 708.[5] This is noteworthy because the Seventh Circuits has applied intermediate scrutiny to other Second Amendment challenges. *United States v. Skoien*, 614 F.3d 638, 641–42 (7th Cir. 2010). The *Kolbe* court, at a minimum, should have applied strict scrutiny.

## B.     The Ban Withstands No Form of Heightened Scrutiny.

At any rate, Maryland's Semiautomatic Rifle Ban fails even under intermediate scrutiny.

1.     That is so, first, as a matter of law. By design, the Ban is intended to reduce firearm violence *by reducing the types of firearms available to the public*. *See Kolbe*, 849 F.3d at 140 ("[T]he primary goal of the FSA 'is to reduce the availability of assault long guns . . . .'"). That is "not a permissible strategy"—even

---

[5] The Ninth Circuit panel decision in *Duncan* applied strict scrutiny to a ban on a subset of "Arms"—only some, not all, magazines. *Duncan*, 970 F.3d at 1152.

if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free-speech doctrine.

The Supreme Court has held that governmental restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny still permits only restrictions whose purpose and effect is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters. Suppressing the expression itself is impermissible. *Id.* at 49. As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear, in defending a restriction as narrowly tailored to further an important or substantial governmental interest, the government must not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449. "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Heller v. District of*

31

*Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Grace*, 187 F. Supp. 3d at 148.

But that is precisely what Maryland has done here. Its Semiautomatic Rifle Ban does not regulate the *manner* of bearing arms or impose reasonable training and safety requirements. No, the Ban's purpose and effect is to *restrict the types of firearms available to the public*. Prohibitions such as the Ban thus "destroy[ ] the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . but by design." *Wrenn*, 864 F.3d at 666. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

2.    Even if the purpose and effect of Maryland's Semiautomatic Rifle Ban were not *intrinsically* unconstitutional, Maryland's ban would still fail constitutional muster because it is not sufficiently tailored to the government's asserted goals—in two separate ways. To survive intermediate scrutiny, first, the State must have considered alternatives to the course it adopted. *McCullen v. Coakley*, 573 U.S. 464, 494–95 (2014); *accord Bruni v. City of Pittsburgh*, 824 F.3d 353, 367–68 (3d Cir. 2016). "In other words, the government is obliged to demonstrate that it actually tried or considered less-[arms-bearing]-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020). Second, there must be "a close fit

32

between ends and means," *McCullen*, 573 U.S. at 486; *accord Bruni*, 824 F.3d at 365. That is, the government "must prove that the law in dispute does not 'regulate [bearing arms] in such a manner that a substantial portion of the burden on [arms-bearing] does not serve to advance its goals," *Billups*, 961 F.3d at 688 n.9 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)). Maryland's law is not sufficiently tailored in *either* sense.

The Ban fails the first *McCullen* requirement because nothing on the face of the statutes establishing Maryland's Semiautomatic Rifle Ban suggests that Maryland considered less restrictive alternatives. *See* Firearm Safety Act of 2013, 2013 Md. Laws Ch. 427 (S.B. 281); Criminal Procedure – Firearms – Transfer, 2018 Md. Laws Ch. 251 (H.B. 1646). To "justify its choice to adopt the [Semiautomatic Rifle Ban]," Maryland "would have to show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason." *See Bruni*, 824 F.3d at 370. These statutes do not even generally "say that other approaches have not worked," which in any event is "not enough" to overcome "the vital [Second] Amendment interests at stake." *See McCullen*, 573 U.S. at 496. Under the Second Amendment, Maryland unconstitutionally chose to "forego a range of alternatives—which would burden substantially less [arms-bearing] than a blanket prohibition on Plaintiffs' [possession of common arms]—without a meaningful record demonstrating that those options

33

would fail to alleviate the problems meant to be addressed." *See Bruni*, 824 F.3d at 371.

Maryland's Semiautomatic Rifle Ban separately fails the second *McCullen* requirement because it lacks a close fit between ends and means. One end that *Kolbe* identifies is "to reduce the availability of assault long guns . . . so that when a criminal acts, he does so with a less dangerous weapon and less severe consequences." *Kolbe*, 849 F.3d at 140. Of course, the purpose of reducing the availability of "Arms" fails intermediate scrutiny for violating secondary-effects doctrine, as discussed above. But its fit is faulty, too, because, as also discussed above, there is no reason to think "assault" rifles more dangerous than other rifles.

