No. 21-1255

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

## DOMINIC BIANCHI, *et al.*,

*Plaintiffs-Appellants*,

**v.**

## BRIAN E. FROSH, *et al.*,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Maryland
(James K. Bredar, District Judge)

_____

## BRIEF OF APPELLEES

_____

BRIAN E. FROSH
Attorney General of Maryland

ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

June 2, 2021                    Attorneys for Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-1255__    Caption: __Bianchi v. Frosh__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Brian E. Frosh, Woodrow W. Jones, III, R. Jay Fisher, Jim Fredericks, all in their official capacities__
(name of party/amicus)

who is _____appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2.  Does party/amicus have any parent corporations? ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert A. Scott                    Date:    03/09/2021

Counsel for: Appellees

Print to PDF for Filing

**TABLE OF CONTENTS**

Page

JURISDICTIONAL STATEMENT ....................................................................1

ISSUE PRESENTED FOR REVIEW .................................................................2

STATEMENT OF THE CASE ...........................................................................2

    The Firearms Safety Act of 2013 .............................................................2

    2013 Suit Challenging the Firearms Safety Act's Assault-
    Weapons Restrictions ...............................................................................4

    Reversal of the District Court by a Divided Panel of this Court....................4

    This Court's En Banc Affirmance of the District Court's
    Conclusion That the Assault Weapons Restrictions in the
    Firearms Safety Act Are Constitutional ..........................................................5

    Procedural History of this Case ................................................................11

SUMMARY OF ARGUMENT.........................................................................12

ARGUMENT .................................................................................................13

I.     THE STANDARD OF REVIEW IS DE NOVO........................................................13

II.    PLAINTIFFS' CHALLENGE TO MARYLAND'S ASSAULT WEAPONS
       RESTRICTIONS IS FORECLOSED AS A MATTER OF LAW BY THE EN BANC
       DECISION IN *KOLBE* ..................................................................................13

CONCLUSION...............................................................................................20

CERTIFICATE OF COMPLIANCE .................................................................21

## TABLE OF AUTHORITIES

Page

### Cases

*Alleyne v. United States*, 570 U.S. 99 (2013) ..........................................15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................... 6-11, 16, 17, 19

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ......................................19

*Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015) .................11

*Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021) .....................................6

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012).......................19

*Joseph v. Angelone*, 184 F.3d 320 (4th Cir. 1999) .................................14

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)...........................18

*Kimble v. Marvel Entm't, LLC*, 576 U.S. 446 (2015)............................15

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ..........................2, 5-9, 11-17, 19, 20

*Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) ............................4

*Mays v. Sprinkle*, 992 F.3d 295 (4th Cir. 2021).......................................13

*McMellon v. United States*, 387 F.3d 329 (4th Cir. 2004)......................................15

*New York Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .......... 11, 17

*Payne v. Taslimi*, No. 18-7030, 2021 WL 2149364
   (4th Cir. May 27, 2021) ............................................................... 14, 15

*Ross v. Reed*, 704 F.2d 705 (4th Cir. 1983)...........................................14

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)..........................................18

*United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017)..........................................19

*Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2020) ..............................17

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)..............................................18

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ................................................ 11, 17

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) ....................................................18

## Constitutional Provisions

U.S. Const. amend. II .........................................................1, 2, 4-7, 9, 11, 13, 15-19

## Statutes

18 U.S.C. § 921(a)(30)(A) .........................................................................................3

28 U.S.C. § 1291 .......................................................................................................1

28 U.S.C. § 1331 .......................................................................................................1

28 U.S.C. § 1343 .......................................................................................................1

Pub. Law 103-322, 108 Stat. 1796 (Sept. 13, 1994) .............................................2, 3

2013 Md. Laws ch. 427 .............................................................................................2

Md. Code Ann., Crim. Law § 4-301(b) (LexisNexis Supp. 2020) ...........................3

Md. Code Ann., Crim. Law § 4-301(d) (LexisNexis Supp. 2020) ...........................3

Md. Code Ann., Crim. Law § 4-301(h)(1) (LexisNexis Supp. 2020) .......................3

Md. Code Ann., Crim. Law § 4-303(b)(3) (LeisNexis Supp. 2020) .........................4

Md. Code Ann., Pub. Safety § 5-101(r)(2) (LexisNexis Supp. 2020) ......................3

## Rules

4th Cir. Loc. R. 35(c) ...............................................................................................5

No. 21-1255

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**DOMINIC BIANCHI, *et al.*,**

*Plaintiffs-Appellants*,

v.

**BRIAN E. FROSH, *et al.*,**

*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the District of Maryland
(James K. Bredar, District Judge)

_____

**BRIEF OF APPELLEES**

_____

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because the plaintiffs alleged a deprivation of their civil rights under the Second Amendment to the United States Constitution. On March 4, 2021, the district court entered a final judgment (J.A. 42-43), from which the plaintiffs filed a timely notice of appeal (J.A. 44). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

Did the district court correctly dismiss plaintiffs' Second Amendment challenge to Maryland's restrictions on assault weapons where, as plaintiffs expressly acknowledge, their claims are foreclosed by this Court's en banc decision in *Kolbe* v. Hogan, 849 F.3d 114 (4th Cir. 2017)?

## STATEMENT OF THE CASE

### The Firearms Safety Act of 2013

On April 4, 2013, the Maryland General Assembly passed the Firearm Safety Act of 2013, 2013 Md. Laws ch. 427, as a comprehensive effort to promote public safety and save lives. The legislation included provisions addressing mental health issues, the establishment of a handgun-qualification-license requirement for purchasers of handguns, and a ban on armor-piercing bullets, among others. As relevant to this case, building on a federal ban on assault-weapons manufacturing, transfer, and possession that expired in 2004, *see* Violent Crime Control and Law Enforcement Act of 1994 § 110102, Pub. Law 103-322, 108 Stat. 1796 (Sept. 13, 1994), the Firearms Safety Act also included a prohibition on the possession, sale, transfer, or receipt of "assault long guns" and "copycat weapons" (collectively "assault weapons"),[1] as defined in the law.

---

[1] Maryland law prohibits the possession, sale, transfer, and receipt of "assault weapons," which is defined as "(1) an assault long gun; (2) an assault pistol; or (3)

The term "assault long gun" is defined in the Maryland Code by reference to a list of specific weapons (or their "copies"), representing many of the weapons that previously were covered by the federal law. Md. Code Ann., Crim. Law § 4-301(b) (LexisNexis Supp. 2020) (defining "assault long gun" to include any weapon "listed under § 5-101(r)(2) of the Public Safety Article"); *compare* Md. Code Ann., Pub. Safety § 5-101(r)(2) (LexisNexis Supp. 2020) *with* weapons listed in the former Violent Crime Control and Law Enforcement Act of 1994 § 110102(b), formerly codified as 18 U.S.C. § 921(a)(30)(A). In contrast, as relevant to this case, the term "copycat weapon" refers to firearms with specific features:

> (i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
>> 1. a folding stock;
>> 2. a grenade launcher or flare launcher; or
>> 3. a flash suppressor;
>
> (ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;
>
> (iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches[.]

Md. Code Ann., Crim. Law § 4-301(h)(1) (LexisNexis Supp. 2020). The law contained a grandfather clause that allowed the continued possession of assault long

---

a copycat weapon." Md. Code Ann., Crim. Law § 4-301(d) (LexisNexis Supp. 2020). Plaintiffs do not challenge Maryland's more longstanding (since 1994) restrictions on "assault pistols." Appellants' Br. 3 n.1.

guns and copycat weapons by those individuals who possessed those weapons as of October 1, 2013.  *Id.* § 4-303(b)(3).

### 2013 Suit Challenging the Firearms Safety Act's Assault-Weapons Restrictions

In September 2013, a group of individuals, firearms retailers, and firearms-related organizations filed a federal lawsuit challenging Maryland's assault weapons restrictions as infringements of the right to keep and bear arms secured by the Second Amendment.[2]  After discovery closed, the district court granted the State's motion for summary judgment and held that the restrictions on assault weapons are constitutional under the Second Amendment.  *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).  Although the district court assumed that the assault weapons are protected to some degree by the Second Amendment, *id*. at 789, the court nonetheless held that, under an intermediate scrutiny analysis, the restrictions survived constitutional review, *id*. at 793-95.

### Reversal of the District Court by a Divided Panel of this Court

Then, in February 2016, a divided three-judge panel of this Court concluded that assault weapons are protected by the Second Amendment.  *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016); *but see id.* at 196 (King, J., dissenting in part) (stating

---

[2] The plaintiffs also challenged restrictions on large-capacity magazines (i.e., magazines that have a capacity of more than ten rounds of ammunition); those restrictions are not at issue in the present case.

his inclination to "proclaim that the Second Amendment is not implicated by the [Firearms Safety Act]" but opining that the Court "need not decide" that question because, like the Second and District of Columbia Circuits, the Court "can assume they are so protected and yet rule that Maryland's [Firearms Safety Act] passes constitutional muster under . . . intermediate scrutiny"). The panel majority also concluded that strict scrutiny—rather than intermediate scrutiny—is the appropriate level of constitutional review and remanded the case to the district court so that it could apply that heightened level of review. *Id*. at 184; *but see id.* at 196-98 (King, J., dissenting in part) (explaining his view that intermediate scrutiny applied). But the panel's decision was vacated per Fourth Circuit Local Rule 35(c) when the Court granted the State's request to rehear the case en banc. *Kolbe v. Hogan*, 636 F. App'x 880 (4th Cir. Mar. 4, 2016).

### This Court's En Banc Affirmance of the District Court's Conclusion That the Assault Weapons Restrictions in the Firearms Safety Act Are Constitutional

The Court sitting en banc affirmed the judgment of the district court. *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017). But, rather than assume that assault weapons are protected by the Second Amendment as the district court had, the Court expressly concluded that assault weapons are *outside* the scope of the Second Amendment. *Id*. at 130. The Court also concluded, in the alternative (and consistent with the district court's opinion), that, if assault weapons were protected, the appropriate standard of

review was intermediate scrutiny and that the assault weapons restrictions in the Firearms Safety Act survived that level of review. *Id.*

The Court began its analysis by following the two-part approach used by nearly all of the federal circuits in considering Second Amendment claims. *Id.* at 132-33 (citations omitted); *see also Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021) (reaffirming this two-part approach). Under this test, a court first asks "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Kolbe*, 849 F.3d at 133 (citation omitted). If the answer is "no," "then the challenged law is valid." *Id.* (citation omitted). "If, however, the challenged law imposes a burden on conduct protected by the Second Amendment, [courts] 'apply[] an appropriate form of means-end scrutiny,'" whether that be intermediate or strict scrutiny. *Id.* (citation omitted). "[T]he level of scrutiny [a court] appl[ies] depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.* (citation omitted).

For guidance regarding whether the assault weapons restrictions imposed a burden on Second Amendment rights, this Court looked to the landmark Supreme Court case *District of Columbia v. Heller*, 554 U.S. 570 (2008). This Court emphasized the significance of several principles in *Heller*, including its pronouncement (1) that the Second Amendment's "'core protection'" is "'the right of the law-abiding, responsible citizens to use arms in defense of hearth and home'"

and (2) that an "'important limitation on the right to keep and carry arms' is that the right 'extends only to certain types of weapons.'" *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 634-35, 623). *Heller* "described 'the sorts of weapons protected' as being 'those in common use at the time,' and observed that such 'limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons.'" *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 627). Of particular importance was *Heller*'s "specifi[cation] that 'weapons that are most useful in military service—M-16 rifles and the like—may be banned' without infringement upon the Second Amendment right." *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 627).

Building on *Heller's* principles, this Court concluded that "[b]ecause the banned assault weapons [in the Firearms Safety Act] . . . are 'like' 'M-16 rifles'— 'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield." *Kolbe*, 849 F.3d at 135. The Court brushed aside the notion that whether a particular arm was within the scope of the Second Amendment could be determined simply by asking whether they were "in common use." *Id*. at 135-36. In doing so, the Court articulated a nonexclusive list of "various questions" that "the *Heller* decision raises" about the proper scope of

such an inquiry.[3]  *Id*. at 135.  These "difficult questions" did not need to be answered, the Court concluded, because *Heller*'s carve-out for weapons "like" "M-16 rifles" that were "most useful in military service" presented a "dispositive and relatively easy inquiry" that, with respect to the weapons prohibited by the Firearms Safety Act, could be answered "plainly in the affirmative."  *Id*. at 136.

In coming to that conclusion, the Court relied on the State's "proffered extensive uncontroverted evidence demonstrating that the assault weapons outlawed by the [Firearms Safety Act] are exceptionally lethal weapons of war."  *Id*. at 124. This evidence established that the "most popular of the prohibited weapons—the AR-15—is simply the semiautomatic version of the M16 rifle used by our military and others around the world."  *Id*.  The Court recounted the history of the development of the AR-15 and how it was designed specifically as an offensive weapon that would efficiently cause maximum carnage on the battlefield.  *Id*. at 124-25.  Although the AR-15 could be fired only in semi-automatic mode (as opposed to

---

[3] These questions included, among others, the following:  "How many assault weapons and large-capacity magazines must there be to consider them 'in common use at the time'?  [S]hould we focus on how many assault weapons and large-capacity magazines are owned; or on how many owners there are; or on how many of the weapons and magazines are merely in circulation?  Do we count the weapons and magazines in Maryland only, or in all of the United States? . . . Must the assault weapons and large-capacity magazines be possessed for any 'lawful purpose[ ]' or, more particularly and importantly, the 'protection of one's home and family'?" *Kolbe*, 849 F.3d at 135-36.

the M16, which could also be fired in automatic mode), the Court described this distinction as "slight," *id*. at 125, based on evidence establishing that both modes could empty a 30-round magazine in a matter of a few seconds. Moreover, "soldiers and police officers are often advised to choose and use semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations." *Id*. The Court also observed that the features many of the banned weapons possessed (and that were specifically referenced in the restrictions on "copycat" weapons) were "designed to achieve their principal purpose—'killing or disabling the enemy' on the battlefield." *Id*. From its review of this evidence, the Court concluded that, "like their fully automatic counterparts, the banned assault weapons 'are firearms designed for the battlefield,'" and "[t]heir design results in 'a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns.'" *Id*.

As an alternative holding, the Court explained that, if assault weapons were protected to some degree by the Second Amendment, any restriction on their possession would be subject only to intermediate, rather than strict, scrutiny. *Kolbe*, 849 F.3d at 138. The Court cited four reasons why "intermediate scrutiny is the appropriate standard." *Id.* First, "the [Firearms Safety Act] does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home." *Id*. Second, "[t]he

[Firearms Safety Act] bans only certain military-style weapons . . ., leaving citizens free to protect themselves with a plethora of other firearms[.]" *Id*. Third, unlike the handgun, which *Heller* described as the "quintessential self-defense weapon," this Court noted that there was "scant evidence in the record before us that the [Firearms-Safety-Act]-banned assault weapons . . . are possessed, or even suitable, for self-protection." *Id*. Finally, the Court rejected the notion that the assault weapons were a "class of weapons" entitled to the same treatment *Heller* gave to handguns; instead, *Kolbe* pointed out that the Firearms Safety Act restricted not an entire "class" of firearms, but only "just some of the semiautomatic rifles and shotguns in existence." *Id*. "At bottom," the Court concluded, "the [Firearms Safety Act]'s prohibitions against assault weapons . . . simply do 'not effectively disarm individuals or substantially affect their ability to defend themselves." *Id*. at 139.

Turning to the application of intermediate scrutiny, the Court concluded that there was a "reasonable fit" between the assault weapons restrictions and the State's "substantial government interest" in public safety. *Id*. at 139-40. The Court highlighted the State's evidence that the "military-style features of the banned assault weapons . . . render them particularly attractive to mass shooters and other criminals, including those targeting police." *Id*. at 139. These violent criminals prefer the prohibited weapons not only "because of the capability to penetrate building materials and soft body armor, but also because of an amalgam of other

capabilities that allow a shooter to cause mass devastation in a very short amount of time." *Id*. The Court echoed the decisions of other circuits, which had explained that assault weapons "'pose unusual risks,'" "'tend to result in more numerous wounds, more serious wounds, and more victims,'" "'are disproportionately used in crime'" such as mass shootings, and are "'disproportionately used to kill law enforcement officers.'" *Id*. at 140 (quoting *New York Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 262 (2d Cir. 2015)); *see, e.g.*, *Worman v. Healey*, 922 F.3d 26, 39-40 (1st Cir. 2019) (making similar observations); *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 409, 411 (7th Cir. 2015) (same). The Firearms Safety Act thus fulfilled its intended purpose of "reduc[ing] the availability of assault long guns . . . so that when a criminal acts, he does so with a less dangerous weapon and less severe consequences." *Kolbe*, 849 F.3d at 140.

Although the *Kolbe* plaintiffs sought further review in the Supreme Court, their petition for writ of certiorari was denied on November 27, 2017. 138 S. Ct. 469 (2017).

### Procedural History of this Case

Three years later, on December 1, 2020, a different set of individual, business, and organizational plaintiffs filed this action for declaratory and injunctive relief asserting that the assault weapons restrictions in the Firearms Safety Act are unconstitutional under the Second Amendment. (J.A. 4.) In doing so, plaintiffs

acknowledged that "the result they seek is contrary to [this Court's en banc decision in] *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)." (J.A. 6.) Defendants filed a timely answer. (J.A. 25.)

Following the defendants' answer, the district court, on its own initiative, ordered plaintiffs to "show cause . . . why this case should not be dismissed sua sponte for plain failure to state a claim upon which relief may be granted . . . and/or on the ground that Plaintiffs have pleaded an admission that it is impossible for them to prevail under controlling law." (J.A. 40-41.) Plaintiffs filed a response, again conceding that the relief they sought was foreclosed by *Kolbe*, but nonetheless arguing that *Kolbe* was wrongly decided and "should be overturned by a court competent to do so." No. 1:20-cv-03495-JKB, ECF 27 at 1. On March 4, 2021, in an order quoting and agreeing with plaintiffs' own concession that the court "'has no discretion but to dismiss Plaintiffs' complaint,'" the district court dismissed the case in light of *Kolbe*. (J.A. 42 (quoting ECF 27, at 1).)

## SUMMARY OF ARGUMENT

As plaintiffs themselves have acknowledged, their claims are foreclosed by this Court's en banc decision in *Kolbe*, which rejected an identical challenge to Maryland's restrictions on assault weapons. Under Fourth Circuit precedent, a panel lacks authority to reconsider an en banc decision. Even if the law of this Circuit did not preclude a panel from revisiting arguments that were rejected by the Court en

banc, plaintiffs offer no valid reason for such reconsideration of *Kolbe*. Instead, their brief merely repackages arguments *Kolbe* deemed unmeritorious, and they do not identify any pertinent authority that has emerged to contradict *Kolbe* since it was decided. If considered at all, plaintiffs' arguments should be rejected for the same reasons that were explained in *Kolbe.*

## ARGUMENT

### I.    THE STANDARD OF REVIEW IS DE NOVO.

This Court reviews a district court's dismissal of a complaint de novo, accepting as true all well-pleaded and nonconclusory allegations in the complaint. *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021).

### II.    PLAINTIFFS' CHALLENGE TO MARYLAND'S ASSAULT WEAPONS RESTRICTIONS IS FORECLOSED AS A MATTER OF LAW BY THE EN BANC DECISION IN *KOLBE* .

The district court dismissed the complaint because, as plaintiffs expressly conceded below, their claims were foreclosed by the en banc decision in *Kolbe*, which upheld the assault weapons restrictions enacted in the Firearms Safety Act against a Second Amendment challenge, and in so doing rejected the same arguments reprised by plaintiffs in this case. Just as that binding precedent warranted the complaint's dismissal by the district court, it requires this Court's affirmance, as well. Fourth Circuit judges sitting "[a]s a panel . . . are not authorized to reconsider an en banc holding even if [the judges] happen to be so inclined."

13

*Joseph v. Angelone*, 184 F.3d 320, 325 (4th Cir. 1999). Rather, "[t]his panel of the court is bound by the en banc decision" in *Kolbe*, because the only exception to this rule does not apply here, since *Kolbe* has not been "supplanted by an en banc decision by this court or by a subsequent decision of the United States Supreme Court." *Ross v. Reed*, 704 F.2d 705, 707 (4th Cir. 1983), *aff'd*, 468 U.S. 1 (1984). Plaintiffs do not contend that any such decision has supplanted *Kolbe*. Indeed, their brief does not cite any Fourth Circuit en banc decision or Supreme Court decision that postdates *Kolbe*. Therefore, under the law of this Circuit, the correct disposition is to affirm the judgment of dismissal, without further consideration of plaintiffs' arguments.

Although plaintiffs expressly acknowledge that "*Kolbe* forecloses a panel of this Court from granting relief," Appellants' Br. 42, they have nonetheless filed a brief that rehashes at length the *Kolbe* plaintiffs' unsuccessful arguments, in support of a request that *Kolbe* be "overturned," not by this panel, but by "a court competent to do so," *id.* *See Payne v. Taslimi*, No. 18-7030, 2021 WL 2149364, at *2 (4th Cir. May 27, 2021) (explaining this Court's "categorical," "prudential judgment" that "a panel of judges 'cannot overrule a decision issued by another panel'"). Even if those arguments were to be addressed not to a panel but to the Court en banc, they would provide no basis for departing from precedent. Even in the en banc setting, "[o]verruling precedent is never a small matter," because "*stare decisis*— . . . the

idea that today's Court should stand by yesterday's decisions—is 'a foundation stone of the rule of law'" that "'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 455 (2015) (citations omitted). *See also Payne*, 2021 WL 2149364, at *2 ("Only by granting en banc review may we apply stare decisis balancing to overrule precedent set by a prior panel (or a prior en banc court)" (citing *McMellon v. United States*, 387 F.3d 329, 334 (4th Cir. 2004) (en banc))).

For these reasons, "[t]o reverse course" and overrule the Court's precedent requires "'special justification'—over and above the belief 'that the precedent was wrongly decided.'" *Id.* at 455-56 (citation omitted). For example, a "special justification" for overruling may exist where a prior decision's "'underpinnings' have been 'eroded' by subsequent developments of constitutional law.'" *Alleyne v. United States*, 570 U.S. 99, 119 (2013) (Sotomayor, J., concurring). No such erosion of *Kolbe*'s underpinnings has even arguably occurred, and plaintiffs here identify no other "special justification," but instead merely reassert arguments that did not prevail in *Kolbe*. If considered, those arguments should be rejected for the same reasons this Court explained so cogently in *Kolbe*.

First, plaintiffs argue that the Second Amendment protects, categorically and as a matter of law, those weapons that are "in common use." Appellants' Br. 8-12.

15

Plaintiffs then attempt to explain why the assault weapons covered by the Firearms Safety Act are "in common use." *Id.* at 15-17, 20-24. As set forth above, however, this Court in *Kolbe* rejected the notion that "common use," by itself, would automatically render a particular weapon within the scope of Second Amendment protection. Instead, while this Court acknowledged that "common use" could be a factor in determining whether other types of weapons are protected by the Second Amendment, *Kolbe*, 849 F.3d at 135-36, the Court found "dispositive" *Heller*'s language expressly placing "M-16 rifles and the like" "outside the ambit of the Second Amendment," *id*. at 136. Thus, this Court had no reason to engage in a "common use" analysis, but, even so, the Court dismissed the notion that *Heller* could be read to support Second Amendment coverage of an assault weapon "like" "M-16 rifles," *id*. at 136, based "on how widely it is circulated to law-abiding citizens by the time a bar on its private possession has been enacted and challenged," *id*. at 141.

Plaintiffs also contend that *Kolbe*'s "military service" test is incompatible with *Heller*. Appellants' Br. 12-15. But *Kolbe* itself refutes that very argument by quoting *Heller*'s own language "specif[ying] that 'weapons that are most useful in military service—M-16 rifles and the like—may be banned' without infringement upon the Second Amendment right." *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 627).

16

Plaintiffs next suggest that the assault weapons banned by the Firearms Safety Act "are not materially distinguishable from other semiautomatic rifles." Appellants' Br. 18-20.  They assert that, to the extent that the features referenced in the Firearms Safety Act make any functional difference, it is to improve the use of the firearm. *Id*. at 19-20.  But, as this Court responded in *Kolbe*, it is these features that render the assault weapons offensive weapons of war, rather than tools for effective self-defense in the home.  849 F.3d at 144.

Plaintiffs also revisit well-worn arguments about the level of scrutiny to be applied to Second Amendment claims.  Appellants' Br. 25-30.  Not only did *Kolbe* expressly identify and apply the appropriate test for determining the applicability of the Second Amendment and the level of scrutiny to be applied, but in doing so it embraced the same test that has been adopted by every other circuit to consider a Second Amendment challenge to assault weapons restrictions.  849 F.3d at 138; *see also Wilson v. Cook County*, 937 F.3d 1028, 1036 (7th Cir. 2020); *Worman v. Healey*, 922 F.3d 26, 38 (1st Cir. 2019); *New York Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015)); *Heller v. District of Columbia*, 670 F.3d 1244, 1261-62 (D.C. Cir. 2011).

The remainder of plaintiffs' brief seeks to relitigate both the way *Kolbe* applied intermediate scrutiny and the facts *Kolbe* cited in support of its conclusion that Maryland's assault weapons restrictions withstand intermediate scrutiny.

17

Appellants' Br. 30-41. As for the former, plaintiffs' arguments emphasize how intermediate scrutiny has been applied outside the context of gun regulation, particularly in decisions under the First Amendment involving time, place, and manner restrictions on speech, *id.* at 32-33, and the "secondary-effects area of free speech doctrine," *id.* at 31. Much of that free speech guidance has, at most, limited utility in analysis of restrictions on guns, however, because "there are salient differences between the state's ability to regulate" speech, on the one hand, and guns, on the other. *Kachalsky v. County of Westchester*, 701 F.3d 81, 92 (2d Cir. 2012). "Most notably, the inherent risk that firearms pose to the public distinguishes their regulation from that of other fundamental rights," *Young v. Hawaii*, 992 F.3d 765, 827 (9th Cir. 2021) (en banc); unlike guns, words and other forms of protected expression do not pose "inherent risk . . . to the public," *id.* Due to these and other material differences, although this Court "may 'look[ ] to the First Amendment as a guide'" in the process of "pinpointing the applicable standard of review" to apply, *Kolbe*, 849 F.3d at 133 (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)), the Court has been "'hesitant to import substantive First Amendment principles wholesale into Second Amendment jurisprudence,'" *Woollard v. Gallagher*, 712 F.3d 865, 883 n.11 (4th Cir. 2013) (quoting *Kachalsky*, 701 F.3d at 91). *See Young*, 992 F.3d at 828 (9th Cir. 2021) ("So far as we can tell, every court to address the question has declined to apply the prior restraint doctrine to firearm-

licensing laws." (citing *Hightower v. City of Boston*, 693 F.3d 61, 80-81 (1st Cir. 2012); *Kachalsky*, 849 F.3d at 91-92; *Drake v. Filko*, 724 F.3d 426, 435 (3d Cir. 2013); *Woollard*, 712 F.3d at 883 n.11; *United States v. Focia*, 869 F.3d 1269, 1283-84 (11th Cir. 2017))).

Plaintiffs' attempts to squeeze a Second Amendment challenge into the framework of First Amendment time-place-and-manner or secondary-effects analysis make even less sense in this case, where the law at issue regulates assault weapons that are "like" "M-16 rifles," which under *Heller* "'may be banned' without infringement upon the Second Amendment right." *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 627).

As to plaintiffs' attempted assault on *Kolbe*'s factual bases, those are not properly before this Court, which cannot reach a result different from the one reached in *Kolbe*. Plaintiffs seek to draw the Court's attention to information that, in their view, demonstrates that the Firearms Safety Act is an ineffective means of preventing mass shootings and keeping dangerous weapons out of the hands of criminals. Appellants' Br. 35-41. But nothing in plaintiffs' newly touted information refutes the extensive evidence cited by *Kolbe*, which showed that the assault weapons at issue have "the capability to penetrate building materials and soft body armor," "tend to result in more numerous wounds, more serious wounds, and more victims," and have "an amalgam of . . . capabilities that allow a shooter to

cause mass devastation in a very short amount of time." *Kolbe*, 849 F.3d at 140 (citation omitted).

In sum, plaintiffs seek to relitigate the arguments that were addressed and rejected in *Kolbe*. As explained above, this Court's precedent and plaintiffs' own concession demand affirmance of the district court's judgment dismissing the complaint for failure to state a claim.[4]

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

---

[4] If this Court sitting en banc were inclined to revisit its decision in *Kolbe*, then the appropriate course would be to remand for further proceedings rather than render an appellate decision on the merits of plaintiffs' claim. Unlike this case, the challenge decided in *Kolbe* came before this Court on appeal from an order resolving the parties' cross-motions for summary judgment. 849 F.3d at 121. Here, however, the appeal arrives upon the district court's *sua sponte* dismissal of plaintiffs' complaint for failure to state a claim, prior to any opportunity for discovery.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Robert A. Scott

_____

ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

Attorneys for Appellees

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 4,346 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Robert A. Scott

_____

Robert A. Scott

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

|  |  |  |
|---|---|---|
| | * | |
| DOMINIC BIANCHI, *et al.*, | | |
| | * | |
| *Plaintiffs-Appellants*, | | |
| v. | * | No. 21-1255 |
| | | |
| BRIAN E. FROSH, *et al.*, | * | |
| | | |
| *Defendants-Appellees*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CERTIFICATE OF SERVICE

I certify that, on this 2nd day of June 2021, the Brief of Appellees was filed electronically and served on all parties entitled to service.

> Nicole J. Moss, Esq.
> 1523 New Hampshire Avenue, N.W.
> Washington, District of Columbia  20036
> nmoss@cooperkirk.com
>
> Peter A. Patterson, Esq.
> 1523 New Hampshire Avenue, N.W.
> Washington, District of Columbia  20036
> ppatterson@cooperkirk.com
>
> John D. Ohlendorf, Esq.
> 1523 New Hampshire Avenue, N.W.
> Washington, District of Columbia  20036
> johlendorf@cooperkirk.com

Raymond M. DiGuiseppe, Esq.
4320 Southport-Supply Road
Suite 300
Southport, North Carolina  28461
law.rmd@gmail.com

Adam Kraut, Esq.
1215 K Street
17th Floor
Sacramento, California  95814
akraut@fpclaw.org

David H. Thompson, Esq.
1523 New Hampshire Avenue, N.W.
Washington, District of Columbia  20036
dthompson@cooperkirk.com

Tiernan B. Kane, Esq.
1523 New Hampshire Avenue, NW
Washington, District of Columbia  20036
tkane@cooperkirk.com

/s/ Robert A. Scott
_____
Robert A. Scott