No. 21-1255

(1:20-cv-03495-JKB)

# In The United States Court of Appeals
## For the Fourth Circuit

DOMINIC BIANCHI, an individual and resident of Baltimore County; DAVID SNOPE, an individual and resident of Baltimore County; MICAH SCHAEFER, an individual and resident of Anne Arundel County; FIELD TRADERS LLC, a resident of Anne Arundel County; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; CITIZEN COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

*Plaintiffs – Appellants*,

v.

BRIAN E. FROSH, in his official capacity as Attorney General of Maryland; COL. WOODROW W. JONES, III, in his official capacity as Secretary of State Police of Maryland; R. JAY FISHER, in his official capacity as Sheriff of Baltimore County, Maryland; JIM FREDERICKS, in his official capacity as Sheriff of Anne Arundel County, Maryland,

*Defendants – Appellees*.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

# SUPPLEMENTAL OPENING BRIEF

Raymond M. DiGuiseppe
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

David H. Thompson
Peter A. Patterson
Tiernan B. Kane
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES ............................................................ iii

INTRODUCTION ......................................................................... 1

JURISDICTION ........................................................................... 3

ISSUE PRESENTED .................................................................... 4

STATEMENT OF THE CASE ........................................................ 4

I.    Maryland's Semiautomatic Rifle Ban ........................................ 4

II.   The Ban's Effect on Plaintiffs-Appellants ................................. 6

III.  Prior Proceedings .................................................................. 6

SUMMARY OF ARGUMENT ......................................................... 8

ARGUMENT ............................................................................... 9

    I.    *Bruen* expressly abrogated this Court's decision in *Kolbe* and
          fundamentally rejected its reasoning. ................................... 9

          a.    In *Bruen*, the Supreme Court reaffirmed *Heller*'s text-
                and-history standard for analyzing Second Amendment
                challenges. ............................................................... 10

          b.    This Court's decision in *Kolbe* is no longer good law. ........... 13

    II.   Maryland's ban of common semiautomatic firearms is
          unconstitutional under *Bruen*. ......................................... 17

          a.    The banned firearms are unquestionably arms within
                the meaning of the Second Amendment. ......................... 18

b.    Maryland's ban on semiautomatic rifles cannot be historically justified. ...............................................19

i.    Only "dangerous and unusual" arms can be banned consistent with our history and tradition. .....................19

ii.    The semiautomatic rifles banned by Maryland are in common use. ..............................................................23

iii.    Banned semiautomatic rifles are not materially distinguishable from other semiautomatic rifles. ...........25

iv.    The banned firearms are typically possessed for lawful purposes. ............................................................27

III.    The Court should enter judgment in Plaintiffs' favor. ................................33

CONCLUSION ...............................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*,
   910 F.3d 106 (3d Cir. 2018)................................................................27

*Bianchi v. Frosh,* 142 S. Ct. 2898 (2022) ...............................................8

*Brown v. Davenport*, 142 S. Ct. 1510 (2022) .......................................16

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) 3, 10, 11, 18, 20, 21, 22, 31, 32, 34

*District of Columbia v. Heller*, 554 U.S. 570 (2008)......3, 16, 18, 19, 20, 21, 22, 34

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019)..................28

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) ...............................27

*Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087 (4th Cir. 1993) .....................9, 13

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)....................29, 30

*Friedman v. City of Highland Park*, 68 F. Supp. 3d 895 (N.D. Ill. 2014)........29, 30

*Friedman v. City of Highland Park,* 784 F.3d 406 (7th Cir. 2015) .......................29

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)....................24, 27

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ................................ 2, 9, 15, 16, 17

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)...................................33

*NewYork State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015)...........................................................27

*New York State Rifle & Pistol Ass'n, Inc. v. Beach*
   354 F. Supp.3d 143 (N.D.N.Y. 2018)............................................35

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022).............................................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U. S. ___ (2022)..............4

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)..............34

*People v. Webb*, 131 N.E. 3d 93 (Sup. Ct. Ill. 2019) ............................32

*People v. Yanna*, 824 N.W.2d 241 (Mich. Ct. App. 2012).....................34

*Qingyun Li v. Holder*, 666 F.3d 147 (4th Cir. 2011) .............................13

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Sup. Ct. Mass. 2018)........................32

*Shew v. Malloy*, 994 F. Supp. 2d 234 (D. Conn. 2014).........................30

iii

*Staples v. United States*, 511 U.S. 600 (1994) ........................................... 23, 24, 25

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ............................................................... 23

*Stokeling v. United States*, 139 S. Ct. 544 (2019) ................................................. 13

*Taylor v. Grubbs*, 930 F.3d 611 (4th Cir. 2019) ..................................................... 13

*United States v. White*, 987 F.3d 340 (4th Cir. 2021) ........................................... 13

*United States v. Winston*, 850 F.3d 677 (4th Cir. 2017) ...................................... 13

*Worman v. Healey*, 293 F. Supp. 3d 251 (D. Mass. 2018) .................................... 25

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ..................................................... 25

## Constitutions and Statutes

U.S. CONST. amend. II ................................................................................................. 18

18 U.S.C.

§ 922(g)(1) (2022) ................................................................................................. 6
§ 921(a)(20) (2022) ............................................................................................... 6

CAL. PENAL CODE

§ 30600 .................................................................................................................. 24
§ 30605 .................................................................................................................. 24

CONN. GEN. STAT. § 53-202c ..................................................................................... 24

D.C. CODE ANN.

§ 7-2501.01(3A) ................................................................................................... 24
§ 7-2502.02(a)(6) ................................................................................................. 24
§ 7-2505.01 ........................................................................................................... 24
§ 7-2505.02(a) ...................................................................................................... 24
§ 7-2505.02(c) ...................................................................................................... 24

11 DEL. CODE § 1466 .................................................................................................. 24

MD. CODE ANN., CRIM. LAW

§ 4-301 (2018) ........................................................................................................ 4
§ 4-301(h)(1) (2018) ........................................................................................... 4, 5
§ 4-302 (2013) ........................................................................................................ 5
§ 4-303 (2018) ..................................................................................................... 4, 5
§ 4-303(a), (b)(3) (2018) ....................................................................................... 5
§ 4-303(b)(2), (4)–(5) (2018) ................................................................................ 5
§ 4-304 (2013) ........................................................................................................ 5

§ 4-306(a) (2018) ...........................................................................5

MD. CODE ANN., PUB. SAFETY

§ 5-101(g)(3) (2022) ..................................................................5, 6
§ 5-101(r)(2) (2022) .......................................................................4
§ 5-133(b)(1) (2018) ..................................................................5, 6
§ 5-205(b)(1) (2018) ..................................................................5, 6

MASS. GEN. LAWS ch. 140, § 131M ..............................................24

N.J. STAT.

§ 2C:39-5(f) ................................................................................24
§ 2C:39-9(g) ...............................................................................24

N.Y. PENAL LAW

§ 265.02(7) .................................................................................24
§ 265.10(1)-(3) ...........................................................................24

## Other Authorities

Amicus Curiae Br. of the Nat'l Shooting Sports Found. in Supp. of Pet'rs,
*Friedman v. City of Highland Park*, No. 15-133, 2015 WL 5139321 ...............29

Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE
(June 20, 2018), https://bit.ly/2OJC72H......................................................28

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries
from Mass Shootings Through Restrictions on Assault Weapons and
Other High-Capacity Semiautomatic Firearms*,
19 CRIM'Y & PUB. POL'Y 147 (2020) ...........................................................25

*Crime Data Explorer*, 2020, FBI, U.S. DEP'T OF JUST.,
https://bit.ly/3pLXPmd ...............................................................................30

Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9,
2013), https://bit.ly/3whtDTj .......................................................................28

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
20 J. CONTEMP. L. 381 (1994) ..............................................................24, 26

*Educational Attainment in the United States: 2019*, U.S. CENSUS BUREAU (Mar. 30,
2020), https://bit.ly/3qBy077 ......................................................................29

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime
in the United States*, 2019, FBI, U.S. DEP'T OF JUST.,
https://bit.ly/31WmQ1V ...................................................................29, 30, 31

*First-Time Gun Buyers Grow to Nearly 5 Million in 2020*, THE FIREARM INDUS. TRADE ASS'N (Aug. 24, 2020), https://bit.ly/37xFH6F ....................................28

Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349 (1992)..........................................................................21

FRANK MINITER, THE FUTURE OF THE GUN (2014)..........................................25, 30

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997)............30

Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, U.S. DEP'T OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. (Jan. 2019), https://bit.ly/31VjRa9 ...........................31

Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 VA. L. REV. 1 (1996)................................................................21

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285 (2009)....................................27, 28

*Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, THE FIREARM INDUS. TRADE ASS'N (July 20, 2020), https://bit.ly/3QBXiyv............28

*Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY 2-1 tbl. 2-1 (2008), https://bit.ly/3pvS3SW .......................................................24

*Shared Micromobility in the U.S.: 2018*, NAT'L ASS'N OF CITY TRANSP. OFFS., https://bit.ly/3dHb2rF ........................................................................28

WALT KULECK & GREG KING, THE NEW AR-15 COMPLETE OWNER'S GUIDE 81 (2014) .................................................................................................26

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw ............28, 29

## INTRODUCTION

The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), establishes that Plaintiffs must succeed in this challenge to Maryland's outright ban on semiautomatic rifles owned by millions of Americans. *Bruen* unequivocally reaffirms that when a law is challenged on Second Amendment grounds, the courts' analysis of the challenged restriction must be rooted in the *text* of the Amendment and the *history* showing which types of firearms regulation were accepted at the Founding, as consistent with the right to keep and bear arms. Indeed, the Court clarified in *Bruen* that *the only way* that a law burdening conduct falling within the Second Amendment's scope can be upheld is if the government can demonstrate a "historical tradition" of regulations, rooted in the Founding Era, that burdened the right in a similar way and for similar reasons. *Id.* at 2130, 2133.

As important as these principles are, *Bruen*'s significance for this case is even more substantial. That is because *Bruen* clarifies *how* the Court's Second Amendment test applies *specifically* to laws like Maryland's barring the possession of certain types of firearms. With respect to the Second Amendment's text, the Court reiterated that "the Second Amendment extends, prima facie, to *all instruments* that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 2132 (emphasis added). With respect to history, the Court indicated

1

that the historical record demonstrates that this prima facie protection can be overcome only by a showing that any banned arms are "dangerous and unusual weapons" at the time the analysis is being conducted; it follows that arms that are "in common use today" are constitutionally protected and cannot be banned. *Id*. at 2143.

The *Bruen* decision leads to two important conclusions in this case. First, this Court's decision in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), is no longer good law. In its principal holding, *Kolbe* expressly *refused* to apply the common use analysis that *Bruen* has now confirmed is dispositive for establishing constitutional protection for types of arms. *See id.* at 136 n.10. And *Kolbe*'s alternative holding relies on the "intermediate scrutiny" analysis that *Bruen* expressly overruled. *Id.* at 138. Indeed, the Court in *Bruen* expressly cited *Kolbe* as an example of the approach *it was explicitly rejecting*. 142 S. Ct. at 2126–27. *Kolbe* has thus been expressly abrogated by *Bruen*, and it can no longer guide this Court's analysis of Plaintiffs' challenge.

Second, *Bruen* demonstrates that Maryland's ban on certain semiautomatic rifles is unconstitutional. As explained, in the context of outright bans on a type of arms, like Maryland's ban on semiautomatic rifles here, the Supreme Court has already analyzed the relevant historical restrictions and concluded that the only justification for banning types of arms is that they are "dangerous and unusual,"

meaning they are *not* " 'in common use' today for self-defense." *Id.* at 2143; *see also District of Columbia v. Heller*, 554 U.S. 570, 627 (2008); *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016). The rifles banned by Maryland are among the most popular firearms in the country, owned by tens of millions of Americans for lawful purposes including for self-defense and defense of the home. Maryland has made clear that it does not *like* the people's desire for these firearms, but that does not change the fact that they are bearable arms that the American people overwhelmingly favor and have a right to possess. Under the Second Amendment, Maryland's judgment is entitled to no deference at all but the choices of millions of Americans "demand[] our unqualified deference." *Bruen*, 142 S. Ct. at 2131. *Bruen* thus dooms Maryland's ban and requires judgment for Plaintiffs.

## JURISDICTION

Appellants allege that provisions of Maryland law violate the United States Constitution. JA 21–23. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this case involves a constitutional challenge to state law. The district court entered judgment on March 4, 2021, and Appellants noticed their appeal on March 5, 2021. JA 42, 44. This appeal is from a final judgment that disposes of all parties' claims. *Id*. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

This Court issued its judgment on September 17, 2021, affirming the district court. *See* Opinion, *Bianchi v. Frosh*, No. 21-1255, Doc. 26 (4th Cir. Sept. 17, 2021) ("Opinion"). Appellants timely sought review by the Supreme Court in a petition for a writ of certiorari on December 16, 2021. *See* Petition, *Bianchi v. Frosh*, No. 21-902 (U.S. Dec. 16, 2021). The Supreme Court granted the petition, vacated this Court's judgment, and remanded the case for further consideration in light of the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U. S. ___ (2022). *See Bianchi v. Frosh*, 142 S. Ct. 2898 (Mem.) (2022).

## ISSUE PRESENTED

Whether Maryland's ban on commonly possessed rifles that the State mischaracterizes as "assault weapons" violates the Second Amendment, as incorporated against the State of Maryland by the Fourteenth Amendment.

## STATEMENT OF THE CASE

### I.    Maryland's Semiautomatic Rifle Ban

The State of Maryland deems scores of common semiautomatic rifles "assault weapons"—and bans them outright. MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303; *id.*, PUB. SAFETY § 5-101(r)(2). The State also has banned any "copy" of the enumerated rifles, *id.*, as well as the following "copycat weapon[s]":

> (i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
> 1. a folding stock;
> 2. a grenade launcher or flare launcher; or

4

       3. a flash suppressor;
(ii) a semiautomatic centerfire rifle that has a fixed magazine with the
capacity to accept more than 10 rounds;
(iii) a semiautomatic centerfire rifle that has an overall length of less
than 29 inches.

*Id.*, CRIM. LAW § 4-301(h)(1).

Maryland's broad ban on transporting, possessing, offering to sell,
transferring, purchasing, or receiving any "assault" rifle applies to everyone who
does not fall into one of a few, specific, narrow categories—primarily on-duty
military personnel, law enforcement officers, and certain other government officials.
*See id.*, CRIM. LAW §§ 4-302, 4-303(b)(2), (4)–(5). Ordinary citizens may transport
or possess "assault" rifles, including "copycat weapon[s]," only if they possessed,
purchased, or applied to purchase them on or before October 1, 2013. *Id*. § 4-303(a),
(b)(3). If an ordinary, law-abiding citizen keeps or bears a rifle that does not fall into
this grandfathered category, and Maryland's Semiautomatic Rifle Ban has dubbed
that arm an "assault weapon," Appellees or their agents may seize and dispose of
that arm, regardless of whether it is in common use. *See id*. § 4-304. Moreover, any
ordinary, law-abiding citizen who possesses such "assault weapons," or transports
them into the State, commits a criminal offense and is subject to severe sanctions,
including imprisonment for up to three years for the first offense. *Id*. §§ 4-303, 4-
306(a). Further, under both state and federal law, conviction under these provisions
results in a lifetime ban on possession even of firearms that have not been prohibited

as "assault weapons." *See id.*, PUB. SAFETY §§ 5-101(g)(3), 5-133(b)(1), 5-205(b)(1)

(Maryland law); 18 U.S.C. §§ 922(g)(1), 921(a)(20) (federal law).

## II.     The Ban's Effect on Plaintiffs-Appellants

Dominic Bianchi, David Snope, and Micah Schaefer are ordinary, law-

abiding, adult citizens of Maryland. *See* JA 7. None have been convicted of a felony

or adjudicated mentally incompetent, nor is any one of them otherwise prohibited

under Maryland or federal law from purchasing, acquiring, and possessing operable

firearms. *See id*. Each individual wants to acquire a banned firearm for self-defense

and other lawful purposes but has been barred from doing so by Maryland's

Semiautomatic Rifle Ban. JA 17–18; JA 19. And Firearms Policy Coalition, Inc.,

Second Amendment Foundation, and Citizens Committee for the Right to Keep and

Bear Arms each have numerous members in Maryland, including the Individual

Plaintiffs, who are otherwise eligible to acquire banned firearms and would do so,

but for the Ban. JA 18–19. Finally, Field Traders LLC is likewise injured by the

Semiautomatic Rifle Ban. Field Traders is a licensed firearms dealer in Maryland

that has been forced to forgo numerous firearms sales to lawful purchasers because

of the Ban. JA 7; JA 18.

## III.     Prior Proceedings

On December 1, 2020, Appellants filed this action for declaratory and

injunctive relief in the U.S. District Court for the District of Maryland, JA 23–24,

alleging that Maryland's categorical ban on the possession of common semiautomatic firearms tendentiously and inaccurately labeled "assault weapons" was facially unconstitutional under the Second Amendment, which is applicable to Maryland under the Fourteenth Amendment. JA 21–22. Appellants' Complaint conceded that their Second Amendment claim was foreclosed at the district-court level by this Court's decision in *Kolbe*, which upheld Maryland's Semiautomatic Rifle Ban against an earlier Second Amendment challenge. JA 6. Noting this concession, on February 16, 2021, the district court ordered Appellants to show cause why their case should not be dismissed sua sponte for failure to state a claim upon which relief may be granted. JA 40–41. In response, Appellants again acknowledged that *Kolbe* is controlling, but argued that it was wrongly decided and should be overruled by a court competent to do so. *See* Pls.' Resp. to the Ct.'s Order To Show Cause, No. 1:20-cv-03495, Doc. 27 (D. Md. Feb. 19, 2021). On March 4, 2021, the court dismissed Appellants' complaint, finding "no discretion but" to do so because "Plaintiffs' theory is foreclosed by the Fourth Circuit's opinion deciding *Kolbe v. Hogan*." JA 42.

On March 5, 2021, Appellants timely noticed their appeal. JA 44. Before this Court, Appellants again conceded this Court's en banc precedent was binding, but argued that it should be "overturned by a court competent to do so, and Appellants' Second Amendment rights should be vindicated." Br. of Pls-Appellants, No. 21-

1255, Doc. 18 at 2 (April 19, 2021) ("Appellants' Initial Br."). Bound by *Kolbe*, this Court issued a short, unpublished per curiam opinion affirming the district court on September 17, 2021. *See* Opinion, Doc. 26 (Sept. 17, 2021). Appellants timely petitioned the Supreme Court for a writ of certiorari on December 16, 2021. *See* Petition, *Bianchi v. Frosh*, No. 21-902 (Dec. 16, 2021). On June 30, 2022, the Supreme Court granted the petition, vacated this Court's judgment, and remanded the case for further consideration in light of the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *See Bianchi v. Frosh*, 142 S. Ct. 2898 (Mem.) (2022).

On August 1, 2022, this Court entered an Order requesting supplemental briefing on the effect of *Bruen* on these proceedings.

## SUMMARY OF ARGUMENT

The Second Amendment guarantees law-abiding citizens the right to possess and use firearms in common use. Maryland infringes this right by prohibiting its citizens from possessing popular semiautomatic rifles that it labels "assault weapons." Although this panel, like the district court before it, was bound by *Kolbe* when it issued its per curiam decision, the Supreme Court's decision in *Bruen* rejected the reasoning underlying both of *Kolbe*'s holdings and explicitly abrogated the decision. *Kolbe* is thus no longer good law, and this Court must now assess Maryland's ban on popular semiautomatic rifles anew, under the appropriate

8

standard. *Bruen* also unequivocally holds that the appropriate standard must hew to the "text, history, and tradition" of the Second Amendment—and, in the context of a flat ban on firearms, the government cannot ban firearms that are in "common use." Since the banned semiautomatic firearms are in common use, Plaintiffs' right to possess them is protected by the Second Amendment and judgment must be entered in Plaintiffs' favor.

## ARGUMENT

I.   ***Bruen* expressly abrogated this Court's decision in *Kolbe* and fundamentally rejected its reasoning.**

Prior to the Supreme Court's decision in *Bruen*, this Court was bound by its earlier en banc decision in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc). *See* Appellants' Initial Br. at 2. Yet *Kolbe*'s dual holdings—and the reasoning utilized by the en banc majority to reach those holdings—are fundamentally at odds with the Supreme Court's decision in *Bruen* and cannot be reconciled with that decision. Indeed, the *Bruen* Court *expressly cited* the *Kolbe* decision as an example of the approach that it *specifically rejected and overruled*. And even if *Bruen* had not abrogated *Kolbe* by name, since "the decision of the Supreme Court in [*Bruen*] specifically rejected the reasoning on which [this Court's decision in *Kolbe*] was based," *Kolbe* "is no longer a correct statement of the law" and "no longer controlling." *Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090–91 (4th Cir. 1993).

9

### a. In *Bruen*, the Supreme Court reaffirmed *Heller*'s text-and-history standard for analyzing Second Amendment challenges.

In *Bruen*, the Supreme Court reaffirmed that *Heller* provided a single and exclusive "standard for applying the Second Amendment." 142 S. Ct. at 2129. "When the Second Amendment's *plain text* covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129–30 (emphasis added). Once this prima facie textual showing has been made, "[t]he *government* must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130 (emphasis added). "*Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961) (emphasis added). This case "demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 2127. That test, and that test alone, is the one that governs Second Amendment challenges. *Id*. at 2161 (Kavanaugh, J., concurring).

In distilling this test, the *Bruen* court spent significant time describing how lower courts, like this one, are to proceed in Second Amendment cases. As particularly relevant here, *Bruen* described the proper analysis of the term "arms." That word, *Bruen* affirmed, has a "historically fixed meaning" but one that "applies to new circumstances." *Id*. at 2132. It thus "covers modern instruments that facilitate armed self-defense." *Id*. (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–412

10

(2016) (per curiam) (stun guns). Accordingly, the text of the Second Amendment "extends, prima facie, to *all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. (emphasis added).

The Court then explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does *history* guide our consideration of modern regulations that were unimaginable at the founding." *Id*. (emphasis added). In considering history, courts are to engage in "reasoning by analogy." *Id*. This "analogical reasoning requires only that the government identify a well-established and representative historical *analogu*e, not a historical *twin*" to the challenged regulation. *Id.* at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the court today. *Id.* at 2132. Two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense. *Id*. at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a "modern-day regulation" is "analogous enough" to "historical precursors" that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id*. And importantly, the burden rests on *the government* to identify a sufficiently close historical analogue to justify the challenged restriction. *Id.* at 2135.

11

Three aspects of *Bruen*'s clarification of the Second Amendment's text-and-history standard are especially relevant here. First, the only manner in which lower courts are to assess challenges to regulations is through the "text, as informed by history"—not any other inquiry, and in particular, not so-called "intermediate scrutiny" or any of the other "tiers" of constitutional scrutiny that apply in the context of some other constitutional rights. Second, the term "arms" encompasses "modern instruments that facilitate armed self-defense." Third, when considering whether "history" and "tradition" support a restriction on "arms," the burden shifts to the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 2127.

Nor is *Bruen* silent about how the text-and-history test applies in the context of blanket bans on the possession of certain arms. Both *Bruen* and *Heller* identified *only one* aspect of our history and tradition that is sufficiently analogous to—and therefore capable of justifying—such a law: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm *is* in "common use," there is no historical tradition of banning it. For this type of restriction, then, the Supreme Court has already analyzed the relevant historical

tradition and established its scope: "dangerous and unusual" weapons may be restricted, but arms "in common use at the time" may not. *Id.*

**b.  This Court's decision in *Kolbe* is no longer good law.**

Under this Court's precedent on precedent, a prior decision is no longer binding if an intervening Supreme Court case has "specifically rejected the reasoning on which [the prior decision] was based." *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011) (quoting *Etheridge*, 9 F.3d at 1090–91). Or as this Court put it more recently, a past decision does not bind when it has been "undermined by later Supreme Court precedent." *United States v. Winston*, 850 F.3d 677, 683 (4th Cir. 2017), *abrogated on other grounds*, *Stokeling v. United States*, 139 S. Ct. 544 (2019). For instance, when the Supreme Court puts forward a "framework" that "invalidate[s] [this Court's] analysis," this Court is duty-bound to follow the Supreme Court's framework. *United States v. White*, 987 F.3d 340, 342 (4th Cir. 2021). "This is so even when [the] prior precedent is *directly on point*." *Taylor v. Grubbs*, 930 F.3d 611, 621 (4th Cir. 2019) (Richardson, J., dissenting) (emphasis added).

*Kolbe* upheld Maryland's Semiautomatic Rifle Ban based on two "alternative" holdings: first, that the Ban purportedly did not infringe Second Amendment rights and second, that even if it did the ban passed intermediate scrutiny. The second of these holdings was directly and expressly repudiated by

13

*Bruen* and is "no longer a correct statement of the law." *Etheridge*, 9 F.3d at 1091. Indeed, *Bruen* expressly identified *Kolbe* as one of a series of court of appeals decisions that articulated, and generally upheld firearms restrictions based upon, a "two-step approach" that first "ascertain[ed] the original scope of the right based on its historical meaning" and then applied either "strict scrutiny" or (more commonly) "intermediate scrutiny." *Bruen*, 142 S. Ct. at 2126–27. *Bruen* unequivocally rejected this approach, holding that it applied "one step too many." *Id.* at 2127. Instead of any "means-end scrutiny," *Bruen* held, courts must adhere to *Heller*'s text and history approach. Since *Bruen* specifically cited the en banc decision in *Kolbe* as one of the line of cases it was expressly repudiating, that decision is plainly no longer good law. This Court thus can dispense with relying on any facet of *Kolbe*'s application of intermediate scrutiny.

But *Kolbe* did not just err in proceeding to a means-end analysis. *Bruen* establishes that the *Kolbe* court got the first step wrong too. As we have explained, *Bruen* makes clear that firearms that are in common use by contemporary Americans simply *cannot be banned*. Indeed, the Court could not have been clearer in stating that "the Second Amendment protects the possession and use of weapons that are in common use at the time"—with the relevant time being the time the analysis is conducted. *See* 142 S. Ct. at 2128, 2143. But in holding that the arms banned by the Semiautomatic Rifle Ban are not protected by the Second Amendment, the *Kolbe*

14

court *refused* to even *consider* whether the banned arms are in common use, explaining that such an inquiry is "best left for cases involving other sorts of weapons." *Kolbe*, 849 F.3d at 136 n.10. *Bruen* makes clear that this analysis is faulty.

Whether the banned arms are in common use cannot be put off for another case. That is the test. Even at the time, *Kolbe*'s "like a M-16" test was a "heretofore unknown" "stand-alone inquiry" that impermissibly dispensed with a "historically rooted" analysis in favor of "ad hoc" comparisons. *Id.* at 155–56 (Traxler, J., dissenting). In the years since, *Kolbe*'s analysis was not adopted by other lower courts. *See* Pls' Initial Br. at 14. And now, after *Bruen*, it must be cast aside.

While this is enough to dispense with *Kolbe*, *Bruen* also establishes that *Kolbe* was wrong not just in its conclusions but also in its general approach to the Second Amendment. *Kolbe* immediately got off the wrong track by dispensing with *any analysis* of the plain text of the Second Amendment. *Bruen* requires a court to engage with the "plain text" of what the Amendment provides—for example, whether the plaintiffs are "part of the 'people' whom the Second Amendment protects," whether their proposed course of conduct is encapsulated by the definition of the verbs "keep and bear," and whether the implements being kept or borne are "arms." *Bruen*, 142 S. Ct. at 2134–35; *see also id.* at 2126, 2129. The *Kolbe* court did not grapple at all with the key word "arms" or what *Bruen* called that word's "general definition." *See, e.g., Kolbe*, 849 F.3d at 137 n.12 ("[W]e need not reach the State's alternative

15

contention that large-capacity magazines lack constitutional protection because they are not 'arms' within the meaning of the Second Amendment."). Instead, *Kolbe* based its analysis on snippets of *Heller*—not the text of the Constitution itself. *Id.* at 156 (Traxler, J., dissenting). And the text of the Constitution itself indicates that its protection "extends, prima facie, to all instruments that constitute bearable arms." *Bruen*, 142 S. Ct. at 2132. As the Supreme Court recently counseled in another context, a court should not "comb the[] pages" of the U.S. Reports "for stray comments and stretch them beyond their context—all to justify an outcome inconsistent with th[e] [Supreme] Court's reasoning and judgments." *Brown v. Davenport*, 142 S. Ct. 1510, 1528 (2022). That is precisely what the en banc majority did in *Kolbe*, and after *Bruen*, that cavalier treatment of the Second Amendment's text is completely untenable.

*Bruen* "specifically rejected" *Kolbe* in yet another way: *Bruen* counsels that lower courts are to assess the validity of firearm regulations by comparing them with "the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Yet the *Kolbe* court affirmatively declined to undertake any historical analysis whatsoever—the majority opinion never even uses the word "history" and only references "historical" once in a passing quotation of *Heller*. *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 627). Such an ahistorical approach can no longer stand.

16

Of course, in a certain sense *Kolbe* was justified in eschewing history because, as *Bruen* confirms, *Heller* had *already* established what must be shown to make the ban of a particular type of arm "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As *Heller* explains and *Bruen* confirms, while there was a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' " at the Founding, there is *zero* historical warrant for bans on "weapons . . . 'in common use at the time.' " *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). As we have explained, the *Kolbe* court entirely ignored this critical distinction. *See* 849 F.3d at 136. *Bruen* has now made clear beyond dispute that this Court must indeed answer the question whether the arms banned by Maryland are in common use. And if they are, they cannot be banned.

## II. Maryland's ban of common semiautomatic firearms is unconstitutional under *Bruen*.

With *Kolbe* abrogated, this Court must assess anew, in light of the Supreme Court's recent teaching in *Bruen*, whether or not Maryland's Semiautomatic Rifle Ban is constitutional. *Bruen* instructs courts first to analyze the text of the Second Amendment; and "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. Here, the Second Amendment's plain text covers the firearms Maryland bans, so it falls to

17

the Defendants to justify their regulation as consistent with historical tradition rooted in the Founding. They cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms.

### a. The banned firearms are unquestionably arms within the meaning of the Second Amendment.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The challenged laws ban semiautomatic centerfire rifles based on certain characteristics those rifles have—for example, a rifle is banned if it can accept a detachable magazine and has a folding stock and flash suppressor—or based on a rifle's inclusion in a list of specific models of firearms Maryland has banned. These are "Arms" within the meaning of the Second Amendment's plain text, which presumptively protects Americans' rights to possess "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016); *see also Bruen*, 142 S. Ct. at 2132. As a result, under *Bruen* the burden shifts to the Defendants to show that Maryland's ban is consistent with this Nation's tradition of firearm regulation.

### b. Maryland's ban on semiautomatic rifles cannot be historically justified.

#### i. Only "dangerous and unusual" arms can be banned consistent with our history and tradition.

*Bruen*'s second step involves asking whether a challenged law is "consistent with this Nation's [historical] tradition of firearm regulation." *Bruen*, 14 S. Ct. at 2126. While in many cases that inquiry will involve new research into potential historical analogues, both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue in this case: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627) . And a law by definition *will not* fit into that tradition if it bans "possession and use of weapons that are 'in common use at the time.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627; *see also Heller*, 554 U.S. at 625 ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").

This test is based on historical practice and "the historical understanding of the scope of the right," but with reference to modern realities of firearm ownership. *Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical

19

understanding."); *Rocky Mountain Gun Owners v. Town of Superior, Colo.*, 1:22-cv-01685, Doc. 18 at 9 (July 22, 2022) (granting, post-*Bruen*, a temporary restraining order against enforcement of a ban on certain semiautomatic rifles and noting "the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes"). In the context of broad bans on bearable arms, in other words, *the Supreme Court has already done the historical spadework*—and the only restrictions of this kind that it has deemed consistent with the historical understanding of the right to keep and bear arms are restrictions limited to *dangerous and unusual* arms that *are not in common use*.

This Court's task, under Supreme Court precedent, is therefore a simple one: it merely must determine whether the banned weapons are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Thus, a firearm that is in common use for lawful purposes, by definition, *does not* fall within this category and *cannot be banned*. *Bruen*, 142 S. Ct. at 2143.

To determine whether a firearm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people *nationwide*, not just, say, in Maryland. *See id.* at 2131 ("It is this balance— struck by the traditions *of the American people*—that demands our unqualified

20

deference." (emphasis added)); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*" (emphasis added)). Therefore, the Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation (like Maryland's ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions. In this way, the Amendment is similar to other constitutional guarantees that serve to hold state and local governments to minimum standards that are applicable nationwide, for "constitutional adjudication frequently involves the justices' seizing upon a dominant national consensus and imposing it on resisting local outliers." Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 VA. L. REV. 1, 16 (1996). More pithily, the Supreme Court "obliterates outliers." Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349, 370 (1992).

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[*w*]*hatever the reason*, handguns are the most popular weapon chosen by

21

Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629 (emphasis added). And in *Bruen* the Court reaffirmed that "the traditions of the American people"—which includes their choice of preferred firearms—"demand[ ] [the courts'] unqualified deference." 142 S. Ct. at 2131. Thus, unless the government can show that a certain type of firearm is "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, that is the end of the matter. Firearms owned by law-abiding citizens for lawful purposes are "Arms" and cannot be banned.

Finally, the Second Amendment inquiry focuses on the choices commonly made by *contemporary* law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *id*. at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 577 U.S. 411–12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.* And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they

22

provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

### ii. The semiautomatic rifles banned by Maryland are in common use.

This case thus reduces to the following, straightforward inquiry: are the arms banned by Maryland in "common use," according to the lawful choices by contemporary Americans? They unquestionably are.

There is no class of firearms known as "semiautomatic assault weapons." "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). But while "semiautomatic assault weapons" is not a recognized category of firearms, "semiautomatic" is. And it is semiautomatic rifles that Maryland's "assault weapons" ban targets. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will not fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

There is thus a significant practical difference between a truly automatic and a merely semiautomatic rifle. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between

forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. *Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY 2-1 tbl. 2-1 (2008), https://bit.ly/3pvS3SW.

There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles. The Supreme Court has held as much, concluding in *Staples* that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994). Yet apart from the now-expired ten-year federal "assault weapons" ban, the Federal Government has not banned them. And currently the vast majority of States do not ban semiautomatic rifles deemed "assault weapons."[1]

---

[1]   In addition to Maryland, only California, Connecticut, Delaware, Massachusetts, New Jersey, and New York, as well as the District of Columbia, have enacted bans on rifles deemed "assault weapons," with varying definitions of the prohibited firearms. *See* CAL. PENAL CODE §§ 30600, 30605; CONN. GEN. STAT. § 53-202c, 11 DEL. CODE § 1466; MASS. GEN. LAWS ch. 140, § 131M; N.J. STAT. §§ 2C:39-5(f), 2C:39-9(g); N.Y. PENAL LAW §§ 265.02(7), 265.10(1)-(3); D.C. CODE ANN. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c).

### iii.   Banned semiautomatic rifles are not materially distinguishable from other semiautomatic rifles.

It is no answer to say that Maryland bans only a subset of semiautomatic rifles. Indeed, this line of argument is foreclosed not only by *Heller* but also by *Staples*, which identified the AR-15—the archetypal "assault weapon"—as a traditionally lawful firearm. *See* 511 U.S. at 603, 611.

The firearms that Maryland bans are not distinguishable for being more dangerous than rifles that the State does not ban. "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Crim'y & Pub. Pol'y 147, 149 (2020). Indeed, the AR-15—the paradigmatic semiautomatic rifle targeted by "assault weapons" laws—is typically chambered for .223in/5.56mm ammunition, *see, e.g.*, *Worman v. Healey*, 293 F. Supp. 3d 251, 258 (D. Mass. 2018), *aff'd* 922 F.3d 26 (1st Cir. 2019), which "makes it safer to use as a home-defense gun because this lighter caliber is less likely to travel through walls," Frank Miniter, The Future of the Gun 35 (2014). The rifles Maryland bans also fire at the same rate as all other semiautomatics—one round for each pull of the trigger.

25

To the extent the cosmetic features singled out by Maryland's Semiautomatic Rifle Ban make any functional difference, they tend to improve a firearm's utility and safety for self-defense and other lawful purposes. For example:

- A folding stock increases maneuverability in tight home quarters, Kopel, *supra*, at 398–99, as well as enabling safe storage of defense instruments in accessible spaces.

- A flash suppressor is a "common accessory" that "reduces the flash of light" from a firearm shot, thus reducing the chance that a home-invader will mark his victim's position, as well as decreasing the homeowner's blindness—"the momentary blindness caused by the sudden flash of light from the explosion of gunpowder." *Id*. at 397.

- A semiautomatic centerfire rifle that has an overall length of less than twenty-nine inches, but which meets the federal overall length requirement of twenty-six inches, is helpful in home-defense situations because of its reduced mass at the firearm's least supported position, to those of smaller stature or less strength, and to reduce the length of the barrel to better move around obstacles and through hallways, for example. *See* WALT KULECK & GREG KING, THE NEW AR-15 COMPLETE OWNER'S GUIDE 81 (2014) (in self-defense, "[t]he shortest practical overall length is usually considered a 'good thing' ").

### iv.  The banned firearms are typically possessed for lawful purposes.

Accordingly, the firearms Maryland has banned are functionally indistinguishable from any other semi-automatic arm—except that they include legitimate, safety-improving features that make them attractive to many law-abiding citizens for self-defense and other lawful purposes.

But even if the banned firearms are considered as a separate category of arms than other semiautomatic firearms, the dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in that category. *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020) ("Commonality is determined largely by statistics."); *Ass'n of N.J. Rifle & Pistol Clubs*, *Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modern semiautomatic rifles, which epitomize the firearms that Maryland bans.

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-

27

selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR-15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9, 2013), https://bit.ly/3whtDTj; *see also Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).

Today, the number of AR-rifles and other modern sporting rifles in circulation in the United States exceeds twenty-four million. *Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, THE FIREARM INDUS. TRADE ASS'N (July 20, 2020), https://bit.ly/3QBXiyv. As one contrast, apparently ubiquitous public e-scooters numbered only 85,000 and were available in only 100 U.S. cities, as of 2018. *Shared Micromobility in the U.S.: 2018*, NAT'L ASS'N OF CITY TRANSP. OFFS., https://bit.ly/3dHb2rF. According to industry sources, as of 2018, roughly thirty-five percent of all newly manufactured guns sold in America are modern semiautomatic rifles, Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), https://bit.ly/2OJC72H, and an estimated five million Americans purchased firearms for the first time in 2020, *First-Time Gun Buyers Grow to Nearly 5 Million in 2020*, THE FIREARM INDUS. TRADE ASS'N (Aug. 24, 2020), https://bit.ly/37xFH6F. In fact, a recent survey of gun owners estimated that 24.6 million Americans have owned AR-15 or similar rifles. *See*

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw. Even if ownership had not increased, so-called assault weapons would be more common than either professional or doctoral degrees. *See Educational Attainment in the United States: 2019*, U.S. CENSUS BUREAU tbl. 1 (Mar. 30, 2020), https://bit.ly/3qBy077 (just 4.56 million noninstitutionalized civilians have doctoral degrees and only 3.15 million have professional degrees).

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, *supra*, at 33–34. This is consistent with the findings of an earlier 2013 survey of 21,942 confirmed owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning these firearms. Amicus Curiae Br. of the Nat'l Shooting Sports Found. in Supp. of Pet'rs, *Friedman v. City of Highland Park*, No. 15-133, 2015 WL 5139321, at *13; *see also Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014), *aff'd sub nom. Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). These purposes are plainly lawful (and also related), as "maintain[ing] proficiency in firearm use [is] an important corollary

29

to . . . self-defense," *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)).

"An additional survey estimated that approximately 11,977,000 people participated

in target shooting with a modern sporting rifle," *Friedman*, 68 F. Supp. 3d at 904,

and indeed the "AR-15 type rifle . . . is the leading type of firearm used in national

matches and in other matches sponsored by the congressionally established Civilian

Marksmanship program." *Shew v. Malloy*, 994 F. Supp. 2d 234, 245 n.40 (D. Conn.

2014). Overall, AR-style rifles

> are popular with civilians and law enforcement around the world
> because they're accurate, light, portable, and modular. . . . [The AR-
> style rifle is] also easy to shoot and has little recoil, making it popular
> with women. The AR-15 is so user-friendly that a group called
> 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it
> possible for people who can't handle a bolt-action or other rifle type to
> shoot and protect themselves.

MINITER, *supra*, at 35.

The fact that "assault" rifles are used extremely rarely in crime underscores

that AR-15s and other banned rifles are commonly possessed by law-abiding citizens

for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are

'assault rifles.' " GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL

112 (1997). From 2015 through 2020, only 2.2% of murders were committed with

*any* type of rifle. *See Crime Data Explorer*, 2020, FBI, U.S. DEP'T OF JUST.,

https://bit.ly/3pLXPmd; *Expanded Homicide Data Table 8: Murder Victims by*

*Weapon, 2015–2019*, *Crime in the United States*, 2019, FBI, U.S. DEP'T OF JUST.,

https://bit.ly/31WmQ1V (90,594 total murders; 2,028 with rifles). Murder by "hands, fists, feet, etc." was almost twice as common, at 4,008, over the same time period—and murder by handgun, at over 40,000, was over *20 times* as common. *Id.* Even in the counterfactual event that a different modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 20 million modern sporting rifles in circulation in the United States during that time period—around .01 percent—would have been used for that unlawful purpose. More broadly, as of 2016, only .8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, U.S. DEP'T OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), https://bit.ly/31VjRa9.

Finally, the Supreme Court's decision in *Caetano* further confirms that the arms banned by Maryland are in common use. That case concerned Massachusetts's ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected by the Second Amendment. 577 U.S. at 411. With a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411–12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, *see id.*, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely

31

owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J., concurring) (cleaned up) (citation omitted). Of course, that is far fewer than the millions of semiautomatic rifles sold to private citizens nationwide that Maryland bans.

The Massachusetts Supreme Judicial Court got the message. In a subsequent case, that Court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Sup. Ct. Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the State to rebut the *prima facie* presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Sup. Ct. Ill. 2019). This reasoning is sound, and it necessarily entails the invalidity of Maryland Semiautomatic Rifle Ban, which restricts arms that are many times more common than stun guns.

## III.    The Court should enter judgment in Plaintiffs' favor.

Although ordinarily the appropriate course after reversing the district court's order dismissing Plaintiffs' suit would be to remand this case for further proceedings, that is neither necessary nor appropriate in this case. In *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the Seventh Circuit was confronted by a pair of district court orders dismissing a Second Amendment challenge to an Illinois law flatly banning the public carry of firearms, which it reversed. Rather than simply remanding, the Seventh Circuit remanded with instruction that the district court enter judgment in plaintiffs' favor, finding that "there are no evidentiary issues in these two cases. The constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." *Id*. at 942.

The same is true here. As explained, the only relevant question for the Court is whether the arms banned by Maryland are in common use by private citizens in the United States. To answer this question the Court need only consult "legislative facts" of the type cited in this brief, "which is to say facts that bear on the justification for legislation, as distinct from" adjudicative facts, which are facts "concerning the conduct of parties in a particular case." *Id*. "Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the [Maryland] gun law." *Id*.

33

The distinction between legislative and adjudicative facts likely explains why the Supreme Court has not cited to evidence in a trial court record when assessing restrictions on particular types of firearms, but instead has relied on sources akin to those we rely on in our briefing in this Court. In *Heller*, for example, the Court cited the D.C. Circuit's decision below for the proposition that handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family." 554 U.S. at 628–29. The D.C. Circuit, in turn, cited directly to a social science paper to support this conclusion. *See Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence & Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)). And in his *Caetano* concurrence, Justice Alito quoted a Michigan Court of Appeals decision for the proposition that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Caetano*, 577 U.S. at 420 (Alito, J., concurring). That decision based this conclusion on a law review article that in turn relied on "a newspaper article from 1985." *See People v. Yanna*, 824 N.W.2d 241, 245 n.5 (Mich. Ct. App. 2012). The evidence we have cited establishing the commonality of arms of the type banned by Maryland is robust in comparison.

*Bruen* provides additional support for ordering judgment for Plaintiffs without further proceedings in district court. Indeed, this case is in essentially the exact same

procedural as posture *Bruen* was before the Supreme Court. In that case, as in this one, the plaintiffs' claims were foreclosed by circuit precedent at the time the complaint was filed, and the district court accordingly entered judgment against the plaintiffs on the pleadings. *See New York State Rifle & Pistol Ass'n, Inc. v. Beach*, 354 F. Supp. 3d 143 (N.D.N.Y. 2018). In holding that New York's may-issue licensing scheme violated the Second Amendment, the Supreme Court expressly rejected the argument that it could not "answer the question presented without giving respondents the opportunity to develop an evidentiary record" relating to the operation of New York's law. *Bruen*, 142 S. Ct. at 2135 n.8. "[I]n light of the text of the Second Amendment, along with the Nation's history of firearm regulation," the conclusion "that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense" did not turn disputed factual questions. *Id*. The same is true here. Application of *Bruen*'s text and history test does not involve any analysis of adjudicative facts of the kind that are disclosed in discovery or found in trials. *See id.* Rather, this case turns entirely on purely legal issues that can and should be fully resolved by this Court on the evidence presented by the parties in their briefs.

## CONCLUSION

For the foregoing reasons, this Court should reverse and order entry of judgment in Plaintiffs' favor.

Dated: August 22, 2022

Raymond M. DiGuiseppe
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite
300 Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
Tiernan B. Kane
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600 / (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Plaintiffs-Appellants' Supplemental Opening Brief complies with the requirements of Federal Rule of Appellate Procedure 32(a). The brief is prepared in 14-point Times New Roman font, a proportionally spaced typeface; it is double-spaced; and it contains 8,468 words (exclusive of items listed in Rule 32(f)), as measured by Microsoft Word.

<u>/s/ David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellants*

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

U.S. Const. amend. II ................................................................ Add 1

18 U.S.C.

    § 921(a)(20) ................................................................ Add 12
    § 922(g)(1) ................................................................. Add 12

Md. Code Ann., Crim. Law

    § 4-301 ...................................................................... Add 1
    § 4-302 ...................................................................... Add 6
    § 4-303 ...................................................................... Add 7
    § 4-304 ...................................................................... Add 9
    § 4-306 ...................................................................... Add 9

Md. Code Ann., Pub. Safety

    § 5-101(g) ................................................................. Add 10
    § 5-101(r) .................................................................. Add 3
    § 5-133 ..................................................................... Add 10
    § 5-133.3(a) ............................................................... Add 11
    § 5-133.3(b)(1) ........................................................... Add 11
    § 5-205 ..................................................................... Add 11

**U.S. Const. amend. II.**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**Md. Code Ann., Crim. Law § 4-301. Definitions**

### In general

(a) In this subtitle the following words have the meanings indicated.

### Assault long gun

(b) "Assault long gun" means any assault weapon listed under § 5-101(r)(2) of the Public Safety Article.

### Assault pistol

(c) "Assault pistol" means any of the following firearms or a copy regardless of the producer or manufacturer:

   (1) AA Arms AP-9 semiautomatic pistol;

   (2) Bushmaster semiautomatic pistol;

   (3) Claridge HI-TEC semiautomatic pistol;

   (4) D Max Industries semiautomatic pistol;

   (5) Encom MK-IV, MP-9, or MP-45 semiautomatic pistol;

   (6) Heckler and Koch semiautomatic SP-89 pistol;

   (7) Holmes MP-83 semiautomatic pistol;

   (8) Ingram MAC 10/11 semiautomatic pistol and variations including the Partisan Avenger and the SWD Cobray;

   (9) Intratec TEC-9/DC-9 semiautomatic pistol in any centerfire variation;

(10) P.A.W.S. type semiautomatic pistol;

(11) Skorpion semiautomatic pistol;

(12) Spectre double action semiautomatic pistol (Sile, F.I.E., Mitchell);

(13) UZI semiautomatic pistol;

(14) Weaver Arms semiautomatic Nighthawk pistol; or

(15) Wilkinson semiautomatic "Linda" pistol.

## Assault weapon

(d) "Assault weapon" means:

(1) an assault long gun;

(2) an assault pistol; or

(3) a copycat weapon.

. . .

## Copycat weapon

(h)

(1) "Copycat weapon" means:

(i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:

1. a folding stock;

2. a grenade launcher or flare launcher; or

3. a flash suppressor;

(ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

(iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches;

Add 2

(iv) a semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;

(v) a semiautomatic shotgun that has a folding stock; or

(vi) a shotgun with a revolving cylinder.

(2) "Copycat weapon" does not include an assault long gun or an assault pistol.

### Detachable magazine

(i) "Detachable magazine" means an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge.

### Flash suppressor

(j) "Flash suppressor" means a device that functions, or is intended to function, to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.

. . .

### Md. Code Ann., Pub. Safety § 5-101. Definitions

. . .

### Regulated firearm

(r) "Regulated firearm" means:

(1) a handgun; or

(2) a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon:

(i) American Arms Spectre da Semiautomatic carbine;

(ii) AK-47 in all forms;

Add 3

(iii) Algimec AGM-1 type semi-auto;

(iv) AR 100 type semi-auto;

(v) AR 180 type semi-auto;

(vi) Argentine L.S.R. semi-auto;

(vii) Australian Automatic Arms SAR type semi-auto;

(viii) Auto-Ordnance Thompson M1 and 1927 semi-automatics;

(ix) Barrett light .50 cal. semi-auto;

(x) Beretta AR70 type semi-auto;

(xi) Bushmaster semi-auto rifle;

(xii) Calico models M-100 and M-900;

(xiii) CIS SR 88 type semi-auto;

(xiv) Claridge HI TEC C-9 carbines;

(xv) Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle;

(xvi) Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2;

(xvii) Dragunov Chinese made semi-auto;

(xviii) Famas semi-auto (.223 caliber);

(xix) Feather AT-9 semi-auto;

(xx) FN LAR and FN FAL assault rifle;

(xxi) FNC semi-auto type carbine;

(xxii) F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;

(xxiii) Steyr-AUG-SA semi-auto;

(xxiv) Galil models AR and ARM semi-auto;

Add 4

(xxv) Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3;

(xxvi) Holmes model 88 shotgun;

(xxvii) Avtomat Kalashnikov semiautomatic rifle in any format;

(xxviii) Manchester Arms "Commando" MK-45, MK-9;

(xxix) Mandell TAC-1 semi-auto carbine;

(xxx) Mossberg model 500 Bullpup assault shotgun;

(xxxi) Sterling Mark 6;

(xxxii) P.A.W.S. carbine;

(xxxiii) Ruger mini-14 folding stock model (.223 caliber);

(xxxiv) SIG 550/551 assault rifle (.223 caliber);

(xxxv) SKS with detachable magazine;

(xxxvi) AP-74 Commando type semi-auto;

(xxxvii) Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, M1A, excluding the M1 Garand;

(xxxviii) Street sweeper assault type shotgun;

(xxxix) Striker 12 assault shotgun in all formats;

(xl) Unique F11 semi-auto type;

(xli) Daewoo USAS 12 semi-auto shotgun;

(xlii) UZI 9mm carbine or rifle;

(xliii) Valmet M-76 and M-78 semi-auto;

(xliv) Weaver Arms "Nighthawk" semi-auto carbine; or

(xlv) Wilkinson Arms 9mm semi-auto "Terry".

. . .

Add 5

**Md. Code Ann., Crim. Law § 4-302. Scope of subtitle**

This subtitle does not apply to:

(1) if acting within the scope of official business, personnel of the United States government or a unit of that government, members of the armed forces of the United States or of the National Guard, law enforcement personnel of the State or a local unit in the State, or a railroad police officer authorized under Title 3 of the Public Safety Article or 49 U.S.C. § 28101;

(2) a firearm modified to render it permanently inoperative;

(3) possession, importation, manufacture, receipt for manufacture, shipment for manufacture, storage, purchases, sales, and transport to or by a licensed firearms dealer or manufacturer who is:

(i) providing or servicing an assault weapon or detachable magazine for a law enforcement unit or for personnel exempted under item (1) of this section;

(ii) acting to sell or transfer an assault weapon or detachable magazine to a licensed firearm dealer in another state or to an individual purchaser in another state through a licensed firearms dealer; or

(iii) acting to return to a customer in another state an assault weapon transferred to the licensed firearms dealer or manufacturer under the terms of a warranty or for repair;

(4) organizations that are required or authorized by federal law governing their specific business or activity to maintain assault weapons and applicable ammunition and detachable magazines;

(5) the receipt of an assault weapon or detachable magazine by inheritance, and possession of the inherited assault weapon or detachable magazine, if the decedent lawfully possessed the assault weapon or detachable magazine and the person inheriting the assault weapon or detachable magazine is not otherwise disqualified from possessing a regulated firearm;

(6) the receipt of an assault weapon or detachable magazine by a personal representative of an estate for purposes of exercising the powers and duties of a personal representative of an estate;

(7) possession by a person who is retired in good standing from service with a law enforcement agency of the State or a local unit in the State and is not otherwise prohibited from receiving an assault weapon or detachable magazine if:

> (i) the assault weapon or detachable magazine is sold or transferred to the person by the law enforcement agency on retirement; or

> (ii) the assault weapon or detachable magazine was purchased or obtained by the person for official use with the law enforcement agency before retirement;

(8) possession or transport by an employee of an armored car company if the individual is acting within the scope of employment and has a permit issued under Title 5, Subtitle 3 of the Public Safety Article; or

(9) possession, receipt, and testing by, or shipping to or from:

> (i) an ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory; or

> (ii) a facility or entity that manufactures or provides research and development testing, analysis, or engineering for personal protective equipment or vehicle protection systems.

## Md. Code Ann., Crim. Law § 4-303. Assault weapons—Prohibited

### In general

(a) Except as provided in subsection (b) of this section, a person may not:

> (1) transport an assault weapon into the State; or

> (2) possess, sell, offer to sell, transfer, purchase, or receive an assault weapon.

### Exception

(b)

> (1) A person who lawfully possessed an assault pistol before June 1, 1994, and who registered the assault pistol with the Secretary of State Police before August 1, 1994, may:

>> (i) continue to possess and transport the assault pistol; or

Add 7

(ii) while carrying a court order requiring the surrender of the assault pistol, transport the assault pistol directly to a law enforcement unit, barracks, or station, a State or local law enforcement agency, or a federally licensed firearms dealer, as applicable, if the person has notified a law enforcement unit, barracks, or station that the person is transporting the assault pistol in accordance with a court order and the assault pistol is unloaded.

(2) A licensed firearms dealer may continue to possess, sell, offer for sale, or transfer an assault long gun or a copycat weapon that the licensed firearms dealer lawfully possessed on or before October 1, 2013.

(3) A person who lawfully possessed, has a purchase order for, or completed an application to purchase an assault long gun or a copycat weapon before October 1, 2013, may:

(i) possess and transport the assault long gun or copycat weapon; or

(ii) while carrying a court order requiring the surrender of the assault long gun or copycat weapon, transport the assault long gun or copycat weapon directly to a law enforcement unit, barracks, or station, a State or local law enforcement agency, or a federally licensed firearms dealer, as applicable, if the person has notified a law enforcement unit, barracks, or station that the person is transporting the assault long gun or copycat weapon in accordance with a court order and the assault long gun or copycat weapon is unloaded.

(4) A person may transport an assault weapon to or from:

(i) an ISO 17025 accredited, National Institute of Justice-approved ballistics testing laboratory; or

(ii) a facility or entity that manufactures or provides research and development testing, analysis, or engineering for personal protective equipment or vehicle protection systems.

(5) A federally licensed firearms dealer may receive and possess an assault weapon received from a person in accordance with a court order to transfer firearms under § 6-234 of the Criminal Procedure Article.

**Md. Code Ann., Crim. Law § 4-304. Assault weapons--Seizure and disposition**

A law enforcement unit may seize as contraband and dispose of according to regulation an assault weapon transported, sold, transferred, purchased, received, or possessed in violation of this subtitle.

**Md. Code Ann., Crim. Law § 4-306. Penalties**

### In general

(a) Except as otherwise provided in this subtitle, a person who violates this subtitle is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

### Use in a felony or crime of violence

(b)

(1) A person who uses an assault weapon, a rapid fire trigger activator, or a magazine that has a capacity of more than 10 rounds of ammunition, in the commission of a felony or a crime of violence as defined in § 5-101 of the Public Safety Article is guilty of a misdemeanor and on conviction, in addition to any other sentence imposed for the felony or crime of violence, shall be sentenced under this subsection.

(2)

(i) For a first violation, the person shall be sentenced to imprisonment for not less than 5 years and not exceeding 20 years.

(ii) The court may not impose less than the minimum sentence of 5 years.

(iii) The mandatory minimum sentence of 5 years may not be suspended.

(iv) Except as otherwise provided in § 4-305 of the Correctional Services Article, the person is not eligible for parole in less than 5 years.

(3)

    (i) For each subsequent violation, the person shall be sentenced to imprisonment for not less than 10 years and not exceeding 20 years.

    (ii) The court may not impose less than the minimum sentence of 10 years.

    (iii) A sentence imposed under this paragraph shall be consecutive to and not concurrent with any other sentence imposed for the felony or crime of violence.

## Md. Code Ann., Pub. Safety § 5-101. Definitions

. . .

### Disqualifying crime

(g) "Disqualifying crime" means:

    (1) a crime of violence;

    (2) a violation classified as a felony in the State; or

    (3) a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years.

. . .

## Md. Code Ann., Pub. Safety § 5-133. Restrictions on possession of regulated firearms

. . .

### Possession of regulated firearm prohibited

(b) Subject to § 5-133.3 of this subtitle, a person may not possess a regulated firearm if the person:

    (1) has been convicted of a disqualifying crime;

. . .

**Md. Code Ann., Pub. Safety § 5-133.3. Persons subject to regulated firearms disqualification**

### Health Department defined

(a) In this section, "Health Department" means the Maryland Department of Health.

### Exemptions to regulated firearms disqualification

(b) A person subject to a regulated firearms disqualification under § 5-133(b)(6), (7), (8), (9), (10), or (11) of this subtitle, a rifle or shotgun disqualification under § 5-205(b)(6), (7), (8), (9), (10), or (11) of this title, or prohibited from the shipment, transportation, possession, or receipt of a firearm by 18 U.S.C. §§ 922(d)(4) or (g)(4) as a result of an adjudication or commitment that occurred in the State may be authorized to possess a firearm if:

> (1) the person is not subject to another firearms restriction under State or federal law; and

> (2) the Health Department, in accordance with this section, determines that the person may possess a firearm.

. . .

**Md. Code Ann., Pub. Safety § 5-205. Possession by person with mental disorder**
. . .

### Persons prohibited from possessing a rifle or shotgun

(b) A person may not possess a rifle or shotgun if the person:

> (1) has been convicted of a disqualifying crime as defined in § 5-101 of this title;

. . .

Add 11

**18 U.S.C. § 921. Definitions**

. . .

(20) The term "crime punishable by imprisonment for a term exceeding one year" does not include—

> (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

> (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

. . .

**18 U.S.C. § 922. Unlawful acts**

. . .

(g) It shall be unlawful for any person--

> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

. . .

Add 12

## **<u>CERTIFICATE OF SERVICE</u>**

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that on August 22, 2022, I electronically filed the foregoing brief with the Clerk of the Court by using the appellate CM/ECF system. Service on counsel for all parties has been accomplished via ECF.

<u>/s/ David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellants*