No. 21-1255

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

———————————

DOMINIC BIANCHI, et al.,

*Plaintiffs-Appellants*,

v.

BRIAN E. FROSH, et al.,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court
for the District of Maryland
Court Case No. 1:20-cv-3495-JKB (James K. Bredar, District Judge)

———————————

**BRIEF OF AMICUS CURIAE JOHN CUTONILLI**
**IN SUPPORT OF PLAINTIFFS-APPELLANTS FOR REVERSAL**

———————————

John Cutonilli
P. O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com

29 August 2022

ii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus John Cutonilli

certifies that the amicus is not a publicly held corporation, that the amicus does not

have a parent corporation, and that no publicly held corporation owns 10 percent or

more of amicus's stock.

/s/John Cutonilli
John Cutonilli
P. O. Box 372
Garrett Park, MD 20896
jcutonilli@gmail.com

iii

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE....................................................................1

SUMMARY OF ARGUMENTS ..................................................................1

ARGUMENTS ....................................................................................2

   1.   The Court erred in deciding *Kolbe*........................................................2

   2.   "Dangerous and Unusual" and "in Common Use" relate to societal uses ..................................................................................5

   3.   "Assault weapons" are in common use................................................9

   4.   History and precedent demonstrate that the people provide for public safety ................................................................................11

   5.   Text of the Second Amendment ........................................................14

   6.   There has been a grave defect in the scrutiny process for nearly 80 years and lower courts continue to exploit it ....................................15

CONCLUSION............................................................................20

iv

## TABLE OF AUTHORITIES

**Cases**

*Association of New Jersey Rifle and Pistol Clubs v. Attorney General New Jersey*,

910 F.3d 106 (2018)..................................................................18

*Aymette v. State*, 21 Tenn. 154 (1840) ......................................................7

*Castle Rock v. Gonzales*, 545 U.S. 748 (2005).........................................13

*DeShaney v. Winnebago County*, 489 U.S. 189 (1989)............................13

*English v. State*, 35 Tex. 473 (1871).........................................................7

*FCC v. Beach Communications, Inc*., 508 U.S. 307 ................................19

*Fried v. Archer*, 775 A. 2d 430 (Md. Ct. Spec. App.) ............................13

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)........18

*Heller v. D.C.*, 556 U.S. 570 (2008) ............................................... passim

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) .......................... 1, 3, 4, 10

*Korematsu v. United States*, 584 F Supp. 1406 (N. D. Cal. 1984).........17

*N.Y. State Rifle & Pistol Ass'n v. City of N.Y.* - 883 F.3d 45 (2d Cir. 2018)...........18

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022)

.................................................................................................. passim

*State v. Buzzard*, 4 Ark. 18 (1842)........................................................8, 9

*State v. Chandler*, 5 La. Ann. 489 (1850).............................................7, 8

*State v. Reid*, 1 Ala. 612 (1840) ...............................................................7

*State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891) ........................................7

*Trump v Hawaii*, 138 S.Ct. 2392 (2018)...................................................17

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622.........................19

*Warren v. DC*, 444 A. 2d 1 (DCCA 1981) .............................................13

### Statutes

Statute of Winchester (1285) ...................................................................13

### Other Authorities

33 Hen. 8, c. 6, § 1 (1541–1542) (Eng.) ...................................................7

Beattie, J. M., Policing and Punishment in London, 1660-1750: Urban Crime and
   the Limits of Terror. p. 226 (2001) ......................................................14

J. Malcolm, To Keep and Bear Arms 2 (1994).........................................14

Sklansky, The Private Police, 46 UCLA L. Rev. 1165, 1198 (1999).....................14

The King James I: A Proclamation Against Steelets, Pocket Daggers, Pocket
   Dagges and Pistols, reprinted in 1 Stuart Royal Proclamations 359–60 (James F.
   Larkin & Paul L. Hughes eds., 1973) ...................................................8

### Treatises

W. Blackstone, 4 Commentaries on the Laws of England 148-149 (1769) ............18

W. Hawkins, Treatise on the Pleas of the Crown ch 63 § 4 (1716) .......................18

1

## INTEREST OF AMICUS CURIAE[1]

Cutonilli is a resident of Maryland and is subject to the same firearm laws in question in this case. He is unable to successfully bring a lawsuit against Maryland due to the precedent set in *Kolbe v. Hogan,* 849 F.3d 114 (4th Cir. 2017). He seeks to provide additional insight into other aspects of the law that were neither addressed in *Kolbe* nor in the Lower Court's decision in this case. His intent is to help this Court avoid previous errors so that other fellow Americans are not subject to such laws.

## SUMMARY OF ARGUMENTS

Upending the basis on which the *Kolbe* argument largely rests, *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022) unequivocally states that the Second Amendment protects the possession and use of weapons that are "in common use at the time." Importantly, *Bruen* makes no mention of arms that are "most useful in military service" (See *Heller v. D.C.*, 556 U.S. 570, 627 (2008)) – a phrase that *Kolbe* relies heavily upon but grossly misinterprets. *Bruen*

———————————

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than amicus contributed money that was intended to fund preparation or submission of this brief. Neither party has objected to Cutonilli filing an amicus brief in this case. Plaintiffs-Appellants granted consent while Defendants-Appellees took no position.

2

also rejects the alternative, two-part approach taken in Kolbe and specifically rejects the use of intermediate scrutiny.

This brief expands upon the Plaintiffs-appellants' discussion of why *Bruen* effectively overrules *Kolbe*. It provides historical insight into how the key phrases, "dangerous and unusual" and "in common use," relate to societal biases that carry forward into *Kolbe*. It provides examples of the commonly accepted uses of "assault weapons," a term defined in Maryland law. It demonstrates through references to history and precedent, that the people themselves provide public safety. It offers additional textual and history-based interpretation of the text of the Second Amendment. It also provides insight into errors that invalidate the scrutiny process used in *Kolbe*.

## ARGUMENTS

### 1.    The Court erred in deciding *Kolbe*

The *Brue*n decision confirms the types of arms that the Second Amendment protects. In doing so, the decision cites the applicable sections of Heller to reiterate the types of arms protected. *Bruen* acknowledges that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Bruen* slip opinion 12 citing Heller at 626). *Bruen* finds that the Second Amendment protects the possession and use of weapons that are "in common use at the time," i*d.* at 12 and 38-39 citing Heller at 627, and asserts that

3

examples of Second Amendment limitations are "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 12 citing Heller at 627. It adds that acceptable limitations are specific to arms that "are highly unusual in society at large." *Id.* at 38-39 citing Heller at 627. At no time does *Bruen* refer to any limitation dealing with arms that are "most useful in military service." (See Heller at 627).

Together, these findings show that the *Kolbe* Court committed an error when it stated that "we are convinced that the banned assault weapons and large-capacity magazines are among those arms that are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—which the *Heller* Court singled out as being beyond the Second Amendment's reach." *Kolbe* at 121. Further, the Court deemed "it prudent and appropriate to simply rely on" the key phrase "weapons that are most useful in military service" without "needlessly endeavoring to define the parameters of 'dangerous and unusual weapons.'" *Id.* at 136. *Bruen* recalibrates the litmus test, holding that "dangerous and unusual weapons" are excluded from protection while making no mention of arms that are "most useful in military service." The *Kolbe* Court failed to determine what arms are "in common use at the time," *id.* at 135-136 when these are the very types of arms that *Bruen* (reiterating Heller) says warrant Second Amendment protection. Illuminated by *Bruen*, it is

4

clear that the *Kolbe* Court failed to understand what is protected by the Second Amendment.

The *Heller* Court never specified that "weapons that are most useful in military service—M-16 rifles and the like—may be banned" without infringement upon the Second Amendment right. See *Heller* at 627, *Kolbe* at 131. In the conditional tense, Heller stated, "**It may be objected that if** weapons that are most useful in military service—M-16 rifles and the like—may be banned**, then the Second Amendment right is completely detached from the prefatory clause**" (emphasis added). It was was not singling out that militarily useful weapons are "beyond the Second Amendment's reach." *Kolbe* at 121. Instead, the *Heller* Court was acknowledging that the militarily usefulness of weapons, as implied by the prefatory clause, was **NOT** the criterion for Second Amendment protection.

This clarification makes the meaning clear: "We think that Miller's 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind **in common use at the time.**' 307 U. S., at 179." (emphasis added) *Heller* at 624. The third sentence of the paragraph then talks about "sophisticated arms that **are highly unusual in society at large**." (emphasis added).

5

The concept of military usefulness is introduced by Heller to address -- and flatly reject -- the argument that the prefatory clause protects all military arms. In refutation, Heller states plainly:

> "Indeed, it may be true that no amount of small arms could be useful against modern-day tanks and bombers. But the fact that modern developments have limited the fit between the prefatory clause and the protected right **cannot change our interpretation of the right**" (emphasis added).

As the Bruen decision makes clear, Kolbe misinterpreted Heller, and the Court failed to properly apply Heller in Kolbe.

## 2.    **"Dangerous and Unusual" and "in Common Use" relate to societal uses**

*Bruen* also rejects the alternative approach taken in *Kolbe*, which depends on intermediate scrutiny (*Bruen* at 10). The test that Bruen adopts "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 17. While Bruen does not provide an "exhaustive survey" of how to do this, they acknowledge that "Heller and McDonald point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 20.

Bruen's brief examination of the historical context relates to public and concealed carry provides a case in point for the type of historical and textual analysis privileged by the Court for Second Amendment cases. A fuller examination of the historical prohibitions on some types of public and concealed

carry further illuminates *Kolbe* by revealing analogous misreadings and unfounded biases.

*Heller* and *Bruen* acknowledged that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 12 quoting *Heller* at 626. They find, for example, that limitations are "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" while, on the other hand, that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'" *Id.* at 12 quoting *Heller* at 627. However, neither *Heller* nor *Bruen* fully examine the historical meaning of the key phrases "dangerous and unusual" and "in common use."

For this reason, historical context is essential to understand why concealed carry was prohibited and to determine if prohibitions such as the Maryland "assault weapon" ban use analogously faulty reasoning. Historically, concealed carry was equated with criminality, with moral deviancy, when there is no necessary or logical link between the two. A number of statues in force before the Constitution was written provide instructive illustrations of these societal biases embedded in the law of the day. For example, in 1541, a statue against concealed carry was enacted to stop "shamefull muthers roberies felonyes ryotts and routs." by "evil disposed persons." 33 Hen. 8, c. 6, § 1 (1541–1542) (Eng.). Similarly, a 1613 proclamation banned the carrying of "Steelets, pocket Daggers, pocket Dags and

Pistols" because they were considered "weapons utterly unserviceable for defence, Militarie practise, or other lawfull use, but odious, and noted Instruments of murther, and mischief," By The King James I: A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols, reprinted in 1 Stuart Royal Proclamations 359–60 (James F. Larkin & Paul L. Hughes eds., 1973).

Similar reasoning may be found in many of the early U.S. state court cases. In *State v. Reid*, 1 Ala. 612 (1840), the court upheld the prohibition on concealed carry because it was believed that concealed weapons would "exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others." In *State v. Chandler*, 5 La. Ann. 489 (1850), the court upheld the prohibition because it was believed to promote "secret advantages and unmanly assassinations." In *English v. State*, 35 Tex. 473 (1871), the court upheld the prohibition because it was thought to "protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit." In *State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891), the court upheld the prohibition because concealed arms "are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the state." In *Aymette v. State*, 21 Tenn. 154 (1840), the court upheld the prohibition because the legislature has "a right to prohibit the wearing or keeping [of] weapons dangerous

8

to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence."

Importantly, in *State v. Buzzard*, 4 Ark. 18, 19 (1842), the court upheld the prohibition on concealed carry because it allowed public carry and, therefore, did not "detract anything from the power of the people to defend their free state and the established institutions of the country." This case is particularly instructive for Kolbe, as in a contemporary context, the prohibitions it has unjustly enforced in the state of Maryland have detracted from the power of the people to contribute to public safety, as will be shown in Argument 4.

Understanding the historical context through close textual reading enables recognition of the bias inherent in the laws of the day that prohibited concealed carry. It becomes clear, as one court echoes the next down through time, that concealed carry was prohibited because it was associated with criminal behavior, "murther" and "mischiefe," and the unsavory moral characteristics of "bullies, blackguards, and desperadoes." Open carry, on the other hand, was believed to "incite men to a manly and noble defence of themselves, if necessary, and of their country" See *Chandler*.

Just as there is no necessary connection between concealed carry and criminality, there is no necessary connection between the weapons Maryland

deems "assault weapons" and criminality – and yet that is the unfounded bias that permeates the state's position. Indeed, in Arguments 3 and 4, it will be demonstrated that such weapons are "in common use" by law enforcement and private security companies because of their effectiveness in *deterring and combatting* criminality.

Following *Bruen's* mandate to root Second Amendment cases firmly in historical and textual analysis, the court should evaluate the meaning of the phrases "dangerous and unusual" and "in common use" in light of these historical cases and the important example set by *State v. Buzzard*, which deftly tailors the right of citizens to bear arms in a way that upholds the intent of the Founders while acknowledging the realities of the contemporary social setting. In being guided by any or all of these cases, the court would be guided rightly by precedent that is intended to limit the consequences of criminally malicious behavior in society while protecting the rights of law-abiding citizens to use them lawfully.

## 3.    "Assault weapons" are in common use

"Assault weapons," as defined by the state of Maryland, are in common use in society today, including in Maryland. In the context of this case, the Maryland legislature has accepted that they play an important, every-day role in protecting public safety and property. For example, they are in common use in Maryland among federal, state, and local law enforcement and are used in the course and

10

scope their regular duties. In addition, retired law enforcement officers are

permitted to use them for their personal self-defense and the protection of property.

In allowing the use of "assault weapons" not only by the police but also by retired

officers, the state acknowledges the public safety benefit that so-called "assault

weapons" provide.

Given this fact, it must be asked why – if "assault weapons" provide a

demonstrable and valued public safety benefit in the hands of the police and certain

private personnel – the same benefit would be denied to law-abiding citizens?

The hyperbolic nature of Maryland's arguments and its use of biased terms

like "assault weapons" militates against recognition of their beneficial use in

society. For example, the Court claims that "[t]he AR-15, semiautomatic AK-47,

and other assault weapons banned by the FSA have a number of features designed

to achieve their principal purpose—'killing or disabling the enemy' on the

battlefield. See J.A. 735." *Kolbe* at 125 "Their design results in 'a capability for

lethality—more wounds, more serious, in more victims—far beyond that of other

firearms in general, including other semiautomatic guns.' Id. at 1121-22. (JA)" *Id.*

at 125. Yet, clearly, in the hands of the police, retired officers, and, by extension,

law-abiding gun owners, it would be very wrong to assume that these weapons are

valued for their capability for "more wounds, more serious, in more victims."

Here, Maryland conflates the features and capabilities of the weapon itself with the

purported intent of its users. Such malicious intent should not be attributed to the government any more than to its law-abiding citizens. Per *Bruen*, *Kolbe* must be reconsidered in light of the fact that the very arms that are defined by Maryland as "assault weapons" are not only commonly used in society but are demonstrably beneficial for the public good.

**4.   History and precedent demonstrate that the people provide for public safety**

Many U.S. laws are rooted in the English legal system and can be illuminated by an appreciation of their lineage. The Bruen decision emphasizes this fundamental point. In the English tradition, the average citizen played a central role in providing law enforcement and protection for society at large. Emerging around the time of King Alfred (c 871), this tradition persisted by custom for hundreds of years and was more formally codified with the Statute of Winchester (1285), which included provisions for arming the people, making arrests, and raising the "hue and cry" to apprehend criminal offenders. The Statute of Winchester further delineated and established the roles of unpaid constables and watchmen—private citizens who functioned as security personnel for their communities.

This system lasted through our founding and was the primary method of law enforcement at the time. Law enforcement was one of the key roles envisioned for

12

the militia in colonial America and following the Revolution. (See Article 1

Section 8 Clause 15.) Professional law enforcement agencies did not arise until the

mid-19[th] century, and it was not until 1878, with the passage of the Posse

Comitatus Act, that military and law enforcement functions were formally

separated (*Heller* at 716, Breyer dissent). The Maryland State Police pays homage

to this long-standing tradition on its website:

> "Under English common law, every person had an active responsibility for
> keeping the peace…The responsibility included crime prevention through
> vigilance and the apprehension of suspected lawbreakers by groups of
> persons raising the 'hue and cry' or the more official 'posse comitatus.'"

This was the most practical system, given the rural conditions in England

and America at the time (J. Malcolm, To Keep and Bear Arms 2 (1994)). It was not

without its limitations, however, as there was no institutional means to prosecute

felons; that was the job of the victim (Beattie, J. M., Policing and Punishment in

London, 1660-1750: Urban Crime and the Limits of Terror. p. 226 (2001);

Sklansky, The Private Police, 46 UCLA L. Rev. 1165, 1198 (1999)).  Additionally,

with the rise of industrialization in the U.S., many companies found it necessary to

hire private police to protect their interests, which led to the emergence of private

security companies. Today, in fact, in the U.S., the number of security personnel

employed by private security companies outnumbers public police by a factor of

three to two.

13

However effective police departments may be, the role of the police is inherently limited. Because the government has limited resources, there are limits to the degree of safety the government can provide. This is not merely a practical issue; it is a legal issue as well. As explained in *Warren v. DC*, 444 A. 2d 1 (DCCA 1981), "…courts have without exception concluded that when a municipality or other governmental entity undertakes to furnish police services, *it assumes a duty only to the public at large and not to individual members of the community*." *Id.* at 4 (emphasis added). In that case, the District of Columbia was found to have based its case on the "uniformly accepted rule…that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen." *Id.* at 4.

Consistently, courts have ruled that public safety, through the government's police power interests, is owed to the public at large and not to any specific individual. (*Warren v. DC*, 444 A. 2d 1 (DCCA 1981), *Fried v. Archer*, 775 A. 2d 430 (Md. Ct. Spec. App.), 2001, *Castle Rock v. Gonzales*, 545 U.S. 748 (2005), *DeShaney v. Winnebago County*, 489 U.S. 189 (1989)). Therefore, the government has no interest in the protection of any specific individual because it cannot deliver protection at the individual level.

Overturning Maryland law on the basis of this historical legacy, with acknowledgement of the role that lawful citizens play in public safety and the arms

14

that are "in common use" for public safety purposes, will restore Constitutional rights while strengthening law-abiding citizens' ability to contribute to their own safety, that of their families, and the community's safety as well.

**5.     Text of the Second Amendment**

As underscored in Heller, the Second Amendment is structurally and grammatically divided into two parts: an operative clause and a prefatory clause. The operative clause guarantees a pre-existing right of the individual to possess and carry weapons in case of confrontation, *Heller* at 592. The prefatory clause, which refers to this right as it relates to the formation of militias, is best understood within the context of the Tenth Amendment, which clarifies the respective powers delegated to the federal government or reserved to the states. At the time of the founding, the Second Amendment was codified to ensure that the federal government did not have the power to disarm the militia. *Id.*, at 599. It ensures that the federal government does not abridge the right of citizens to keep and bear arms. Additional examples of the right to keep and bear arms appear in state declarations of the period, such as the right to possess arms for self-defense or to hunt. *Id.* at 642 (Stevens dissenting). These examples are enumerated in state declarations because they apply at the state and not the federal level. Together, the Second Amendment plus the various state-level declarations constitute the full expression of citizens' rights to keep and bear arms.

15

While the right to keep and bear arms is broader than – or extends beyond – the Second Amendment in this way, it is not unlimited. Heller at 627, for example, notes the historical prohibition on carrying "dangerous and unusual weapons," a phrase that originates in the Statute of Northampton. See 4 Blackstone 148–149 (1769). Neither *Heller* nor *Bruen* elaborate on what is meant by "dangerous and unusual weapons," and the legal history since Northampton provides little in the way of a clear definition of the phrase. Nonetheless many assumptions and unfounded assertions have been made. Fortunately, a number of 17th- and 18th-century treaties provide useful interpretive context (W. Blackstone, 4 Commentaries on the Laws of England 148-149 (1769), W. Hawkins, Treatise on the Pleas of the Crown ch 63 § 4 (1716). These texts consistently demonstrate that there was no general prohibition on carrying common arms, as has been reiterated in Bruen.

## 6. There has been a grave defect in the scrutiny process for nearly 80 years and lower courts continue to exploit it

*Korematsu v. United States,* 323 US 214 (1944) provides an object lesson in the types of mistakes the courts have made in Second Amendment cases. During World War II the United Stated forced the relocation and incarceration of more than 100,000 Japanese Americans, citing concerns for public safety. The Supreme Court found that "exclusion of those of Japanese origin was deemed necessary

16

because of the presence of an un-ascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country." *Id.* at 218. The Court's decision resulted in placing restrictions on the Japanese-American population at large—most of whom were law-abiding citizens—because of the purported or potentially illicit acts of a few.

While the court acknowledged that "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect," it still asserted that "pressing public necessity may sometimes justify the existence of such restrictions…" *Id.* at 216. While claiming that it applied "the most rigid scrutiny," it appears, particularly in retrospect, that the Court instead simply deferred to the government's findings, stating an unwillingness to "reject as unfounded the judgment of the military authorities." *Id.* at 219.

Importantly, the dissent in Korematsu claimed that in deferring to the government, the Court had failed to rule on a key judicial question. In doing so, it had permitted the overstepping of "… the allowable limits of military discretion" and failed to define the "definite limits to [the government's] discretion." *Id.* at 234. In a statement that anticipates the future view of the courts and the American public on the Korematsu decision, the dissent further argued that:

17

"[I]ndividuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support." *Id.* at 234 (Murphy, J., dissenting).

A subsequent trial held long after the war, *Korematsu v. United States,* 584 F

Supp. 1406 (N. D. Cal. 1984), brought forward substantial evidence that the

government omitted relevant information from the Court and also provided

misleading information. While the Court decided not to determine any errors of

law, it did grant a writ of *coram nobi* and cautioned subsequent courts that:

> "It stands as a caution that in times of distress the shield of military necessity and national security must not be used to protect governmental actions from close scrutiny and accountability. It stands as a caution that in times of international hostility and antagonisms our institutions, legislative, executive and judicial, must be prepared to exercise their authority to protect all citizens from the petty fears and prejudices that are so easily aroused." Id. at 1420

While the Court has only recently said "Korematsu was gravely wrong the

day it was decided" *Trump v Hawaii*, 138 S.Ct. 2392, 2423 (2018), it has yet to

explain why it was "gravely wrong". One thing is certain.

> "Korematsu was not excluded from the Military Area because of hostility to him or his race. He was excluded because we are at war with the Japanese Empire, because the properly constituted military authorities feared an invasion of our West Coast…" *Korematsu* at 223.

At a time of marked "distress … hostility and antagonism" in the country,

*Kolbe* employs the same unjust logic that was at work in the case of Korematsu,

arguing that the government's public safety interest supersedes constitutional guarantees and abridging the rights of law-abiding citizens because of the wrongdoing of others. As in the Korematsu case, the Fourth Circuit (*Kolbe*) deferred to the rule maker (the legislature in this instance) without putting the evidence before it to the proper test.

The failure to apply intermediate scrutiny is not unique to the Fourth Circuit but is part of a broader pattern that has become typical of how Second Amendment cases are handled. In *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.* - 883 F.3d 45 (2d Cir. 2018), the City presented no empirical evidence, yet the Second Circuit found the challenged rule met intermediate scrutiny because there was a "substantial fit between the Rule and the City's interest in promoting public safety." *Id*. at 64. An assertion of "substantial fit" stands in for the demonstration of "substantial evidence." Similarly, in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), the Seventh Circuit found that the law in question *may increase the public's sense of safety*. "If a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit." *Id.* at 412. Again in *Association of New Jersey Rifle and Pistol Clubs v. Attorney General New Jersey*, 910 F.3d 106 (2018), the dissent chastises the majority for substituting "anecdotes and armchair reasoning for the concrete proof that we demand for heightened

19

scrutiny anywhere else." *Id.* at 126. Nonetheless, the majority found that "the Act survives intermediate scrutiny." *Id.* at 122.

While the *Bruen* rejected the intermediate scrutiny approach used in Kolbe, this Court should understand the problems that led *Bruen* to its decision. At the core of intermediate scrutiny is the requirement for the government to draw "reasonable inferences based on substantial evidence" because the government "must demonstrate . . . that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994). When courts fail to uphold this essential requirement, they fail to maintain the standard of intermediate scrutiny.  Without substantial evidence, the intermediate scrutiny standard devolves to the lower order of the rational basis standard, which does not require substantial evidence. Instead, rational basis cases may be decided using "rational speculation *unsupported by evidence or empirical data*." *FCC v. Beach Communications, Inc.* 508 U.S. 307, 315 (1993) (Emphasis added.) Rational basis is inappropriate for fundamental rights, such as those comprised by the Second Amendment, *Heller* at 628. Infamously, in the Korematsu decision, the Court failed to properly evaluate the evidence and, instead, accepted at face value the government's assessment of the evidence. This abnegation of the court's proper role compromised the constitutional rights of

20

American citizens rather than protecting them – and serves as both an analogy for past Second Amendment cases and an object lesson for future ones.

CONCLUSION

Upending the basis on which the Kolbe argument largely rests, *Bruen* unequivocally states that it protects the possession and use of weapons that are "in common use at the time." Importantly, *Bruen* makes no mention of arms that are "most useful in military service" (See *Heller* at 627) – a phrase that *Kolbe* relies heavily upon but grossly misinterprets. Weapons defined by Maryland as "assault weapons" are "in common use" and allow the law-abiding people of Maryland to provide for their own safety and that of their families and communities.

For the foregoing reasons, this Court should reverse the District Court opinion in light of the *Bruen* decision.

Respectfully submitted,

John Cutonilli
P.O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com

29 August 2022

CERTIFICATE OF COMPLIANCE

1. This motion complies with type-volume limitation of Fed. R. App. P. 29(a)(5) because the amicus brief contains 4643 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

Dated: 29 August 2022

/s/ John Cutonilli

John Cutonilli
P.O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com

22

CERTIFICATE OF SERVICE

I hereby certify that on 29 August 2022, I emailed a copy of this document

to the following:

David H. Thompson, Email: dthompson@cooperkirk.com

Raymond M. DiGuiseppe, Email: law.rmd@gmail.com

Robert A. Scott, Email: rscott@oag.state.md.us

Ryan R. Dietrich, Email: rdietrich@oag.state.md.us


/s/ John Cutonilli

John Cutonilli
P.O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com