No. 21-1255

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

### DOMINIC BIANCHI, *et al.*,

*Plaintiffs-Appellants*,

**v.**

### BRIAN E. FROSH, *et al.*,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Maryland
(James K. Bredar, District Judge)

_____

### SUPPLEMENTAL BRIEF OF APPELLEES

_____

BRIAN E. FROSH
Attorney General of Maryland

ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

October 19, 2022                    Attorneys for Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 21-1255         Caption: Bianchi v. Frosh

Pursuant to FRAP 26.1 and Local Rule 26.1,

Brian E. Frosh, Woodrow W. Jones, III, R. Jay Fisher, Jim Fredericks, all in their official capacities
(name of party/amicus)

_____

 who is _____appellees_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:


12/01/2019 SCC                          - 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert A. Scott                          Date: 03/09/2021

Counsel for: Appellees

- 2 -

Print to PDF for Filing

**TABLE OF CONTENTS**

Page

ISSUES PRESENTED FOR REVIEW ...................................................................1

STATEMENT OF THE CASE ...............................................................................2

    Mass Shootings and the Federal Assault-Weapons Ban ................................2

    Maryland's Response to the Deadly Use of Assault Weapons .......................5

        Maryland's 1994 Assault-Pistols Ban .....................................................5

        The Firearm Safety Act of 2013 .............................................................7

    2013 Suit Challenging the Firearm Safety Act's Assault-Weapons
    Restrictions ....................................................................................................9

    This Court's en Banc 2017 Decision in *Kolbe v. Hogan* Upholding the
    Constitutionality of the Assault-Weapons Restrictions in the
    Firearm Safety Act .......................................................................................10

    Procedural History ........................................................................................14

SUMMARY OF ARGUMENT.............................................................................15

ARGUMENT ........................................................................................................17

I.    THE STANDARD OF REVIEW IS DE NOVO. .......................................................17

II.   THIS CASE IS CONTROLLED BY THIS COURT'S 2017 EN BANC DECISION
    IN *KOLBE V. HOGAN*...................................................................................17

    A.    Under *Heller*, Certain Types of Weapons Are Not Protected by
        the Second Amendment. ...................................................................18

    B.    Applying *Heller*, this Court, Sitting en Banc, Held That the
        Weapons Banned by Maryland's Law Fall Outside of the Scope
        of the Second Amendment. ...............................................................19

C.    The Supreme Court in *Bruen* Reaffirmed the General Standard to be Applied in Second Amendment Cases and Did Not Alter the Principles Relating to the Scope of Weapons Protected in *Heller*. ................................................................................. 20

D.    *Kolbe* Is Controlling Precedent in this Case. ...................... 22

III.  IF NOT CONTROLLED BY *KOLBE,* THIS COURT SHOULD REMAND THIS CASE TO THE DISTRICT COURT TO DEVELOP AN APPROPRIATE RECORD. ....... 23

IV.  MARYLAND'S LAW BANNING ASSAULT WEAPONS IS CONSISTENT WITH THE HISTORICAL TRADITION OF REGULATING EXTRAORDINARILY DANGEROUS WEAPONS THAT POSE HEIGHTENED RISKS. .............................. 30

A.    A State's Regulation of "Arms" Accords with the Second Amendment When History Reveals a Tradition of Comparable Regulations Imposed for Similar Reasons. ......................... 31

B.    Maryland's Assault Weapons Law Is Consistent with the Nation's Historical Tradition of Regulating Extraordinarily Dangerous Weapons. ................................................ 36

    1.    Dangerous Weapons ................................................ 38

    2.    Dangerous Modifications ........................................ 39

    3.    Semiautomatic Rifles .............................................. 40

    4.    Comparable Burdens ............................................... 41

    5.    Comparable Justifications ....................................... 42

CONCLUSION ............................................................................. 44

REQUEST FOR ORAL ARGUMENT ............................................. 45

CERTIFICATE OF COMPLIANCE ................................................ 45

ADDENDUM A - 19TH AND 20TH CENTURY RESTRICTIONS ON WEAPONS THAT ARE ESPECIALLY DANGEROUS/ASSOCIATED WITH CRIMINALITY ......... 46

ADDENDUM B - 18TH, 19TH, AND 20TH CENTURY BANS ON FIREARM MODIFICATIONS THAT ARE ESPECIALLY DANGEROUS/ASSOCIATED WITH CRIMINALITY. ...................................................................... 50

ADDENDUM C - Early 20th Century Firearm Restrictions for Semiautomatic Capability/Fire Rate ......................................................52

ADDENDUM D - Empirical Evidence of the Dangers of Assault Rifles .................................................................................................54

# TABLE OF AUTHORITIES

Page

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................17

*Association of N.J. Rifle & Pistol Clubs Inc. v. Attorney Gen. of N.J.*, No. 19-3142 (3d Cir. Aug. 25, 2022) ..........................................................24

*Aymette v. State*, 21 Tenn. 154 (1840) ....................................................42

*Bianchi v. Frosh*, 858 F. App'x 645 (4th Cir. 2021) ...............................23

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ...............................19, 28

*Cupp v. Bonta*, No. 21-16809 (9th Cir. Aug. 19, 2022) ..........................24

*Duncan v. Bonta*, No. 19-55376 (9th Cir. Sept. 23, 2022) ......................24

*Higgins* v. *Burroughs,* 834 F.2d 76 (3d Cir. 1987)...................................24

*Joseph v. Angelone*, 184 F.3d 320 (4th Cir. 1999) .................................23

*Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), .....................................10

*Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014) ............................9

*Martinez v. Villanueva*, No. 20-56233 (9th Cir. July 6, 2022)...............24

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..........................36, 42

*McDougall v. County of Ventura*, No. 21-55608 (9th Cir. June 29, 2022) ............24

*Miller v. Bonta*, No. 21-55608 (9th Cir. Aug. 1, 2022)......................24, 27

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................27

*New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ........29

*Oakland Tactical Supply, LLC. v. Howell Twp.*, No. 21-1244, 2022 WL 3137711 (6th Cir. Aug. 5, 2022) ..................................................24

*People v. Persce*, 97 N.E. 877 (N.Y. 1912)..............................................42

*Rupp v. Bonta*, No. 19-56004 (9th Cir. June 28, 2022) ...........................................24

*Sibley v. Watches*, No. 21-1986-cv, 2022 WL 2824268 (2nd Cir. July 20, 2022) .............................................................................................................24

*Taveras v. New York City*, No. 21-398, 2022 WL 2678719 (2nd Cir. July 12, 2022) .............................................................................................................24

*Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 580 F.2d 1222 (4th Cir. 1978) .............................................................................................................23

*Wag More Dogs, LLC v. Cozart*, 680 F.3d 359 (4th Cir. 2012) ............................17

*Weidman v. Exxon Mobil Corp.*, 776 F.3d 214 (4th Cir. 2015) ............................17

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ....................................................29

*Young v. Hawaii*, No. 12-17808 (9th Cir. Aug. 19, 2022)......................................24

## Constitutional Provisions

U.S. Const. amend II .................................................................................passim

## Statutes

18 U.S.C. § 921(a)(30)(A) ......................................................................................8

1994 Md. Laws ch. 456.........................................................................................5, 6

2013 Md. Laws ch. 427............................................................................................7

Cal. Penal Code § 16350 ..........................................................................................7

Cal. Penal Code § 16890 ..........................................................................................7

Cal. Penal Code §§ 30500-31115 .............................................................................7

Cal. Penal Code §16790............................................................................................7

Conn. Gen. Stat. §§ 53-202a – 53-202o ...................................................................7

DC Ann. Code § 7-2505.02(a)..................................................................................7

DC Code Ann. § 7-2501.01(3A)...............................................................................7

DC Code Ann. § 7-2502.02(a)(6) ................................................................7

DC Code Ann. § 7-2505.01 ........................................................................7

DC Code Ann. § 7-2505.02(c) ....................................................................7

Del. Code Ann. Tit. 11, § 1465 ..................................................................7

Del. Code Ann. Tit. 11, § 1466 ..................................................................7

Mass. Gen. Laws ch. 140, § 121 ................................................................7

Mass. Gen. Laws ch. 140, § 122 ................................................................7

Mass. Gen. Laws ch. 140, § 123 ................................................................7

Mass. Gen. Laws ch. 140, §131M ..............................................................7

Md. Code Ann., Crim. Law § 4-301(b) (LexisNexis 2021) .......................7

Md. Code Ann., Crim. Law § 4-301(c) (LexisNexis 2021) .......................5

Md. Code Ann., Crim. Law § 4-301(d) (LexisNexis 2021) .......................7

Md. Code Ann., Crim. Law § 4-301(h)(1) (LexisNexis 2021)..............8, 40

Md. Code Ann., Crim. Law § 4-302 (LexisNexis 2021) ...........................6

Md. Code Ann., Crim. Law § 4-303(a) (LexisNexis 2021) .......................5

Md. Code Ann., Crim. Law § 4-303(b) (LexisNexis 2021) .......................6

Md. Code Ann., Crim. Law § 4-303(b)(3) (LexisNexis 2021)...................8

Md. Code Ann., Pub. Safety § 5-101(r)(2) (LexisNexis Supp. 2022).......8

N.J. Stat. Ann. § 2C:39-1w ........................................................................7

N.J. Stat. Ann. § 2C:39-5 ...........................................................................7

N.J. Stat. Ann. § 2C:58-12 .........................................................................7

N.J. Stat. Ann. § 2C:58-13 .........................................................................7

N.J. Stat. Ann. § 2C:58-5 ...........................................................................7

N.Y. Penal Law § 265.00(22) ...................................................................7

N.Y. Penal Law § 265.02(7) .....................................................................7

N.Y. Penal Law § 265.10 ..........................................................................7

N.Y. Penal Law § 400.00(16-a) ................................................................7

Violent Crime Control & Law Enforcement Act of 1994, Pub. Law No. 103-322, § 110102, 108 Stat. 1796 (Sept. 13, 1994) ...............................3, 8

## Miscellaneous

B. Wilson, 3 *Works of the Honourable James Wilson* (1804)..................18

Charles DiMaggio, *et al.*, *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. Trauma Acute Care Surg. No. 1 (2019)................2

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Crim. & Pub. Pol'y 147 (2020)........................................................................................2

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ......................................................................32

David B. Kopel *et al*., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167 (Fall 2013) .................................................................38

Gina Kolata & C.J. Chivers, *Wounds from Military-Style Rifles? 'A Ghastly Thing to See,'* N.Y. Times (Mar. 4, 2018)............................................2

Gordon Dillow, *Slungshots, Sword Canes, and Shobi-zues*, Orange County Register (July 24, 2007)....................................................................42

H.R. Rep. No. 103-489 (1994)....................................................................3

John Donohue III & Theodora Boulouta, *The Assault Weapons Ban Saved Lives* (Oct. 15, 2019)..........................................................................3

Md. Sen. Econ. & Envtl. Affairs Comm., Floor Rep. S.B. 619 (1994)....................6

Model Law: Report of Firearms Committee, Handbook of the National
    Conference on Uniform State Laws and Proceedings of the Thirty-Eighth
    Annual Meeting 422 (1928)..............................................................................40

Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons,
    Magazines, and Silencers*, 83 Law & Contemp. Problems 231 (2020) .......39, 43

William Blackstone, 4 *Commentaries on the Laws of England* (1769) .................18

No. 21-1255

───────────────────

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

───────────────────

**DOMINIC BIANCHI, *et al.*,**

*Plaintiffs-Appellants*,

v.

**BRIAN E. FROSH, et al.,**

*Defendants-Appellees*.

───────────────────

On Appeal from the United States District Court for the District of Maryland
(James K. Bredar, District Judge)

───────────────────

**SUPPLEMENTAL BRIEF OF APPELLEES**

───────────────────

**ISSUES PRESENTED FOR REVIEW**

1.      Is this Court's en banc decision in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), controlling precedent in this case, because that decision held that assault weapons fall outside the scope of the Second Amendment right to keep and bear arms?

2.      Even if not controlled by *Kolbe*, should this Court follow the ordinary procedural course and remand this matter to the district court to allow the parties to develop a record upon which this case can properly be decided?

3.      Is Maryland's assault-weapons ban consistent with the historical tradition of prohibiting extraordinarily dangerous weapons that pose heightened risks?

## STATEMENT OF THE CASE

### Mass Shootings and the Federal Assault-Weapons Ban

Since the 1980s, the United States has experienced an upsurge in the frequency and severity of mass public shootings involving assault rifles.  Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Crim. & Pub. Pol'y 147, 150 (2020).  From 1981 through 2017, "[a]ssault rifles accounted for 430 or 85% of the total 501 mass-shooting fatalities reported . . . in 44 mass-shooting incidents."  Charles DiMaggio, *et al.*, *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban:  Analysis of Open-Source Data*, 86 J. Trauma Acute Care Surg. No. 1, at 12 (2019).  The typical assault rifle used in these tragic attacks has exceptional destructive power.  Gina Kolata & C.J. Chivers, *Wounds from Military-Style Rifles?  'A Ghastly Thing to See,'* N.Y. Times (Mar. 4, 2018) (describing

2

trauma surgeons' recollections of "grievous bone and soft tissue wounds" inflicted by "lightweight, high-speed bullets" fired by AR-15 semiautomatic rifles).

In 1994, Congress banned semiautomatic assault weapons[1] "because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered."[2]  H.R. Rep. No. 103-489, at 19-20 (1994) (House Report).  From 1994 to 2004, the federal assault-weapons ban made it unlawful to transfer and possess semiautomatic assault weapons.  Violent Crime Control & Law Enforcement Act of 1994, Pub. Law No. 103-322, § 110102, 108 Stat. 1796 (Sept. 13, 1994),  Congress relied on evidence that assault weapons have heightened "capability for lethality—more wounds, more serious, in more victims—far beyond other firearms in general, including other semiautomatic guns." House Report 19-20.  Studies found that the ban was effective in reducing deaths from gun massacres.  *See, e.g.*, John Donohue III & Theodora Boulouta, *The Assault Weapons Ban Saved Lives* (Oct. 15, 2019), available at https://law.stanford.edu/publications/the-assault-weapon-ban-saved-lives/.

---

[1] In addition to specific semi-automatic rifles, the federal ban also covered specific semi-automatic pistols and semi-automatic shotguns.

[2] This ban was based on an earlier ban enacted by California in 1989.

Within the last decade, the frequency of mass public shootings has increased dramatically, with assault rifles figuring prominently in many of the most catastrophic episodes:

- On December 14, 2012, in Newtown, Connecticut, a gunman opened fire at Sandy Hook Elementary School and murdered 27 first graders and adults.

- On December 2, 2015, in San Bernardino, California, a married couple opened fire at a San Bernardino County Department of Public Health training event and Christmas party and murdered 14 people and injured 22 others.

- On June 12, 2016, in Orlando, a gunman opened fire at a nightclub and murdered 49 people and injured 53 others.

- On October 1, 2017, in Las Vegas, a gunman fired from his hotel room into a music festival crowd and murdered 58 people and wounded 413 others.

- On November 5, 2017, in Sutherland Springs, Texas, a gunman opened fire on churchgoers who had gathered to worship at the First Baptist Church on Sunday morning and murdered 25 people and wounded 20 others.

- On February 14, 2018, in Parkland, Florida, a gunman opened fire at Marjory Stoneman Douglas High School and murdered 17 students and staff members and wounded 17 others.

- On August 3, 2019, a gunman opened fire at a crowded Walmart in El Paso and murdered 23 people and wounded at least 26 others.

- On May 24, 2022, a gunman entered an elementary school in Uvalde, Texas, where he killed 19 children and two teachers.

- On July 4, 2022, a gunman opened fire on an Independence Day parade in Highland Park, Illinois, and killed seven people and injured more than 30 others.[3]

**Maryland's Response to the Deadly Use of Assault Weapons**

**Maryland's 1994 Assault-Pistols Ban**

While Congress was debating the federal assault-weapons ban, Maryland enacted a ban on "assault pistols," which it defined as 15 specific weapons (as well as "cop[ies]" of those weapons). 1994 Md. Laws ch. 456, now codified at Md. Code Ann., Crim. Law §§ 4-301(c) & 4-303(a) (LexisNexis 2021). The law contained

---

[3] The information on mass shootings presented above is principally drawn from the Violence Project's Mass Shooter Database, accessible through https://www.theviolenceproject.org/mass-shooter-database/. The project, supported by the National Institute of Justice, compiled the data from open sources. *See* https://nij.ojp.gov/topics/articles/public-mass-shootings-database-amasses-details-half-century-us-mass-shootings.

exceptions for certain law enforcement personnel and for assault pistols that were owned as of June 1, 1994 (so long as they were registered with the Maryland State Police).[4]  1994 Md. Laws ch. 456, now codified at Crim. Law §§ 4-302 & 4-303(b).

In a floor report, the Senate Economic and Environmental Affairs Committee explained that the bill was enacted in response to the recent "proliferat[ion]" of these weapons.  Identifying specific mass-murder events, the committee noted that, within the preceding decade, "[a]n increasing number of assault pistols [were] being used by criminals."  Md. Sen. Econ. & Envtl. Affairs Comm., Floor Rep. S.B. 619 (1994). The committee stated that the intent of the law was "to ban assault pistols in the State that have no legitimate legal purpose such as competition shooting or hunting."  *Id*. It noted that the banned pistols were designed (1) "to maximize lethal effects through a rapid rate of fire," (2) "to be spray-fired from the hip and to enable the shooter to maintain control of the firearm while firing many rounds in rapid succession," and (3) "for military purposes and, accordingly, are equipped with various kinds of combat hardware."  *Id*.  Although plaintiffs challenged the assault pistols ban in their complaint in this case (J.A. 18-19), plaintiffs have since abandoned that challenge on appeal.  Appellants' Principal Br. 3 n.1.

---

[4] The 1994 law also banned the manufacture and sale (but not the mere possession) of magazines that had a capacity of more than 20 rounds of ammunition. 1994 Md. Laws ch. 456.

## The Firearm Safety Act of 2013

Acting shortly after the Sandy Hook Elementary School mass shooting, and in response to the prevalence of assault rifles in mass shootings, the Maryland General Assembly passed the Firearm Safety Act of 2013.  2013 Md. Laws ch. 427.[5] The Firearm Safety Act contains various measures to enhance public safety[6]; as relevant here, the act prohibits the possession, sale, transfer, or receipt of "assault long guns" and "copycat weapons," as defined in the law.  These weapons, along with the assault pistols banned in 1994, are collectively included in the definition of "assault weapons."  Crim. Law § 4-301(d).

Like the General Assembly's treatment of "assault pistols," the term "assault long gun" is defined by reference to a list of specific weapons (or "copies") and represents many of the weapons that were covered by the federal ban.  Crim. Law § 4-301(b) (defining "assault long gun" to include any weapon "listed under

---

[5] California, five other States and the District of Columbia have enacted prohibitions on assault weapons.  Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115; Conn. Gen. Stat. §§ 53-202a – 53-202o; Del. Code Ann. Tit. 11, §§ 1465, 1466; DC Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c); Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131M; N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13; N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a).

[6] The legislation also included provisions addressing mental health issues, the establishment of a handgun qualification license requirement for purchasers of handguns, a ban on armor-piercing bullets, and a ban on "detachable magazine[s] that ha[ve] a capacity of more than 10 rounds of ammunition for a firearm."  Crim. Law § 4-305(b).

§ 5-101(r)(2) of the Public Safety Article"); *compare* Md. Code Ann., Pub. Safety § 5-101(r)(2) (LexisNexis Supp. 2022) *with* weapons listed in the former Violent Crime Control & Law Enforcement Act of 1994 § 110102(b),formerly codified as 18 U.S.C. § 921(a)(30)(A).   In addition, unlike Maryland's 1994 assault-pistols legislation, the Firearm Safety Act prohibits the possession of "copycat" weapons, which are defined in reference to their specific features:

> (i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
>> 1. a folding stock;
>> 2. a grenade launcher or flare launcher; or
>> 3. a flash suppressor;
>
> (ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;
>
> (iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches[.]

Crim. Law § 4-301(h)(1).[7]  Although the Firearm Safety Act bans specific rifles (and their copies), as well as rifles containing particular features, the law does not ban all semiautomatic rifles, and the Maryland Department of State Police maintains a website that identifies a wide variety of semiautomatic rifles that remain legal:

---

[7] Like the assault pistols ban, the assault weapons ban in the Firearm Safety Act contains exceptions for certain law enforcement personnel as well as a grandfather clause that allowed the continued possession of assault long guns and copycat weapons by those individuals who possessed those weapons as of October 1, 2013.  Crim. Law § 4-303(b)(3).

https://mdsp.maryland.gov/Organization/Pages/Criminal

InvestigationBureau/LicensingDivision/Firearms/FirearmSearch.aspx.

### 2013 Suit Challenging the Firearm Safety Act's Assault-Weapons Restrictions

In September 2013, a group of individuals, firearms retailers, and firearms-related organizations brought a Second Amendment challenge to Maryland's restrictions on assault rifles.[8]  After discovery closed, the district court granted the State's motion for summary judgment and held that the restrictions on assault weapons were constitutional under the Second Amendment.  *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014).  Although the district court assumed that the assault weapons were protected to some degree by the Second Amendment, *id*. at 789, the court nonetheless held that, under an intermediate scrutiny analysis, the restrictions survived constitutional review, *id*. at 793-95.  After a divided panel of this Court concluded that assault weapons are protected by the Second Amendment and reversed the district court's decision, *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir.

---

[8] The plaintiffs in that case also challenged the Firearm Safety Act's restrictions on large-capacity magazines (i.e., magazines that have a capacity of more than ten rounds of ammunition); those restrictions are not being challenged in this case.  And unlike plaintiffs in this case (at least initially), the plaintiffs in that case did not challenge Maryland's ban on assault pistols.  *Kolbe*, 849 F.3d at 122 n.2.

2016), this Court granted the State's petition for rehearing en banc, 636 F. App'x 880 (4th Cir. Mar. 4, 2016).

### This Court's en Banc 2017 Decision in *Kolbe v. Hogan* Upholding the Constitutionality of the Assault-Weapons Restrictions in the Firearm Safety Act

This Court sitting en banc affirmed the judgment of the district court. But, rather than assume that assault weapons are protected by the Second Amendment, this Court concluded that assault weapons are outside the scope of the Second Amendment. *Kolbe*, 849 F.3d at 130. This Court also concluded, in the alternative (and consistent with the district court's opinion), that if assault weapons were protected, the appropriate standard of review was intermediate scrutiny and that the assault weapons restrictions in the Firearm Safety Act survived that level of review.[9] *Id*. at 138.

This Court began by describing the State's "extensive uncontroverted evidence demonstrating that the assault weapons outlawed by the [law] are exceptionally lethal weapons of war." *Id*. at 124. That evidence, this Court explained, established that the "most popular of the prohibited weapons—the AR-15—is simply the semiautomatic version of the M16 rifle used by our military and others around the world." *Id*. This Court described the military's post-World War

---

[9] The law satisfied this standard because there was a "reasonable fit" between the assault weapons restrictions and the State's "substantial government interest" in public safety. *Kolbe*, 849 F.3d at 138-40.

II development of the AR-15 and its proven status as "a very lethal combat weapon that was well-liked for its size and light recoil." *Id*. (internal quotation marks and ellipsis omitted). Following field testing in Vietnam, this Court noted, the Department of Defense purchased more than 100,000 AR-15 rifles, which the Department renamed the "M16." *Id*. at 124-25.

The M16, like the original AR-15, is a "selective-fire rifle," able to fire "in either automatic mode (firing continuously as long as the trigger is depressed) or semiautomatic mode (firing one round of ammunition for each pull of the trigger and, after each round is fired, automatically loading the next)." *Id*. at 124. The civilian versions of the AR-15 (and other assault rifles, like the AK-47), this Court explained, are "semiautomatic but otherwise retain the military features and capabilities of the fully automatic M16 and AK-47." *Id*. at 125. The difference between selective fire and semiautomatic firing, this Court found, has limited relevance: because of the rapid rate of fire of the AR-15, a shooter can empty a 30-round magazine "in as little as five seconds." *Id*. And "soldiers and police officers are often advised to choose and use semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations." *Id*. This Court also observed that certain features on many of the banned weapons— such as flash suppressors and folding stocks—were "designed to achieve their principal purpose—killing or disabling the enemy on the battlefield." *Id*. (internal

quotation marks omitted).  Based on that evidence, this Court concluded that assault rifles, "like their fully automatic counterparts, . . . are firearms designed for the battlefield," and "[t]heir design results in a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns."  *Id*. (internal quotation marks omitted).

This Court also described the lethal potential of assault rifles in civilian society and their limited use for self-defense.  "[A]ccording to the State's evidence," the "banned assault weapons have been used disproportionately to their ownership in mass shootings and the murders of law enforcement officers."  *Id*. at 126.  At the same time, this Court explained, the evidence did not support the claim that the banned weapons "are well-suited to self-defense."  *Id*. at 127.  "Neither the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has used a military-style rifle . . . to protect herself."  *Id*.

Turning to the legal analysis, this Court applied the two-part approach that was used by nearly all the federal circuits in considering Second Amendment claims.  *Id*. at 132-33 (citations omitted).  Under this test, a court would first ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *Id*. at 133 (citation omitted).  If the answer was "no," "then the challenged law [was] valid."  *Id*. (citation omitted).  "If, however, the challenged law imposes a burden on conduct protected by the Second

Amendment," courts applied an "appropriate form of means-end scrutiny,'" whether that be intermediate or strict scrutiny. *Id*. (citation omitted).

For guidance at the first step regarding whether the assault weapons restrictions imposed a burden on Second Amendment rights, this Court looked to *District of Columbia v. Heller*, 554 U.S. 570 (2008). In *Heller*, the Court affirmed that the Second Amendment right was "not unlimited," *id*. at 626, and that an "'important limitation on the right to keep and carry arms' is that the right 'extends only to certain types of weapons,'" *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 634-35, 623). In particular, this Court looked to the Supreme Court's pronouncement "that 'weapons that are most useful in military service—M-16 rifles and the like—may be banned' without infringement upon the Second Amendment right." *Id*. (quoting *Heller*, 554 U.S. at 627). Noting that the prohibited weapons were simply the civilian versions of the M-16, this Court concluded that *Heller*'s carve-out for weapons "like" "M-16 rifles" that were "most useful in military service" presented a "dispositive and relatively easy inquiry" that, with respect to the weapons prohibited by the Firearm Safety Act, could be answered "plainly in the affirmative." *Id*. at 136.

Although the *Kolbe* plaintiffs sought further review in the Supreme Court, their petition for writ of certiorari was denied on November 27, 2017. 138 S. Ct. 469 (2017).

13

**Procedural History**

Three years later, on December 1, 2020, a different set of individual, business, and organizational plaintiffs filed this action for declaratory and injunctive relief challenging, as unconstitutional under the Second Amendment, both (1) the 1994 ban on assault pistols,[10] and (2) the assault-weapons restrictions in the Firearm Safety Act. (J.A. 4.) In their complaint, plaintiffs acknowledged that "the result they seek is contrary to [this Court's en banc decision in] *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)." (J.A. 6.)

Defendants filed a timely answer (J.A. 25) and thereafter prepared to undergo the discovery process.

Soon after the defendants filed their answer, the district court, on its own initiative, ordered plaintiffs to "show cause . . . why this case should not be dismissed sua sponte for plain failure to state a claim upon which relief may be granted . . . and/or on the ground that Plaintiffs have pleaded an admission that it is impossible for them to prevail under controlling law." (J.A. 40-41.) Plaintiffs filed a response, which again conceded that the relief they sought was foreclosed by *Kolbe*, but nonetheless argued that *Kolbe* was wrongly decided and "should be overturned by a court competent to do so." (No. 1:20-cv-03495-JKB, ECF 27, at 1.) On March 4,

---

[10] Plaintiffs have since abandoned their challenge to the assault-pistols ban. Appellants' Principal Br. 3 n.1.

2021, in an order quoting and agreeing with plaintiffs' own concession that the court

"'has no discretion but to dismiss Plaintiffs' complaint,'" the district court dismissed

the case in light of *Kolbe*. (J.A. 42 (quoting ECF 27, at 1).)

Plaintiffs appealed to this Court. Although they again acknowledged that

*Kolbe* was controlling, plaintiffs nonetheless argued that *Kolbe* was wrongly

decided. (Doc. 18.) In an unpublished per curiam opinion, this Court affirmed that

*Kolbe* was controlling and affirmed the judgment of the district court. (Doc. 26.)

Plaintiffs filed a petition for writ of certiorari. (Doc. 29.)

While plaintiffs' petition was pending, the Supreme Court decided *New York

State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), which struck down New

York's discretionary public-carry licensing scheme. On June 30, 2022, the Supreme

Court granted the plaintiffs' petition, vacated this Court's decision, and remanded

for further consideration in light of *Bruen*. (Doc. 30.) On August 1, 2022, this Court

ordered supplemental briefing from the parties. (Doc. 34-35.)

## SUMMARY OF ARGUMENT

In *Kolbe*, this Court, sitting en banc, concluded that the assault weapons

banned by the Firearm Safety Act were outside the scope of the Second Amendment.

In doing so, this Court applied the principles set forth in *Heller*, including the

Supreme Court's express statement that weapons "like" "M-16 rifles" "may be

banned" without offending the Second Amendment. This Court concluded that,

because the weapons banned by Maryland law were the civilian versions of the M-16, *Heller*'s analysis was dispositive.

Nothing in *Bruen* changes that analysis. *Bruen* held that challenges to firearms regulation are to be evaluated exclusively through the backdrop of the text, history, and tradition of the Second Amendment, rather than through a tiers-of-scrutiny analysis. But *Bruen* concerned the validity of a discretionary public-carry-licensing scheme for handguns, and it left intact the Supreme Court's pronouncement in *Heller* that weapons "like" "M-16 rifles" "may be banned" without offending the Second Amendment. As a result, this Court's en banc decision in *Kolbe*, which was not dependent on an intermediate-scrutiny analysis but rather applied the principles in *Heller*, remains controlling precedent.

If this Court declines to find *Kolbe* dispositive, the appropriate remedy would be to remand this case to the district court so that the parties have the opportunity to develop an appropriate factual record upon which this Court can make a fully informed decision. This is the ordinary course to be followed where a court of appeals vacates a dismissal of a complaint, and there is no reason to depart from that course here.

Finally, Maryland's assault-weapons ban is supported by the Nation's historical tradition of firearms regulation. The historical record demonstrates a tradition of regulating extraordinarily dangerous weapons (and their modifications)

that pose heightened risks, are ill-suited for self-defense, and have a strong connection to criminal uses. Because the assault weapons banned by Maryland's law are the types of weapons that fall within this tradition, the Firearm Safety Act's prohibitions do not offend the Second Amendment.

## ARGUMENT

### I.    The Standard of Review Is de Novo.

A motion to dismiss for failure to state a claim upon which relief can be granted is reviewed de novo. *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although the Court is required to "'take the facts in the light most favorable to the plaintiff,'" the Court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (citations omitted).

### II.   THIS CASE IS CONTROLLED BY THIS COURT'S 2017 EN BANC DECISION IN *KOLBE V. HOGAN*.

In *Kolbe*, this Court applied the principles set forth in *Heller* in concluding that the assault weapons banned by the Firearm Safety Act fell outside the protection of the Second Amendment. The Supreme Court's recent decision in *Bruen* did not disturb either the general framework announced in *Heller*, nor the specific principles

17

applied by this Court in *Kolbe*, relating to the types of weapons within the protections of the Second Amendment. As a result, *Kolbe* is controlling precedent in this case.

### A. Under *Heller*, Certain Types of Weapons Are Not Protected by the Second Amendment.

In *Heller*, the Supreme Court struck down the District of Columbia's blanket prohibition on handgun possession. In so doing, the Court explained that the Second Amendment right was not "unlimited"; instead, the historical tradition established that the Second Amendment does not embody "a right to keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose." 554 U.S. at 626. The Court explained that the source of this "historical understanding" was the common-law "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that Blackstone had set forth in his *Commentaries on the Laws of England* (and which had then been repeated by founding-era legal commentators on this side of the Atlantic).[11] *Id*. at 627 (citations omitted).

Building on its pronouncement that "dangerous and unusual" weapons fell outside the scope of the Second Amendment, the Court acknowledged that the

---

[11] As this Court pointed out in *Kolbe*, Blackstone's *Commentaries* refers to the offense of carrying "dangerous *or* unusual weapons[.]" *Kolbe*, 849 F.3d at 131 n. 9 (citing William Blackstone, 4 *Commentaries on the Laws of England* 148-49 (1769), emphasis in *Kolbe*). Although later, post-Founding sources also cited in *Heller* did use the conjunctive phrase "dangerous and unusual weapons," *see, e.g.*, B. Wilson, 3 *Works of the Honourable James Wilson* 79 (1804), *Heller* did not reconcile this discrepancy.

weapons of today "that are most useful in military service—M-16 rifles and the like—may be banned." *Id*. at 627.

**B.    Applying *Heller*, this Court, Sitting en Banc, Held That the Weapons Banned by Maryland's Law Fall Outside of the Scope of the Second Amendment.**

In concluding that the weapons banned by Maryland's law were outside the scope of the Second Amendment, this Court in *Kolbe* emphasized the significance of several principles in *Heller*, including its pronouncement that an "'important limitation on the right to keep and carry arms' is that the right 'extends only to certain types of weapons.'" 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 623). As this Court noted, *Heller* "described 'the sorts of weapons protected' as being 'those in common use at the time,' and observed that such 'limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons.'" *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 627). Of particular importance, however, was *Heller*'s statement, which immediately followed the principles set forth above, "that 'weapons that are most useful in military service—M-16 rifles and the like—may be banned' without infringement upon the Second Amendment right." *Id*. (quoting *Heller*, 554 U.S. at 627).[12]

---

[12] This Court also acknowledged the Supreme Court's then-recent decision in *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016). In its per curiam opinion remanding the case, the Supreme Court rejected the Supreme Judicial Court of Massachusetts' conclusions that stun guns were not protected by the Second Amendment because they were (1) "not in common use at the time of the Second

Applying these factors, this Court concluded that "[b]ecause the banned assault weapons [in the Firearm Safety Act] . . . are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield." *Kolbe*, 849 F.3d at 135. Given *Heller*'s express exclusion of these weapons, this Court declined to engage in its own analysis of other factors, such as whether (and to what extent) the weapons were "in common use." *Id.* at 135-36.

### C. The Supreme Court in *Bruen* Reaffirmed the General Standard to be Applied in Second Amendment Cases and Did Not Alter the Principles Relating to the Scope of Weapons Protected in *Heller*.

In *Bruen*, the Supreme Court held that the individual right to keep and bear arms recognized in *Heller* also encompasses a "similar right to carry handguns publicly for self-defense." 142 S. Ct. at 2122. At issue in that case was a challenge to the constitutionality of New York's "may-issue" public-carry licensing regime. At the heart of the challenge was the requirement that, to obtain a license to carry a

---

Amendment's enactment," (2) "a thoroughly modern invention," and (3) "not readily adaptable to use in the military." *Caetano*, 577 U.S. at 411-12. *Kolbe* noted that the *Caetano* Court, in rejecting all three of these rationales, "reiterated two points made by *Heller*: first, 'that the Second Amendment "extends . . . to . . . arms . . . that were not in existence at the time of the founding"'; and, second, that there is no merit to 'the proposition "that only those weapons useful in warfare are protected."''' 849 F.3d at 132. Thus, like *Bruen*, *Caetano* just reaffirmed the principles set forth in *Heller* regarding the weapons protected by the Second Amendment.

handgun publicly, an applicant had to show "proper cause," which had been defined by case law to mean "a special need for self-protection distinguishable from that of the general community." *Id*. at 2123.

The Supreme Court struck down the "proper cause" requirement. As a threshold matter, the Court addressed the two-part test that had been adopted by this Court and nearly all the other circuits for analyzing Second Amendment claims. The Court first gave its blessing to "[s]tep one of the predominant framework," which it found to be "broadly consistent with *Heller*." *Id*. at 2127. Regarding the second part of the test, however, the Court rejected "applying a means-end scrutiny in the Second Amendment context." *Id*.

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2129-30 (citation omitted).

But the Court reaffirmed that the scope of the Second Amendment is not "unlimited." As to the types of weapons the Second Amendment protects, the Court echoed its assertion in *Heller* that the Second Amendment "right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 2128. Confirming that *Heller* still controlled the underlying analysis, the Court explained that it was "fairly supported by the historical tradition

of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Id*. at 2128 (citing *Heller*, 554 U.S. at 627 (citations omitted; some quotation marks omitted)). As Justice Alito recognized in his concurring opinion, the Court's opinion in *Bruen* left *Heller*'s principles intact in this area: "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring).

### D.    *Kolbe* Is Controlling Precedent in this Case.

Thus, nothing in *Bruen* supports plaintiffs' contention that *Bruen* repudiated *Kolbe's* holding that "'M-16 rifles and the like . . . may be banned.'" *Kolbe*, 849 F.3d at 131 (quoting *Heller*, 554 U.S. at 627). Indeed, the Supreme Court's exclusion of M-16s from the scope of the Second Amendment is, as with the weapons banned by Maryland's law, entirely consistent with the more basic principles set forth above.

Nor does it make any difference, as plaintiffs contend, that the Court in *Bruen* expressly referenced *Kolbe* in its rejection of the two-part test. 142 S. Ct. at 2126 (citing *Kolbe*, 849 F.3d at 133); Appellants' Supp'l Br. 14. First, *Bruen*'s *sole* reference to *Kolbe* fell squarely within the context of explaining how lower courts had improperly employed tiers-of-scrutiny analysis "[a]t the second step" of the

now-abrogated analysis. 142 S. Ct. at 2126 (citing *Kolbe*, 849 F.3d at 133). This is confirmed not only by the context in which *Bruen* has cited *Kolbe*, but by the page in *Kolbe* cited in *Bruen*, which contains a discussion relating only to the application of tiers-of-scrutiny. *Id.* Notwithstanding its use of *Kolbe* to illustrate its rejection of tiers-of-scrutiny analysis, the Supreme Court did not similarly reference *Kolbe* in its discussion of the standard to be applied in determining the types of weapons protected by the Second Amendment, despite its opportunity to do so.

As this Court recognized in its prior decision in this case, a panel is "not authorized to reconsider an en banc holding." *Bianchi v. Frosh*, 858 F. App'x 645, 646 (4th Cir. 2021) (quoting *Joseph v. Angelone*, 184 F.3d 320, 325 (4th Cir. 1999)). Because *Kolbe* applied principles set forth in *Heller*, and those principles were then reaffirmed in *Bruen*, this panel is bound by this Court's en banc decision.

## III. IF NOT CONTROLLED BY *KOLBE*, THIS COURT SHOULD REMAND THIS CASE TO THE DISTRICT COURT TO DEVELOP AN APPROPRIATE RECORD.

If the Court concludes that this case is not controlled by *Kolbe*, the Court should vacate the district court's judgment dismissing the action and remand for further proceedings. This is the ordinary course to be followed when a court of appeals vacates a district court's dismissal of a complaint, and plaintiffs present no reason for deviating from this course here. *See Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 580 F.2d 1222, 1226 (4th Cir. 1978) (remanding because the

"district court should be the first to apply the facts to the new standard" adopted by the Supreme Court); *Higgins* v. *Burroughs,* 834 F.2d 76, 77-78 (3d Cir. 1987) (remanding "because the parties may require additional evidence in connection with the standard now announced by the Supreme Court").

This is the approach taken by other circuit courts in Second Amendment cases that were pending when *Bruen* was decided. *See, e.g.*, *Sibley v. Watches*, No. 21-1986-cv, 2022 WL 2824268, at *1 (2nd Cir. July 20, 2022); *Taveras v. New York City*, No. 21-398, 2022 WL 2678719, at *1 (2nd Cir. July 12, 2022); *Association of N.J. Rifle & Pistol Clubs Inc. v. Attorney Gen. of N.J.*, No. 19-3142 (3d Cir. Aug. 25, 2022) (3d. Cir. Dkt. 147-1) (remand was appropriate to allow the parties to further develop the record in a matter "targeted at the legal and historical analysis" required under *Bruen)*; *Oakland Tactical Supply, LLC. v. Howell Twp.*, No. 21-1244, 2022 WL 3137711, at *2 (6th Cir. Aug. 5, 2022); *Duncan v. Bonta*, No. 19-55376 (9th Cir. Sept. 23, 2022) (9th Cir. Dkt. 215) (en banc); *Rupp v. Bonta*, No. 19-56004 (9th Cir. June 28, 2022) (9th Cir. Dkt. 71); *Miller v. Bonta*, No. 21-55608 (9th Cir. Aug. 1, 2022) (9th Cir. Dkt. 27); *McDougall v. County of Ventura*, No. 21-55608 (9th Cir. June 29, 2022) (9th Cir. Dkt. 55) (en banc); *Martinez v. Villanueva*, No. 20-56233 (9th Cir. July 6, 2022) (9th Cir. Dkt. 45); *Young v. Hawaii*, No. 12-17808 (9th Cir. Aug. 19, 2022) (9th Cir. Dkt. 329) (en banc); *Cupp v. Bonta*, No. 21-16809 (9th Cir. Aug. 19, 2022) (9th Cir. Dkt. 23).

Further, if this Court is to reconsider the issue decided in *Kolbe*, this case should be placed in the same posture before this Court as *Kolbe*. *Kolbe* was decided in the district court on cross-motions for summary judgment. 849 F.3d at 130. The parties had engaged in extensive discovery, including on such topics as (1) the number of banned weapons in circulation, (2) the suitability of the banned weapons for self-defense, and (3) whether those weapons had in fact been used effectively for self-defense. The parties had also engaged numerous experts, whose reports helped to fill the more-than-3,000-page joint appendix that was submitted to this Court in *Kolbe*.

In contrast, the joint appendix in this case is less than 50 pages. It consists solely of the pertinent legal filings below, culminating in the district court's sua sponte dismissal of plaintiffs' complaint. (J.A. 42-43.) It is important to note that immediate dismissal was not the result the State had sought. Rather than seek to dismiss the complaint outright, the State filed an answer. (J.A. 25-39.) Although this would have ordinarily allowed the case to proceed to the discovery stage where a robust and updated record could be developed, the district court's decision to dismiss the case on its own initiative short-circuited that process.

As a result, this case comes before this Court with, for all intents and purposes, no record at all. Nonetheless, plaintiffs seek, in essence, to have this Court simply

enter judgment in their favor. Yet this case presents numerous questions that require factual development and expert testimony.

For example, plaintiffs assert that the "rifles banned by Maryland are among the most popular firearms in the country, owned by tens of millions of Americans for lawful purposes including for self-defense and defense of the home." Appellants' Supp'l Br. 3. But defendants have not been afforded any opportunity to test these conclusory assertions in discovery. Plaintiffs assert that there are more than 24 million "AR-rifles and other modern sporting rifles" in circulation. Appellants' Supp'l Br. 28. But plaintiffs provide no evidence as to how many of these weapons would be banned by Maryland's law and how many would be permitted. The sparse record does not indicate what percentage of the Nation's population own rifles banned by Maryland's law or how many of the 24 million firearms in circulation are kept by gun enthusiasts and collectors who may own multiple such rifles. Similarly, the record contains no evidence that the weapons banned by Maryland's law have in fact been used for self-defense purposes. As this Court highlighted in *Kolbe*, "[n]either the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has used a military-style rifle or shotgun, or needed to fire more than ten rounds, to protect herself." 849 F.3d at 127.

Recent filings in a case challenging California's assault-weapons ban demonstrate the kind of extensive factual record that is necessary to resolve questions regarding *Bruen's* application to Maryland's assault-weapons law. *See Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal. Oct. 13, 2022) (S.D. Cal. ECF 137). This is especially true because, although *Heller* and *Bruen* provide a rough sketch, the standard for evaluating prohibitions on particular weapons is still evolving. Even if, as plaintiffs allege, "the only relevant question for the Court is whether the arms banned in Maryland are in common use by private citizens in the United States" at "the time the analysis is conducted" Appellants' Supp'l Br. 14, 33, such a determination—and the subsidiary questions that abound, *see Kolbe*, 894 F.3d at 135-36—patently require factual development.

Plaintiffs brush aside these questions and assert that this Court need only consult "legislative facts." Appellants' Supp'l Br. 33 (citing *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)). But when it comes to some of the "facts" at issue here— e.g., commonality and the uses to which certain weapons can and have been put— plaintiffs cite only cases in which the ultimate conclusions were not necessarily in dispute. For example, in *Heller* the Court concluded that there was an individual right to bear arms based on a review of historical and legal sources. While the prevalence of handgun ownership for self-defense in the home certainly bolstered the majority's reasoning, the District of Columbia's position was not at all predicated

on the extent to which handguns were owned, whether in the District or elsewhere. Similarly, in *Caetano*, while the prevalence of stun guns supported Justice Alito's formulation of a standard for determining whether those weapons could be banned, it was immaterial to the analysis in which the Supreme Judicial Court of Massachusetts had otherwise engaged. Stated simply, in those cases the "facts" at issue were not meaningfully in dispute because those facts did not ultimately matter to the government's position.[13]

Likewise, in those cases in which other courts of appeals have purported to address whether assault weapons were "in common use," they did not do so through any meaningful scrutiny. Instead, those courts were invariably uncertain about the exact standards to be applied (an uncertainty that endures even after *Bruen*) and made short shrift of a "common use" analysis as a means of avoiding the question altogether and moving on to perhaps the more straightforward (and in their view dispositive) application of intermediate scrutiny. Thus, although the Second Circuit concluded that assault weapons were "in common use" as a matter of "ownership statistics," that court also found "that reliable empirical evidence of lawful

---

[13] Similarly, in *Bruen*, the question at hand—whether a discretionary public-carry licensing scheme was consistent with the historical tradition of the Second Amendment—was purely legal in nature. Not so here. Indeed, as noted above, the historical analogue upon which plaintiffs' argument is premised—the prohibition of dangerous and unusual weapons—is by its very nature fact-intensive.

possession for lawful purposes was 'elusive,'" and thus—"[i]n the absence of clearer

guidance from the Supreme Court or stronger evidence in the record"—"proceed[ed]

on the assumption that these laws ban weapons protected by the Second

Amendment." *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir.

2015). Similarly, although the District of Columbia Circuit accepted that assault

weapons were in "common use" based on ownership statistics, that court nonetheless

assumed that the weapons ban did "impinge upon the right protected by the Second

Amendment" because the record did not contain any evidence as to the purposes for

which those weapons were being used. *Heller v. District of Columbia*, 670 F.3d

1244, 1261 (D.C. Cir. 2011). Finally, the First Circuit, recognizing that "*Heller*

provide[d] only meager guidance" on the standards to be applied, declined to engage

in a "common use" analysis, admitting that it was "reluctant to plunge into this

factbound morass." *Worman v. Healey*, 922 F.3d 26, 35-36 (1st Cir. 2019).

This Court, too, should be "reluctant to plunge into this factbound morass"

without the assistance of a well-developed record. Accordingly, should this Court

conclude that *Kolbe* is not controlling, the appropriate remedy would be to remand

this matter to the district court so that the parties may engage in the discovery

process, which is what would have happened had *Kolbe* never been decided. This

would place this case on the same path that is currently being taken by other circuit

courts that remanded Second Amendment cases to the district courts in light of *Bruen*.

## IV. MARYLAND'S LAW BANNING ASSAULT WEAPONS IS CONSISTENT WITH THE HISTORICAL TRADITION OF REGULATING EXTRAORDINARILY DANGEROUS WEAPONS THAT POSE HEIGHTENED RISKS.

*Bruen* makes clear that a modern regulation of weapons is valid if it is consistent with our Nation's historical tradition of firearms regulation. Plaintiffs would short circuit that historical inquiry by positing that if weapons are "in common use," they cannot qualify as "dangerous and unusual" and thus necessarily fall outside of American historical traditions. Quite apart from the need for a remand to address the "common use" question, Plaintiffs' legal submission is wrong. The Nation's historical tradition encompasses firearms regulation of novel weapons that pose heightened dangers to public safety. The laws that embody this historical tradition—regulating an array of extraordinarily dangerous weapons and hazardous features—imposed "comparable burden[s]," and are "comparably justified," to Maryland's assault-rifle ban, which targets the recent advent of mass public shootings committed with a particular type of highly dangerous weapon. Jurisdictions have always responded to those dangers with targeted regulations that left the core right of armed self-defense intact. The Nation's history and tradition of firearms regulation therefore validate Maryland's assault-rifle ban.

## A.   A State's Regulation of "Arms" Accords with the Second Amendment When History Reveals a Tradition of Comparable Regulations Imposed for Similar Reasons.

*Bruen* explains the framework for determining when the Nation's historical traditions support a challenged regulation.  The historical inquiry will be "fairly straightforward" when "a general societal problem" existed since the Framing era, and jurisdictions did not enact similar regulations to address it or if they did, courts invalidated them as unconstitutional.  142 S. Ct. at 2131.  But *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."  *Id*. at 2132.  In that scenario, "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Id*.  In that context, the inquiry requires "reasoning by analogy," using a "metric" to identify "relevantly similar" laws.  *Id*. at 2132-33.  That metric asks "how and why the [historical] regulations burden a law-abiding citizen's right to armed self-defense."  *Id*.  The ultimate question is "whether the modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."  *Id*. at 2133.

Three key guideposts should guide the inquiry.  First, "analogical reasoning" in this context is not a "regulatory straightjacket" and requires only a "historical analogue, not a historical twin" or a "dead ringer."  *Id*.  That makes sense because

novel technologies or new societal dangers may have no exact historical counterpart, yet the earlier regulations may have addressed comparable problems with comparable prohibitions.

Second, while *Bruen* did not fully explain the quantity of historical regulation necessary to amount to a tradition, it did recognize that even a few analogous regulations can suffice where the historical record reveals a lack of dispute over the lawfulness of such regulation. *Id.* For example, despite acknowledging "relatively few" historical prohibitions on firearms in "sensitive places," *Bruen* "assume[d] it settled" that courthouses, legislative assemblies, and polling places qualified as "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 235 (2018) (noting Maryland's 1647 and 1650 prohibitions on guns in the legislature); *id.* at 246 (noting 1874 Georgia case upholding Georgia's 1870 ban on weapons in court); Br. for Independent Institute as Amicus Curiae, *Bruen*, No. 20-843, at 11-12 (noting same two Maryland laws as Kopel & Greenlee); *id.* at 12 (noting Virginia's 1786 ban on guns in courthouses). In the absence of any dispute about the lawfulness of such prohibitions, the Court accepted that "courts can use analogies to these historical regulations of 'sensitive places'" to conclude that "modern regulations prohibiting the carry of firearms in

new and analogous sensitive places are constitutionally permissible."  *Bruen*, 142 S. Ct. at 2133.

Third, the most relevant time period for the historical inquiry centers on 1868 and the ensuing decades—when the Fourteenth Amendment made the Second Amendment applicable to the States and state officials familiar with those requirements adopted firearms regulations.  *Bruen* left open "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified.  142 S. Ct. at 2138.  But, as *Bruen* noted, a State "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second."  *Id*. at 2137.  Thus, when the people chose to extend the Bill of Rights to the States in 1868, their understandings should control the originalist analysis today.

This historical inquiry is not limited to regulations enacted contemporaneously with the ratification of the Fourteenth Amendment.  In *Heller*, for example, the Court considered post-Civil-War practices as confirmation of prior historical tradition that bore on the interpretation of the Second Amendment, 554 U.S. at 614, although that evidence had "secondary" significance, *Bruen*, 142 S. Ct. at 2137.  *Bruen* itself declined to consider late nineteenth century and early twentieth century evidence, but only because it "contradict[ed] earlier evidence" that

overwhelmingly established a contrary tradition. *Id*. at 2154 & n.28. *Bruen* does not bar consideration of early twentieth century evidence when it does not contradict "the overwhelming evidence of an otherwise enduring American tradition." *Id*. at 2154. Rather, when courts assess how States today can address recently emerging firearms challenges, evidence of late nineteenth and early twentieth century firearms regulations in periods of rapid change merits consideration where, as here, it is consistent with earlier regulations of extraordinarily dangerous arms. Indeed, such regulations may confirm the Nation's traditions surrounding the period of ratification of the Fourteenth Amendment.

Plaintiffs' arguments give short shrift to this historical inquiry. Instead, they assert that if the possession and use of arms was "in common use at the time," prohibiting those arms cannot be within the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." Appellants' Supp'l Br. 19. In their view, the Supreme Court "has already done the historical spadework" and has collapsed all historical analysis into an exclusive and determinative "common use" inquiry. *Id*. at 20. That is incorrect. Neither *Heller* nor *Bruen* held that this general standard would be exclusive or controlling as to all questions regarding weapons prohibitions, and those cases certainly did not discount the possibility that there might be other historical traditions that would govern the analysis in a different context. *Bruen* made clear that "[l]ike *Heller*, [the Court did] not undertake an

exhaustive historical analysis . . . of the full scope of the Second Amendment." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 626). And nothing in *Bruen* forecloses a State from making the relevant showing—based on historical antecedents—that the law at issue "is consistent with this Nation's historical tradition of firearms regulation." *Id*. at 2136.

Under plaintiffs' theory, a State like Maryland can be stripped of its power to ban dangerous weapons, even when the banned weapons were not in common use at the time the regulation was enacted, based on nothing more than the fact that the weapon becomes popular in other States. If a State like Maryland decides to enact a law prohibiting a particular dangerous weapon not in common use at that time, the constitutionality of that law should not depend on whether the weapon later becomes commonly used in other States that opted not to ban the weapon. But under plaintiffs' theory, a firearm regulation that is constitutional at the time it is enacted can thereafter become *un*constitutional because the banned weapon comes into common use outside of that State's borders.

Plaintiff's theory defies logic and common sense and is inconsistent with the Nation's federal system. Indeed, in no other context will the parameters of a constitutional right expand or contract based *solely* on the extent to which it is being exercised. And allowing the constitutionality of one State's firearms laws to rise and fall on the policy decisions of other States would betray the proposition, affirmed

by the Supreme Court in *McDonald v. City of Chicago*, that the Second Amendment "by no means eliminates" the States' "ability to devise solutions to social problems that suit local needs and values." 561 U.S. 742, 785 (2010). It would instead take the power of self-determination from the hands of the people of one State and place it at the mercy of the unaccountable legislators of other States.

## B. Maryland's Assault Weapons Law Is Consistent with the Nation's Historical Tradition of Regulating Extraordinarily Dangerous Weapons.

The historical record reveals that Maryland's assault weapons law fits well within the Nation's history and traditions of regulating "Arms" and is supported by ample historical analogues that imposed comparable burdens and were comparably justified.

Indeed, this case directly implicates the type of "unprecedented societal concerns" and "dramatic technological changes" that *Bruen* recognized "may require a more nuanced approach" in evaluating historical tradition. *Bruen*, 142 S. Ct. at 2132. The advent of assault rifles capable of inflicting mass public casualties is a recent phenomenon. The assault rifles that Maryland has banned originated in mid-twentieth century efforts to create a civilian counterpart to military-issue combat weapons. Their entry into the civilian world came slowly, picking up speed only in the late-twentieth century. And the terrorizing potential of assault rifles, based on their immense firepower and design for the battlefield,

became a pressing societal problem only when mass shootings proliferated, and the death and injury toll spiked. *See* pp. 2-5, *supra*. The collision of these two realities—the use of military-style weapons to inflict mass causalities—represented a twentieth-century crisis that had no precise precursor.

Accordingly, the inquiry into analogous firearms regulations that impose "comparable burdens" that are "comparably justified," *Bruen*, 142 S. Ct. at 2118, must turn to prior situations when society confronted the proliferation of new types of weapons that could inflict heightened harms—dangers that flowed from weapons with limited self-defense uses but great offensive-use dangers. That inquiry reveals a consistent historical tradition of jurisdictions enacting focused regulations of extraordinarily dangerous weapons that had limited self-defense functions.

Maryland's assault weapons regulation is analogous to at least three uncontroversial forms of historical regulation that establish a relevant tradition. First, Maryland's law aligns with a longstanding tradition of regulating novel dangerous weapons and weapons with a strong connection to criminal uses. Second, Maryland's law aligns with a longstanding tradition of regulating dangerous modifications to firearms' features and capabilities to enhance their dangerous potential. Third, Maryland's law is analogous to early twentieth-century regulations of semi-automatic weapons.

37

### 1.  Dangerous Weapons

Between 1837 and 1929, 37 laws across 22 States restricted weapons that were especially dangerous, associated with criminality, or both.[14]   *See* Addendum A. These dangerous and criminal-favored weapons included Bowie knives, slungshots, metallic knuckles, canes with swords or spears sheathed in them, and the like. Bowie knives, for example, provide a representative comparison.  The 1830s were racked with a "panic over the Bowie knife."  David B. Kopel *et al.*, *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 179 (Fall 2013).  Bowie knives were considered especially dangerous (and thus warranting restriction) because of the uniquely harmful damage they caused in fights.  *Id.* at 187.

These predecessors are relevantly analogous because they reflect a comparable burden that is comparably justified. *Bruen*, 142 S. Ct. at 2118.  Just as novel weapons in the 1830s triggered novel regulation, the advent of mass shootings with assault rifles in the late-twentieth century created a need for regulation to address those heightened dangers.  And just as, in an earlier era, new weapons were regulated because of their damaging potential in offensive use (while having limited self-defense function), assault weapons used in mass shootings inflict carnage on the

---

[14] Broken down into more fine-grained historical windows, this includes seven laws in six States from between 1837 and the Civil War; ten laws in ten states from Reconstruction through 1895; 14 laws in 13 States between 1901 and the end of World War I; and three laws in three States in the late 1920s.  *See* Addendum A.

human body much worse than bullets from non-assault weapons can. *See* Addendum D (cataloging empirical evidence of the unique brutality of gunshot wounds from assault weapons). And just as Bowie knives were closely associated with criminality, so too are assault weapons disproportionately used in gang crime, mass shootings, and other crimes. *See* p. 43, *infra*.

### 2. Dangerous Modifications

The second longstanding historical tradition that establishes the validity of Maryland's assault-weapons ban is the regulation of dangerous modifications to firearms' features and capabilities to enhance their lethality. Between 1771 and 1895, at least five States banned trap guns, spring guns, and guns rigged to discharge by added mechanisms like strings or ropes, suggesting that those modifications heightened the danger posed by the guns above and beyond their ordinary potential. *See* Addendum B. As technological advancements made it easier to modify firearms to become deadlier and better suited to criminals' needs, regulations evolved to keep pace. Between 1909 and 1933, at least eight States banned silencers, and at least one (Minnesota) banned modifying weapons to increase their firing capacity. *Id.*; *see also* Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Problems 231, 232 (2020) ("Since their invention over a century ago, silencers have been subject to strict regulation.").

Maryland's law is similarly structured to reach variations on the listed assault rifles to cover features that pose the heightened harms and to keep pace with new models.  In particular, the ban restricts specific components of semiautomatic centerfire rifles that increase their dangerousness and facilitate use by criminals in mass shootings and other tactical scenarios—for example, flash suppressors, the capability to accept magazines of more than ten rounds, and an overall length shorter than 29 inches.  Crim. Law § 4-301(h)(1).

### 3.  Semiautomatic Rifles

In the early twentieth century, technological advances led to the emergence of a new threat:  semiautomatic weapons with the capacity to rapidly fire multiple rounds.  As with prior novel technological and societal dangers, jurisdictions reacted with targeted regulations to contain those risks.  *See* Addendum C.  So well-accepted was this form of regulation that the National Conference on Uniform State Laws promulgated a model law for national use.  *See* Model Law: Report of Firearms Committee, Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting 422, 428 (1928) (prohibiting possession of any "any firearm which shoots more than twelve shots semi-automatically without reloading").

Likewise, Maryland responded to the new danger posed by technological innovation—this time, the rise of battlefield assault rifles adapted to purported

civilian use—by enacting restrictions comparable to those enacted nearly a century earlier. Like those earlier restrictions, the banned weapons had ready application in offensive (and military) settings, yet had more attenuated application (in design and actual experience) to civilian self-defense.[15] Finally, the Maryland law's burden on the right of armed self-defense is "comparable" to those predecessors: like all of these laws, Maryland's law zeros in on the weapons posing the heightened danger, while leaving open ample access to firearms for self-defense. *See* pp. 8-9, *supra*.

From all of this it follows that, applying *Bruen*'s second step, Maryland's regulation is "relevantly similar" to the historical analogues described above because it satisfies both of *Bruen*'s "central" considerations: comparable burdens and comparable justifications. 142 S. Ct. at 2133.

### 4. Comparable Burdens

By banning only certain models of certain semiautomatic rifles and copycats with certain features, Maryland's law, like the historical analogues, "burdens" only the extraordinarily dangerous firearms that trigger heightened concern, while leaving

---

[15]    Even if assault weapons were assumed to be suited to self-defense, plaintiffs have presented no evidence that these weapons have in fact been used for self-defense purposes. As this Court highlighted in *Kolbe*, "[n]either the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has used a military-style rifle or shotgun, or needed to fire more than ten rounds, to protect herself." 849 F.3d at 127. While this Court noted that the banned assault weapons could "conceivably" be used for self-defense, this Court noted that the State's evidence confirmed what the Supreme Court had already concluded in *Heller*: "that most individuals choose to keep other firearms for that purpose." *Id*.

the core right of self-defense intact. Plaintiffs' claim that Maryland imposes an

"outright ban[]" on "semiautomatic rifles" is wrong. Appellants' Supp'l Br. 2.

Unlike the categorical bans at issue in *Bruen*, *McDonald*, and *Heller*, and contrary

to plaintiffs' position, Maryland does not take an entire class of firearms off the table.

Law-abiding citizens in Maryland still have access to a broad range of legal firearms,

including a diverse array of semiautomatic rifles (*see* pp. 8-9, *supra*) and, of course,

handguns. *See Heller*, 554 U.S. at 629 (handguns are the "quintessential self-defense

weapon").

### 5. Comparable Justifications

Maryland's law addresses the same concern driving earlier laws restricting

other historical analogues, like Bowie knives, slungshots, metal knuckles, and the

like: they are uniquely dangerous and suited to criminal uses. *Compare Aymette v.

State*, 21 Tenn. 154, 158–59 (1840) (finding that the Bowie knife was "efficient only

in the hands of the robber and the assassin" and used by "desperadoes" and

"ruffians"); Gordon Dillow, *Slungshots, Sword Canes, and Shobi-zues*, Orange

County          Register          (July          24,          2007),

https://www.ocregister.com/2007/07/24/slungshots-sword-canes-and-shobi-zues/

("Slungshots were popular among urban street thugs in the 19th century[.]"); and

*People v. Persce*, 97 N.E. 877, 878-79 (N.Y. 1912) (slingshot, billy, sand club, metal

knuckles, daggers, dirks, and dangerous knives "are ordinarily used for criminal and

improper purposes") *with* H.R. Rep. No. 103-489 at 12-13, 18 (Congress justifying the 1994 federal assault-weapons ban in part because "semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder," and disproportionately used in crimes) and Spitzer, 83 Law & Contemp. Problems at 240-42 (detailing empirical evidence that assault weapons are the "preferred weapon for gang activity," disproportionately used in police killings, and "over-represented in [active-shooter events] compared with all gun crime and the percentage of assault weapons in society"). The reasoning supporting Maryland's ban mirrors the rationales of those earlier laws: Maryland regulates only certain semiautomatic rifles with certain features—a uniquely dangerous weapon used disproportionately in gang crime and mass shootings. *See Bruen*, 142 S. Ct. at 2133.

Thus, under *Bruen*'s framework, the historical evidence supports Maryland's law. Because the assault-rifle ban is consistent with this Nation's traditions of firearms regulation, the law accords with the Second Amendment.

43

# CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed or, in the alternative, the case should be remanded to the district court for further proceedings.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Robert A. Scott

ROBERT A. SCOTT
RYAN R. DIETRICH
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

Attorneys for Appellees

## REQUEST FOR ORAL ARGUMENT

This Court has already set this case in for argument during its December 2022 session.

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 9,933 words, excluding the parts of the brief exempted by Rule 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

/s/ Robert A. Scott

_____

Robert A. Scott

# ADDENDUM A

## *19th and 20th Century Restrictions on Weapons That Are Especially Dangerous/Associated with Criminality*

1. <u>Alabama</u>: 1837 Ala. Laws 7, No. 11 § 2 (prohibitively taxing Bowie knives);
2. <u>Georgia</u>: 1837 Ga. Laws 90, § 1 (prohibiting the sale and possession of "Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense" as well as "pistols, dirks, sword canes, [and] spears");
3. <u>Tennessee</u>: 1837-1838 Tenn. Pub. Acts 200-01, §§ 1-2 (prohibiting the sale and concealed carry of Bowie knives, Arkansas toothpicks, or other similar knives);
4. <u>Florida</u>: 1838 Fla. Laws 36, No. 24, § 1 (prohibitively taxing the sale and possession of pocket pistols, sword canes, or bowie knives);
5. <u>Virginia</u>: 1838 Va. Acts 76, ch. 101 (banning habitually or generally carrying or keeping Bowie knives and other deadly weapons);
6. <u>Alabama</u>: 1839 Ala. Acts 67, ch. 77 (banning the concealed carry of Bowie knives and other deadly weapons);
7. <u>Massachusetts</u>: 1850 Mass. Acts 401, ch. 194 (prohibiting the manufacture or sale of slung-shots);
8. <u>Alabama</u>: 1868 Ala. Laws 11 (prohibiting the "carrying of hostile deadly weapons" known as "'rifle' walking canes" or "'gunshot' walking canes");
9. <u>Florida</u>: 1868 Fla. Laws 95, ch. 7, § 11 (prohibiting the manufacture or selling of slung shots or metallic knuckles);
10. <u>Minnesota</u>: 1869 Minn. Laws 50-51, ch. 39 § 1 (prohibiting "[t]he setting of a so-called trap or spring gun, pistol, rifle or other deadly weapon");
11. <u>Nashville, Tennessee</u>: John Lellyett, Ordinances of the City of Nashville 244 (1872) (§ 9) (prohibiting any "sling gun, or spring shot, made from India rubber, or other elastic substances, attached to a forked stick, or other brace, to throw or shoot pebbles, gravel, shot, bullets, or other hard substances, or to use a bow and arrow");
12. <u>Michigan</u>: 1875 Mich. Pub. Acts 136, No. 97 § 1 (prohibiting the setting of "any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive");

13. <u>Arkansas</u>: 1881 Ark. Acts 191-92, No. 96 § 1 (prohibiting the carry or sale of "any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy");

14. <u>Illinois</u>: 1881 Ill. Laws 71, § 1 (prohibiting the possession or sale of slung-shots, metallic knuckles, "or other deadly weapon of like character");

15. <u>West Virginia</u>: 1882 W. Va. Acts 421-22, ch. 85 § 2 (prohibiting the carry of "any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character");

16. <u>Oklahoma</u>: 1890 Okla. Sess. Laws 475-76, §§ 18-19 (prohibiting the possession, manufacture, sale, or disposing of slung shots or similar weapons);

17. <u>North Dakota</u>: The Revised Codes of the State of North Dakota 1259, § 7094 (1895) ("Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor[.]");

18. <u>Arizona</u>: Ariz. Rev. Stat. Ann. § 385 (1901) (prohibiting "any person within any settlement, town, village or city . . . [to] carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie-knife or any other kind of knife manufactured or sold for purposes of offense or defense");

19. <u>South Dakota</u>:1901 S.D. Sess. Laws 6, ch. 7 §§ 1-2 (prohibiting the use, manufacture, and selling of "any air gun or any article of fire works known as cannon fire crackers …, and all fire crackers more than three inches in length or … made wholly or in part of dynamite or giant powder");

20. <u>Utah</u>: 1901 Utah Laws 97-98, ch. 96, §§ 1-3 (prohibiting the construction or mailing of "infernal machine[s]" defined as "any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing, constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or

to strike with any of its parts … under conditions, or in a manner calculated to endanger health, life, limb or property”);

21. Alabama: 1907 Ala. Laws 80, § 1 (prohibiting the sale of “any pistol of less than twenty-four inches in length of barrel, or any brass knucks, metalic knucks, dirks, slung shot, bowie knives or knife of like kind”);

22. Washington: 1909 Wash. Sess. Laws 973, § 266 (prohibiting the setting of a “so-called trap, spring pistol, rifle, or other deadly weapon”);

23. New York: 1911 N.Y. Laws 442-45, ch. 195 § 1897 (prohibiting the carry, possession, manufacture, or sale of blackjacks, slungshots, billy clubs, sandclubs, sandbags, metal knuckles, and bludgeons);

24. Ohio: 1911 Ohio Laws 124, § 1 (prohibiting the manufacture or sale of brass knuckles, billies, slung-shots, sandbags, and blackjacks);

25. New Jersey: 1912 N.J. Laws 365-66, ch. 225 §§ 2-3 (prohibiting the possession, carry, use, manufacture, or sale of blackjacks, slung-shots, billies, sand-clubs, sandbags, bludgeons, and metal knuckles);

26. Iowa: 1913 Iowa Acts 307, ch. 297, § 2 (“It shall be unlawful to sell, to keep for sale or offer for sale, loan or give away, dirk, dagger, stiletto, metallic knuckles, sand bag or skull cracker.”);

27. New Jersey: 1913 N.J. Laws 339, ch. 186, §§ 1-2 (prohibiting the use, manufacture, selling, or possession of “any air gun, spring gun, or pistol, or other weapon of a similar nature in which the propelling force is a spring or air and ejecting a bullet or missile smaller than three eighths of an inch in diameter, with sufficient force to injure the person”);

28. Vermont: 1915 Vt. Acts & Resolves 344, No. 204 (prohibiting the use, possession, manufacture, or sale of slung shots, blackjacks, or brass knuckles);

29. North Dakota: 1915 N.D. Laws 96, ch. 83, §§ 1-2 (prohibiting the possession and carry of any “black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon” and “any gun, revolver, pistol or other dangerous fire arm, loaded or unloaded, … or any other dangerous or violent explosive”);

30. California: 1917 Cal. Stat. 221, ch. 145 § 1 (prohibiting the possession of “any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, bomb or bombshells”);

31. Minnesota: 1917 Minn. Laws 354, ch. 243 § 1 (prohibiting the manufacture and concealed carry or possession of any "slung-shot, sand-club, or metal knuckles" and the concealed carry or possession of "any dagger, dirk, knife, pistol, or other dangerous weapon");

32. Massachusetts: 1927 Mass. Acts 416, ch. 326, § 10 ("Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun … or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun … shall be punished by imprisonment for not less than six months nor more than two and one half years in a jail[.]");

33. Michigan: 1927 Mich. Pub. Acts 888-89, ch. 372 § 3 (prohibiting the manufacture, sale, or possession of "any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon"); and

34. Michigan: 1929 Mich. Pub. Acts 529, § 3 (prohibiting the manufacture, sale, or possession of "any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact").

**ADDENDUM B**

*18th, 19th, and 20th Century Bans on Firearm Modifications That Are Especially Dangerous/Associated with Criminality.*

1. <u>New Jersey</u>: 1763-1775 N.J. Laws 346, ch. 539, § 10 [1771] ("Whereas a most dangerous Method of setting Guns has too much prevailed…, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds.");

2. <u>Minnesota</u>: 1869 Minn. Laws 50-51, ch. 39 § 1 (prohibiting "[t]he setting of a so-called trap or spring gun, pistol, rifle or other deadly weapon");

3. <u>Michigan</u>: 1875 Mich. Pub. Acts 136, No. 97 § 1 (prohibiting the setting of "any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive");

4. <u>Vermont</u>: 1884 Vt. Acts & Resolves 74-75, No. 76, § 1 ("A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars.");

5. <u>North Dakota</u>: The Revised Codes of the State of North Dakota 1259, § 7094 (1895) ("Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor[.]");

6. <u>South Carolina</u>: 1903 S.C. Acts 127-28, No. 86 § 1 (prohibiting the carry, manufacture, or sale of any pistols "less than twenty inches long and three pounds in weight");

7. <u>Maine</u>: 1909 Me. Laws 141, ch. 129 (prohibiting possession of "any gun, pistol or other firearm, fitted or contrived with any device for deadening the sound of explosion" or "silencer")

8. <u>Vermont</u>: 1912 Vt. Acts & Resolves 310, No. 237 (prohibiting the use of "an appliance known as or used for a gunsilencer");

9. <u>Minnesota</u>: 1913 Minn. Laws 55, ch. 64 § 1 (prohibiting "any silencer for a shotgun, revolver, rifle or other fire-arm");

10. <u>New York</u>: 1916 N.Y. Laws 338-39, ch. 137, § 1 (prohibiting the sale or concealed carry of "any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol, or other firearms to be silent or intended to lessen or muffle the noise of the firing");

11. <u>Massachusetts</u>: 1926 Mass. Acts 256, ch. 261 (prohibiting "any instrument, attachment, weapon or appliance" that silences "the firing of any gun, revolver, pistol or other firearm");

12. <u>Michigan</u>: 1927 Mich. Pub. Acts 888-89, ch. 372 § 3 (prohibiting silencers, machine guns, explosives, and other dangerous weapons);

13. <u>Rhode Island</u>: 1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1, 4 (prohibiting the carry, "in any vehicle or concealed," of "any pistol or revolver, and any shot gun, rifle or similar weapon with overall length less than twenty-six inches, but … not includ[ing] any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only");

14. <u>Rhode Island</u>: 1927 R.I. Pub. Laws 259, ch. 1052 § 8 ("It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.");

15. <u>District of Columbia</u>: 47 Stat. 650, H.R. 8754, 72d Cong. §§ 1, 14 (1932) (making it a crime in D.C. to "possess any … sawed-off shotgun" to include "any shotgun with a barrel less than twenty inches in length"); and

16. <u>Minnesota</u>: 1933 Minn. Laws 231-32, ch. 190 (banning "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure," and penalizing "the modification of weapons that were altered to accommodate such extra firing capacity"[16]).

---

[16] Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 237 & n.45-46 (2020).

# ADDENDUM C

## *Early 20th Century Firearm Restrictions for Semiautomatic Capability/Fire Rate*

1. <u>Rhode Island</u>: 1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1, 4 (prohibiting the manufacture, sale, purchase, or possession of "any weapon which shoots more than twelve shots semi-automatically without reloading");

2. <u>Michigan</u>: 1927 Mich. Pub. Acts 888-89, ch. 372 § 3 (prohibiting the manufacture, selling, and possession of "any machine gun or firearm which can be fired more than sixteen times without reloading");

3. <u>District of Columbia</u>: 47 Stat. 650, H.R. 8754, 72d Cong. §§ 1, 14 (1932) (making it a crime in D.C. to "possess any machine gun" defined as "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading");

4. <u>Minnesota</u>: 1933 Minn. Laws 231-32, ch. 190 (banning "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure");

5. <u>Ohio</u>: 1933 Ohio Laws 189-90 (creating prohibitive licensing for "any firearm which shoots more than eighteen shots semi-automatically without reloading");

6. <u>South Dakota</u>: 1933 S.D. Sess. Laws 245-47, ch. 206, §§ 1-8 (regulating the possession of machine guns defined to include any weapon "from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device"); and

7. <u>Virginia</u>: 1934 Va. Acts 137-40, ch. 96 (enacting a variety of regulations on the possession or use of weapons "from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device," and weapons "from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading").

8. <u>Illinois</u> (1932), <u>Louisiana</u> (1934), and <u>South Carolina</u> (1934) also had similar statutes "includ[ing] language that may also have extended regulations to semi-automatic weapons and to fully automatic weapons."[17]

---

[17] Spitzer, *supra* note 1, at 237 & n.51 (collecting statutes).

# ADDENDUM D

### *Empirical Evidence of the Dangers of Assault Rifles*

1. Scott Pelley, [What Makes the AR-15 Style Rifle the Weapon of Choice for Mass Shooters](#), 60 Minutes (June 23, 2019) (comparing the physical damage caused by an AR-15 rifle versus a a 9mm handgun);

2. Heather Sher, [What I Saw Treating the Victims From Parkland Should Change the Debate on Guns](#), The Atlantic (Feb. 22, 2018) (explaining how injuries from AR-15s differ from injuries from handguns);

3. Gina Kolata & C.J. Shivers, [Wounds From Military-Style Rifles? 'A Ghastly Thing to See,](#)' N.Y. Times (Mar. 4, 2018) (compiling accounts from trauma surgeons who have treated wounds caused by military-style rifles);

4. Tim Craig et al., [As the Wounded Kept Coming, Hospitals Dealt with Injuries Rarely Seen in the U.S.](#), Wash. Post (Oct. 3, 2017) (recounting the injuries from the Las Vegas shooting);

5. Peter M. Rhee et al., [Gunshot Wounds: A Review of Ballistics, Bullets, Weapons, and Myths](#), 80 J. Trauma & Acute Care Surgery 853 (2016) (explaining that assault weapons are capable of firing far more bullets at a faster rate than other firearms);

6. Sarah Zhang, [What an AR-15 Can Do to the Human Body](#), Wired (June 17, 2016) (comparing the kinetic energy released by a bullet fired from an AR-15 versus a bullet fired from a 9mm handgun);

7. Jennifer Henderson, ['There's Nothing to Repair': Emergency Docs on Injuries From Assault Weapons](#), Medpage Today (May 31, 2022) (describing the first-hand experiences of physicians who, in responding to the scenes of mass shootings, observed the extensive physical damage inflicted by the bullets of an assault weapon as compared to the injuries inflicted in other shootings involving non semi-automatic firearms); and

8. Josh Campbell, [See how AR-15 style guns create 'explosion inside the body'](#), CNN (June 8, 2022).

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| | * |
| DOMINIC BIANCHI, ET AL., | |
| | * |
| *Plaintiffs-Appellants*, | |
| v. | * |
| | |
| BRIAN E. FROSH, ET AL., | * |
| | |
| *Defendants-Appellees*. | * |

No. 21-1255

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## CERTIFICATE OF SERVICE

I certify that, on this 19th day of October, 2022, the Brief of Appellees was filed electronically and served on counsel of record who are registered CM/ECF users.

/s/ Robert A. Scott

_____

Robert A. Scott