According to *Kolbe*, though, "[a]nother objective [of the Firearm Safety Act] is to prevent the unintentional misuse of assault weapons . . . by otherwise law-abiding citizens." *Id.* But there is a plain disconnect between the end of preventing unintentional misuse of something and the means of banning that thing altogether. All the worse is the fit between a ban and the end of supporting *law-abiding* citizens, who cannot be presumed to be irresponsible. Accordingly, when the Federal Government sought to ban certain speech in advertisements for fear that such speech would induce the general population to unintentionally misuse the product advertised, the Supreme Court invalidated that ban under intermediate scrutiny. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002). By the same principle,

34

Maryland's so-called "assault" rifles ban does not reasonably fit prevention of unintentional misuse of the arms it targets.

That leaves only the broadest end that *Kolbe* identified: "the protection of its citizenry and the public safety." 849 F.3d at 139. Of course, the District of Columbia identified the same end for the handgun ban reviewed in *Heller*. Yet, the Supreme Court held that the ban would fail "any of the standards of scrutiny [the Court has] applied to enumerated constitutional rights," *Heller*, 554 U.S. at 628—including intermediate scrutiny—even though handguns are "the overwhelmingly favorite weapon of armed criminals," *id.* at 682 (Breyer, J., dissenting).

Nor does *Kolbe* court's mention of mass shootings, 849 F.3d at 140, change anything. Justice Breyer argued in dissent that the District's handgun ban was "tailored to the urban crime problem in that it is local in scope and thus affects only a geographic area both limited in size and entirely urban." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). While this was not enough to save the District's ban, the fit between the problem of mass shootings and Maryland's ban on certain semiautomatic rifles is not even that tight. Mass shootings, of course, generally occur in public. Yet, Maryland bans semiautomatic "assault" rifles *even in the home*. This alone demonstrates that Maryland's "complete ban" cannot be justified, for "each activity within the proscription's scope [must be] an appropriately targeted evil."

35

*Ward*, 491 U.S. at 800. The problem of violence that takes place in public is not remedied by targeting possession of arms in the home.

Moreover, mass shootings are "particularly rare events." Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, *1994–2004*, *in* Reducing Gun Violence In America: Informing Policy with Evidence and Analysis 166 (Daniel W. Webster & Jon S. Vernick eds., 2013). Indeed, "[a]ccording to a Bureau of Justice statistics review, homicides that claimed at least three lives accounted for less than 1% of all homicide deaths from 1980 to 2008." D'Vera Cohn et al., *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware*, Pew Rsch. Ctr. 4 (May 7, 2013), https://pewrsr.ch/3qwE94l. At present, "[e]ven unintentional shootings (about 1 percent of the total) outnumber mass shootings." Dan Gross, *I Helped Lead the Gun Control Movement. It's Asking the Wrong Questions.* N.Y. Times (Apr. 8, 2021), https://nyti.ms/3uLsznE. Accordingly, despite the horrors of recent mass shootings, the truth is that "[m]ass shootings have not increased in number or in overall death toll, at least not over the past several decades." James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 Homicide Studies 125, 128 (2013). The *only* thing that "has increased with regard to mass murder . . . is the public's fear, anxiety, and widely held belief that the problem is getting worse." *Id*. at 130.

In any event, so-called "assault weapons" bans would not prevent mass shootings. Fox and DeLateur conclude that the notion that "restoring the federal ban on assault weapons will prevent these horrible crimes" is a "myth." *Id*. at 136. "[A] comparison of the incidence of mass shootings during the 10-year window when the assault weapon ban was in force against the time periods before implementation and after expiration shows that the legislation had virtually no effect" on mass shootings. *Id*. The problem is that the "overwhelming majority of mass murderers use firearms that would not be restricted by an assault weapons ban." *Id*. To start, in mass shootings, "semiautomatic handguns are far more prevalent . . . than firearms that would typically be classified as assault weapons." *Id*.; *accord* Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim'y & Pub. Pol'y 171, 188 (2020) ("[M]ost mass shootings do not involve assault rifles."). Indeed, during the period of the federal ban, "only one quarter of . . . mass murderers killed with an assault weapon; they easily could have identified an alternate means of mass casualty if that were necessary." Fox & DeLateur, *supra*, at 136. And from 2009 to 2016, only ten percent of mass shootings with four or more victim fatalities "involved firearm models classified as assault weapons." Webster et al., *supra*, at 188.

37

It is no surprise, then, that the State's own expert in *Kolbe*, Professor Daniel Webster, has since conceded that bans of so-called assault weapons "do not seem to be associated with the incidence of fatal mass shootings," Webster et al., *supra*, at 187. Similarly telling, the then-president of the Brady Center, a principal amicus in support of the outcome in *Kolbe*, Dan Gross, has recently recognized that "most mass shootings, like most gun fatalities in this country, are committed with handguns"—and insisted that "[t]here are far more effective means to prevent these sadly routine tragedies than by focusing on assault weapons." Gross, *I Helped Lead the Gun Control Movement. It's Asking the Wrong Questions*, *supra*.

More broadly, there is simply no empirical evidence for the proposition that semiautomatic "assault" rifle bans advance public safety. Research on the now-expired federal statute banning "assault weapons" reveals that such legislation has no discernible impact on firearms violence. The Justice Department's own study found that

> we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with ['assault weapons'] . . . .

Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003,* Rep. to the Nat'l Inst. of Just., U.S. Dep't of Just. 96 (June 2004).

The report concluded that, "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement." *Id.* at 3. The insurmountable problem is that criminals denied banned semiautomatic rifles will simply substitute other firearms: "Because offenders can substitute non-banned guns . . . for banned [arms], there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns."[6]

In a follow-up essay in 2013, the principal author of the Justice Department studies, Professor Koper, reiterated that, "[b]ecause offenders could substitute non-banned guns . . . , there was not a clear rationale for expecting the ban to reduce assaults and robberies with guns." *America's Experience*, *supra*, at 165. Although he noted that some stories by media journalists suggested that the federal ban "may have modestly reduced gunshot victimizations had it remained in place for a longer period," *id.* at 170, 158; *see also id.* at 164–65, Koper concluded that "analyses

---

[6] *Id*. at 81 & n.95. These conclusions are consistent with the first study of the federal ban (done in 1997), which recognized that "[a]ny effort to estimate how the ban affected the gun murder rate must confront a fundamental problem, that the maximum achievable preventive effect of the ban is almost certainly too small to detect statistically." Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 (Final Report)* 79 (Mar. 13, 1997), https://urbn.is/3u91ACW. "[T]he evidence is not strong enough for us to conclude that there was any meaningful effect (i.e., that the effect was different from zero.)." *Id*. at 6. Specifically, the research "found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds. Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns." *Id*.

showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years." *Id*. at 165.

The failure of the federal ban to have *any* discernible effect on gun violence has been confirmed by two well-respected entities—the National Research Council and the Task Force on Community Preventative Services—that conducted comprehensive reviews of *all* the published literature on firearms violence. The NRC and Task Force both found that there is insufficient evidence to conclude that bans on "assault weapons" or other particular firearms or firearm features have had any beneficial effect on gun violence.[7]

And Maryland's law necessarily will be *less* effective than the federal ban in curtailing criminal access to "assault weapons," for the banned items continue to be legal in the vast majority of States, which do not have laws similar to Maryland's. As Professor Koper has acknowledged, "the impact of [state 'assault

---

[7] *See* National Research Council, *Firearms and Violence: A Critical Review* 97 (Charles F. Wellford et al. eds., 2005) ("[G]iven the nature of the [1994 assault weapons ban], the maximum potential effect of the ban on gun violence outcomes would be very small and, if there were any observable effects, very difficult to disentangle from chance yearly variation and other state and local gun violence initiatives that took place simultaneously."); Task Force on Community Preventive Services, *Recommendations To Reduce Violence Through Early Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*, 28 Am. J. Prev. Med. 6, 7 (2005) (With respect to "bans on specified firearms or ammunition," the Task Force found that "[e]vidence was insufficient to determine the effectiveness of [bans, for] the prevention of violence."); *see also* Robert A. Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 Am. J. Prev. Med. 40, 49 (2005).

weapons'] laws is likely undermined to some degree by the influx of ['assault weapons'] from other states . . . ." *Updated Assessment*, *supra*, at 81 n.95.

Furthermore, it is highly unlikely that prohibitions on certain firearms will deter any violent criminal from using one. *See, e.g.*, James D. Wright & Peter H. Rossi, *Armed & Considered Dangerous* 210 (2d ed. 2017) (although 73 percent of convicted felons in study knew acquiring a firearm would be illegal, "most of them did not anticipate much trouble in acquiring a handgun once released from prison," and 82 percent agreed that "gun laws affect only law-abiding citizens"); Anthony J. Pinizzotto et al., *Violent Encounters* 50 (U.S. Dep't of Just. 2006) (97 percent of handguns used to assault law enforcement officers participating in study were acquired illegally). This means that Maryland's ban impairs public safety to the extent it deprives law-abiding citizens of accuracy-enhancing features that criminals continue to employ.

Far from ordaining this result, the ratifiers of the Second Amendment would have rejected it. As evidenced by Thomas Jefferson's quotation book, the Founding generation was influenced by Italian penal reformer and criminologist Cesare Beccaria, who reasoned that laws forbidding the

> wear[ing] [of] arms . . . disarm[ ] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly

41

> makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms,"* 49 L. & Contemp. Probs. 151, 153–54 (1986).

The impact of such disarmament would be severe, as defensive gun uses "are about three to five times as common as criminal uses, even using generous estimates of gun crimes." Gary Kleck & Mark Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Crim'y 150, 170 (1995), https://bit.ly/2Zv7lgj. As explained above, there are valid reasons why law-abiding citizens may prefer to possess rifles banned by Maryland for self-defense, and millions of Americans have indeed chosen to possess them. Under *Heller*, it must be the choices of these law-abiding citizens, not speculation about the effects of a ban on a small subset of gun crimes, that govern. Maryland "ha[s] to provide . . . more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety." *Moore*, 702 F.3d at 942. Because it cannot meet this burden, its ban must be invalidated, even under intermediate scrutiny. *See id.*

## CONCLUSION

For the foregoing reasons, Maryland's ban on "assault weapons" violates the Second Amendment. Although *Kolbe* forecloses a panel of this Court from granting relief, *Kolbe* should be overturned by a court competent to do so.

Dated: April 19, 2020

Raymond M. DiGuiseppe
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite
300 Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

Adam Kraut, Esq.
Firearms Policy Coalition
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 476-2342
F: (215) 525-4437
akraut@fpclaw.org

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
Tiernan B. Kane
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600 / (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

43

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Plaintiffs-Appellants' Opening Brief complies with the requirements of <u>Federal Rule of Appellate Procedure 32(a)</u>. The brief is prepared in 14-point Times New Roman font, a proportionally spaced typeface; it is double-spaced; and it contains 10,339 words (exclusive of items listed in Rule 32(f)), as measured by Microsoft Word.

<u>/s/ David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellants*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

U.S. Const. amend. II ........................................................................ Add 1

18 U.S.C.

    § 921(a)(20) .......................................................... Add 12
    § 922(g)(1) ............................................................ Add 12

Md. Code Ann., Crim. Law

    § 4-301 ................................................................... Add 1
    § 4-302 ................................................................... Add 6
    § 4-303 ................................................................... Add 7
    § 4-304 ................................................................... Add 9
    § 4-306 ................................................................... Add 9

Md. Code Ann., Pub. Safety

    § 5-101(g) ............................................................. Add 10
    § 5-101(r) ............................................................. Add 3
    § 5-133 ................................................................... Add 10
    § 5-133.3(a) .......................................................... Add 11
    § 5-133.3(b)(1) ..................................................... Add 11
    § 5-205 ................................................................... Add 11

**<u>U.S. Const. amend. II</u>.**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**Md. Code Ann., Crim. Law § 4-301. Definitions**

### In general

(a) In this subtitle the following words have the meanings indicated.

### Assault long gun

(b) "Assault long gun" means any assault weapon listed under § 5-101(r)(2) of the Public Safety Article.

### Assault pistol

(c) "Assault pistol" means any of the following firearms or a copy regardless of the producer or manufacturer:

(1) AA Arms AP-9 semiautomatic pistol;

(2) Bushmaster semiautomatic pistol;

(3) Claridge HI-TEC semiautomatic pistol;

(4) D Max Industries semiautomatic pistol;

(5) Encom MK-IV, MP-9, or MP-45 semiautomatic pistol;

(6) Heckler and Koch semiautomatic SP-89 pistol;

(7) Holmes MP-83 semiautomatic pistol;

(8) Ingram MAC 10/11 semiautomatic pistol and variations including the Partisan Avenger and the SWD Cobray;

(9) Intratec TEC-9/DC-9 semiautomatic pistol in any centerfire variation;

(10) P.A.W.S. type semiautomatic pistol;

(11) Skorpion semiautomatic pistol;

(12) Spectre double action semiautomatic pistol (Sile, F.I.E., Mitchell);

(13) UZI semiautomatic pistol;

(14) Weaver Arms semiautomatic Nighthawk pistol; or

(15) Wilkinson semiautomatic "Linda" pistol.

**Assault weapon**

(d) "Assault weapon" means:

(1) an assault long gun;

(2) an assault pistol; or

(3) a copycat weapon.

. . .

**Copycat weapon**

(h)

(1) "Copycat weapon" means:

(i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:

1. a folding stock;

2. a grenade launcher or flare launcher; or

3. a flash suppressor;

(ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

(iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches;

Add 2

(iv) a semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;

(v) a semiautomatic shotgun that has a folding stock; or

(vi) a shotgun with a revolving cylinder.

(2) "Copycat weapon" does not include an assault long gun or an assault pistol.

### Detachable magazine

(i) "Detachable magazine" means an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge.

### Flash suppressor

(j) "Flash suppressor" means a device that functions, or is intended to function, to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.

. . .

### Md. Code Ann., Pub. Safety § 5-101. Definitions

. . .

### Regulated firearm

(r) "Regulated firearm" means:

(1) a handgun; or

(2) a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon:

(i) American Arms Spectre da Semiautomatic carbine;

(ii) AK-47 in all forms;

Add 3

(iii) Algimec AGM-1 type semi-auto;

(iv) AR 100 type semi-auto;

(v) AR 180 type semi-auto;

(vi) Argentine L.S.R. semi-auto;

(vii) Australian Automatic Arms SAR type semi-auto;

(viii) Auto-Ordnance Thompson M1 and 1927 semi-automatics;

(ix) Barrett light .50 cal. semi-auto;

(x) Beretta AR70 type semi-auto;

(xi) Bushmaster semi-auto rifle;

(xii) Calico models M-100 and M-900;

(xiii) CIS SR 88 type semi-auto;

(xiv) Claridge HI TEC C-9 carbines;

(xv) Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle;

(xvi) Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2;

(xvii) Dragunov Chinese made semi-auto;

(xviii) Famas semi-auto (.223 caliber);

(xix) Feather AT-9 semi-auto;

(xx) FN LAR and FN FAL assault rifle;

(xxi) FNC semi-auto type carbine;

(xxii) F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;

(xxiii) Steyr-AUG-SA semi-auto;

(xxiv) Galil models AR and ARM semi-auto;

Add 4

(xxv) Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3;

(xxvi) Holmes model 88 shotgun;

(xxvii) Avtomat Kalashnikov semiautomatic rifle in any format;

(xxviii) Manchester Arms "Commando" MK-45, MK-9;

(xxix) Mandell TAC-1 semi-auto carbine;

(xxx) Mossberg model 500 Bullpup assault shotgun;

(xxxi) Sterling Mark 6;

(xxxii) P.A.W.S. carbine;

(xxxiii) Ruger mini-14 folding stock model (.223 caliber);

(xxxiv) SIG 550/551 assault rifle (.223 caliber);

(xxxv) SKS with detachable magazine;

(xxxvi) AP-74 Commando type semi-auto;

(xxxvii) Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, M1A, excluding the M1 Garand;

(xxxviii) Street sweeper assault type shotgun;

(xxxix) Striker 12 assault shotgun in all formats;

(xl) Unique F11 semi-auto type;

(xli) Daewoo USAS 12 semi-auto shotgun;

(xlii) UZI 9mm carbine or rifle;

(xliii) Valmet M-76 and M-78 semi-auto;

(xliv) Weaver Arms "Nighthawk" semi-auto carbine; or

(xlv) Wilkinson Arms 9mm semi-auto "Terry".

. . .

Add 5

**Md. Code Ann., Crim. Law § 4-302. Scope of subtitle**

This subtitle does not apply to:

(1) if acting within the scope of official business, personnel of the United States government or a unit of that government, members of the armed forces of the United States or of the National Guard, law enforcement personnel of the State or a local unit in the State, or a railroad police officer authorized under Title 3 of the Public Safety Article or 49 U.S.C. § 28101;

(2) a firearm modified to render it permanently inoperative;

(3) possession, importation, manufacture, receipt for manufacture, shipment for manufacture, storage, purchases, sales, and transport to or by a licensed firearms dealer or manufacturer who is:

    (i) providing or servicing an assault weapon or detachable magazine for a law enforcement unit or for personnel exempted under item (1) of this section;

    (ii) acting to sell or transfer an assault weapon or detachable magazine to a licensed firearm dealer in another state or to an individual purchaser in another state through a licensed firearms dealer; or

    (iii) acting to return to a customer in another state an assault weapon transferred to the licensed firearms dealer or manufacturer under the terms of a warranty or for repair;

(4) organizations that are required or authorized by federal law governing their specific business or activity to maintain assault weapons and applicable ammunition and detachable magazines;

(5) the receipt of an assault weapon or detachable magazine by inheritance, and possession of the inherited assault weapon or detachable magazine, if the decedent lawfully possessed the assault weapon or detachable magazine and the person inheriting the assault weapon or detachable magazine is not otherwise disqualified from possessing a regulated firearm;

(6) the receipt of an assault weapon or detachable magazine by a personal representative of an estate for purposes of exercising the powers and duties of a personal representative of an estate;

Add 6

(7) possession by a person who is retired in good standing from service with a law enforcement agency of the State or a local unit in the State and is not otherwise prohibited from receiving an assault weapon or detachable magazine if:

（i) the assault weapon or detachable magazine is sold or transferred to the person by the law enforcement agency on retirement; or

(ii) the assault weapon or detachable magazine was purchased or obtained by the person for official use with the law enforcement agency before retirement;

(8) possession or transport by an employee of an armored car company if the individual is acting within the scope of employment and has a permit issued under Title 5, Subtitle 3 of the Public Safety Article; or

(9) possession, receipt, and testing by, or shipping to or from:

(i) an ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory; or

(ii) a facility or entity that manufactures or provides research and development testing, analysis, or engineering for personal protective equipment or vehicle protection systems.

## Md. Code Ann., Crim. Law § 4-303. Assault weapons—Prohibited

### In general

(a) Except as provided in subsection (b) of this section, a person may not:

(1) transport an assault weapon into the State; or

(2) possess, sell, offer to sell, transfer, purchase, or receive an assault weapon.

### Exception

(b)

(1) A person who lawfully possessed an assault pistol before June 1, 1994, and who registered the assault pistol with the Secretary of State Police before August 1, 1994, may:

(i) continue to possess and transport the assault pistol; or

Add 7

(ii) while carrying a court order requiring the surrender of the assault pistol, transport the assault pistol directly to a law enforcement unit, barracks, or station, a State or local law enforcement agency, or a federally licensed firearms dealer, as applicable, if the person has notified a law enforcement unit, barracks, or station that the person is transporting the assault pistol in accordance with a court order and the assault pistol is unloaded.

(2) A licensed firearms dealer may continue to possess, sell, offer for sale, or transfer an assault long gun or a copycat weapon that the licensed firearms dealer lawfully possessed on or before October 1, 2013.

(3) A person who lawfully possessed, has a purchase order for, or completed an application to purchase an assault long gun or a copycat weapon before October 1, 2013, may:

(i) possess and transport the assault long gun or copycat weapon; or

(ii) while carrying a court order requiring the surrender of the assault long gun or copycat weapon, transport the assault long gun or copycat weapon directly to a law enforcement unit, barracks, or station, a State or local law enforcement agency, or a federally licensed firearms dealer, as applicable, if the person has notified a law enforcement unit, barracks, or station that the person is transporting the assault long gun or copycat weapon in accordance with a court order and the assault long gun or copycat weapon is unloaded.

(4) A person may transport an assault weapon to or from:

(i) an ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory; or

(ii) a facility or entity that manufactures or provides research and development testing, analysis, or engineering for personal protective equipment or vehicle protection systems.

(5) A federally licensed firearms dealer may receive and possess an assault weapon received from a person in accordance with a court order to transfer firearms under § 6-234 of the Criminal Procedure Article.

Add 8

**Md. Code Ann., Crim. Law § 4-304. Assault weapons--Seizure and disposition**

A law enforcement unit may seize as contraband and dispose of according to regulation an assault weapon transported, sold, transferred, purchased, received, or possessed in violation of this subtitle.

**Md. Code Ann., Crim. Law § 4-306. Penalties**

### In general

(a) Except as otherwise provided in this subtitle, a person who violates this subtitle is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

### Use in a felony or crime of violence

(b)

(1) A person who uses an assault weapon, a rapid fire trigger activator, or a magazine that has a capacity of more than 10 rounds of ammunition, in the commission of a felony or a crime of violence as defined in § 5-101 of the Public Safety Article is guilty of a misdemeanor and on conviction, in addition to any other sentence imposed for the felony or crime of violence, shall be sentenced under this subsection.

(2)

(i) For a first violation, the person shall be sentenced to imprisonment for not less than 5 years and not exceeding 20 years.

(ii) The court may not impose less than the minimum sentence of 5 years.

(iii) The mandatory minimum sentence of 5 years may not be suspended.

(iv) Except as otherwise provided in § 4-305 of the Correctional Services Article, the person is not eligible for parole in less than 5 years.

Add 9

(3)

(i) For each subsequent violation, the person shall be sentenced to imprisonment for not less than 10 years and not exceeding 20 years.

(ii) The court may not impose less than the minimum sentence of 10 years.

(iii) A sentence imposed under this paragraph shall be consecutive to and not concurrent with any other sentence imposed for the felony or crime of violence.

## Md. Code Ann., Pub. Safety § 5-101. Definitions

. . .

### Disqualifying crime

(g) "Disqualifying crime" means:

(1) a crime of violence;

(2) a violation classified as a felony in the State; or

(3) a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years.

. . .

## Md. Code Ann., Pub. Safety § 5-133. Restrictions on possession of regulated firearms

. . .

### Possession of regulated firearm prohibited

(b) Subject to § 5-133.3 of this subtitle, a person may not possess a regulated firearm if the person:

(1) has been convicted of a disqualifying crime;

. . .

**Md. Code Ann., Pub. Safety § 5-133.3. Persons subject to regulated firearms disqualification**

### Health Department defined

(a) In this section, "Health Department" means the Maryland Department of Health.

### Exemptions to regulated firearms disqualification

(b) A person subject to a regulated firearms disqualification under § 5-133(b)(6), (7), (8), (9), (10), or (11) of this subtitle, a rifle or shotgun disqualification under § 5-205(b)(6), (7), (8), (9), (10), or (11) of this title, or prohibited from the shipment, transportation, possession, or receipt of a firearm by 18 U.S.C. §§ 922(d)(4) or (g)(4) as a result of an adjudication or commitment that occurred in the State may be authorized to possess a firearm if:

> (1) the person is not subject to another firearms restriction under State or federal law; and

> (2) the Health Department, in accordance with this section, determines that the person may possess a firearm.

· · ·

**Md. Code Ann., Pub. Safety § 5-205. Possession by person with mental disorder**

· · ·

### Persons prohibited from possessing a rifle or shotgun

(b) A person may not possess a rifle or shotgun if the person:

> (1) has been convicted of a disqualifying crime as defined in § 5-101 of this title;

· · ·

Add 11

**18 U.S.C. § 921. Definitions**

. . .

(20) The term "crime punishable by imprisonment for a term exceeding one year" does not include—

> (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

> (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

. . .

**18 U.S.C. § 922. Unlawful acts**

. . .

(g) It shall be unlawful for any person--

> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

. . .

Add 12

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to <u>Federal Rule of Appellate Procedure 25(d)</u> and Local Rule 25(b)(3), I hereby certify that on April 19, 2021, I electronically filed the foregoing brief with the Clerk of the Court by using the appellate CM/ECF system. Service on counsel for all parties has been accomplished via ECF.

<u>/s/ David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellants*