No. 21-1255

(1:20-CV-03495-JKB)

# In The United States Court of Appeals For the Fourth Circuit

DOMINIC BIANCHI, an individual and resident of Baltimore County; DAVID SNOPE, an individual and resident of Baltimore County; MICAH SCHAEFER, an individual and resident of Anne Arundel County; FIELD TRADERS LLC, a resident of Anne Arundel County; FIREARMS POLICY COALITION, INC.; SECOND AMENDMENT FOUNDATION; CITIZEN COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS,

*Plaintiffs – Appellants*,

v.

BRIAN E. FROSH, in his official capacity as Attorney General of Maryland; COL. WOODROW W. JONES, III, in his official capacity as Secretary of State Police of Maryland; R. JAY FISHER, in his official capacity as Sheriff of Baltimore County, Maryland; JIM FREDERICKS, in his official capacity as Sheriff of Anne Arundel County, Maryland,

*Defendants – Appellees*.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

# SUPPLEMENTAL REPLY BRIEF

Raymond M. DiGuiseppe
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

October 31, 2022

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ...............................................................................1

ARGUMENT .......................................................................................2

    I.      *Kolbe* Is No Longer Good Law. ............................................2

    II.    This Court Should Address the Merits of Plaintiffs' Claim and Hold Maryland's Ban Unconstitutional. .......................................4

    III.   The State's Historical Analysis Does Not Justify the Ban on Commonly Possessed Rifles. .............................................13

        A.    The Meaning of the Second Amendment Is Fixed In 1791......13

        B.    Restrictions on "Dangerous" Weapons Do Not Support Maryland's Ban. ...........................................................16

        C.    Restrictions on "Dangerous Modifications" Also Do Not Support the Maryland Ban. .............................................21

        D.    Mass Shootings Do Not Justify The Ban. ...............................23

    CONCLUSION .......................................................................26

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Agostini v. Felton*, 521 U.S. 203 (1997) ....................................................................15

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ............................................8, 11, 23

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)................................................ 2, 4, 7, 11, 12, 14, 15, 20, 23

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) ...................................19

*Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022) ................................................7, 19

*First Am. Title Ins. Co. v. W. Sur. Co.*,
    491 F. App'x 371 (4th Cir. 2012).......................................................................7

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) ..................................................17

*Howard v. Haddad*, 962 F.2d 328 (4th Cir. 1992) ....................................................7

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...........................1, 3, 4, 5, 13, 21

*McDonald v. City of Chicago,* 561 U.S. 742 (2010) ......................................1, 4, 20

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) .....................................................6

*New York State Rifle & Pistol Ass'n, Inc. v. Beach*,
    354 F. Supp. 3d 143 (N.D.N.Y. 2018).................................................................5

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022)...................... 1, 2, 3, 4, 5, 6, 7, 14, 15, 16, 17, 19, 20, 25

*Parker v. District of Columbia*, 311 F. Supp. 2d 103 (D.D.C. 2004).......................6

*Qingyun Li v. Holder*, 666 F.3d 147 (4th Cir. 2011) .................................................3

*Rupp v. Bonta*, 2022 WL 2382319 (9th Cir. 2022) ...............................................7, 8

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 528 (2012).................................................20

*Staples v. United States*, 511 U.S. 600 (1994).................................................18, 19

*State v. Workman*, 35 W. Va. 367 (1891) ...............................................................18

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) ........................................12

*United States v. White*, 987 F.3d 340 (4th Cir. 2021)................................................2

*Williams v. United States*, 50 F.3d 299 (4th Cir. 1995)............................................7

*Workman v. United States*, 711 F. App'x 147 (4th Cir. 2018) ..................................7

*Young v. Hawaii*, 45 F.4th 1087 (9th Cir. 2022) ......................................................7

ii

## Acts and Statutes

47 Stat. 650, H.R. 8754, 72d Cong. (1932) ...........................................19

1868 ALA. LAWS 11 ..................................................................................17

1881 ARK. ACTS 191–92, No. 96 § 1 .......................................................17

1868 FLA. LAWS 95, ch. 7, § 11 ..............................................................17

1931 ILL. LAWS 452.................................................................................19

1932 LA. ACTS 336 .............................................................................18, 19

MD. CODE ANN., CRIM. LAW § 4-301(b) .....................................................9

MD. CODE ANN., PUB. SAFETY § 5-101 .......................................................9

1875 MICH. PUB. ACTS 136, No. 97 § 1 ...................................................17

1927 MICH. PUB. ACTS 888–89 ...............................................................19

1869 MINN. LAWS 50–51, ch. 39 § 1 .......................................................17

N.D. REV. CODE 1259, § 7094 (1895).......................................................17

1933 OHIO LAWS 189–90 ........................................................................19

Ordinances of the City of Nashville 244, § 9 (1872)...............................17

1927 R.I. PUB. LAWS 256–57 ..................................................................19

1934 S.C. ACTS 1288................................................................................18

1933 S.D. SESS. LAWS 245–47, ch. 206, §§ 1–8 .....................................18

1934 VA. ACTS 137–40 ............................................................................19

1882 W. VA. ACTS 42–22, ch. 85 § 2 .......................................................17

## Other Authorities

Br. of United States as Amicus Curiae, *District of Columbia v. Heller*,
    No. 07-290, 2008 WL 157201 (U.S. Jan. 11, 2008) ...............12, 13

DENNIS P. CHAPMAN, THE AR-15 CONTROVERSY: SEMIAUTOMATIC RIFLES
    AND THE SECOND AMENDMENT (2021) ...................................18, 22

Elyssa Cherney, *Sheriff: Man who witnessed stabbing used 'threat' of AR-15-style
    rifle to stop Oswego attack*, CHICAGO TRIBUNE (Feb. 27, 2018),
    https://bit.ly/3Na7zRP ..................................................................11

*Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation,* NAT. SHOOTING SPORTS FOUND. (July 20, 2022), https://bit.ly/3QBXiyv ...........8, 9

*2019 Crime in the United States, Expanded Homicide Data Table*, DEPT. OF JUST., CRIM. JUST. INFO. SERVS. DIV. (last visited Oct. 28, 2022), https://bit.ly/3Nfj8r9 ........................................25

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw ........................................................................9, 10, 11

NAT'L SHOOTING SPORTS FOUND., INC., Modern Sporting Rifle: Comprehensive Consumer Report, *available at* https://bit.ly/3SSrVjM.........................8, 9, 11

NAT'L SHOOTING SPORTS FOUND., INC., Sport Shooting Participation in the U.S. in 2020, *available at* https://bit.ly/3sPuEQl ......................................................9

NAT'L SHOOTING SPORTS FOUND., INC., 2021 Firearms Retailer Survey Report *available at* https://sforce.co/3gLCd7X ..........................................................8

James Alan Fox & Monica J. DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 HOMICIDE STUD. 127 (2014), *available at* http://goo.gl/Ji7Yyp ...............................................................................23

JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, LAW & POLICY (2022).....................................................................................21

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue:* Stenberg *Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285 (2009) .................................24

Mark W. Smith, *"Not all History is Created Equal": In the post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), available at https://bit.ly/3Dm2HEI.......................................................13, 14

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL (2006)..............24

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994) ......................................................................21

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIM. & PUB. POL'Y 147 (2020). ............................................................22

Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban*, JERRY LEE CTR. OF CRIM. UNIV. OF PA. 7 (June 2004), https://goo.gl/iVZvt. .................................................................................24

WILLIAM J. KROUSE & DANIEL J. RICHARDSON, CONG. RSCH. SERV., R44126, MASS MURDER WITH FIREARMS: INCIDENTS AND VICTIMS, 1999-2013 (2015), *available at* https://goo.gl/XuSffG .............................................24, 25

RANDOLPH ROTH, AMERICAN HOMICIDE (2012).....................................................23

## INTRODUCTION

Following the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), this Court's task is a straightforward one. This Court need only assess whether the rifles banned by Maryland are "in common use" for lawful purposes and, therefore, protected by the Second Amendment's "unqualified command." *Id.* at 2126, 2128. It can and should complete this task on the record before it—there can be no reasonable dispute that the rifles banned by Maryland are among the most popular firearms in the country.

The State attempts to complicate this case, first by arguing that the panel is bound by *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), even though that opinion was expressly abrogated by *Bruen*, did not apply the text-and-history approach *Bruen* has confirmed is *the* standard for judging Second Amendment challenges, and refused to assess the commonality of the banned firearms, the feature that *Bruen* said is key in cases like this one.

Failing that, the State argues this case should be remanded, but remand would only delay the inevitable. Maryland's ban cannot survive under governing precedent, in light of indisputable facts about the banned rifles' overwhelming popularity among the American people. A remand would allow the State to continue to deprive Plaintiffs of their constitutional rights for months or years to come. It is appropriate for this Court, in such a circumstance, to address the important issues presented by

1

this case on the record before it and let things end here, just as the Supreme Court did in *Bruen* in an identical procedural posture.

Finally, the State ignores that *Bruen* has confirmed that the only historically acceptable (which is also to say the only constitutionally acceptable) justification for banning types of arms is that they are both "dangerous and unusual." Instead, recognizing its law is unconstitutional under that standard, it searches for other historical traditions, but it cannot identify any tradition of banning the most popular rifles in contemporary society. Through its efforts, the State inadvertently confirms *Bruen*'s statement that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' " 142 S. Ct. at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). The banned rifles are indisputably that, and this Court should direct judgment be entered in Plaintiffs' favor.

## ARGUMENT

## I.  *Kolbe* Is No Longer Good Law.

In *Bruen*, the Supreme Court expressly abrogated this Court's decision in *Kolbe* and held that this Court had applied the wrong framework to past Second Amendment challenges. *Bruen*, 142 S. Ct. at 2126–27. The new "framework" "invalidated [this Court's] analysis in" *Kolbe*, so no circuit precedent bars the panel from considering Plaintiffs' claim on the merits. *United States v. White*, 987 F.3d 340, 343 (4th Cir. 2021). The State attempts to minimize the effect of *Bruen* and

argues that all it did was eliminate the tiers-of-scrutiny analysis this Court undertook in that case, while it "did not similarly reference *Kolbe* in its discussion of the standard to be applied in determining the types of weapons protected by the Second Amendment." Suppl. Br. of Appellees, Doc. 59 at 23 (Oct. 19, 2022) ("State Suppl."). But the Supreme Court does not need to mention precedent by name to overrule it (though in this case it did); as Plaintiffs explained in their opening brief, the relevant question is whether the Supreme Court's intervening decision "specifically rejected the reasoning on which [*Kolbe*] was based." *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011) (quotation omitted); *see* Supplemental Opening Br. of Pls-Appellants, Doc. 42 at 13–17 (Aug. 22, 2022) ("Pls.' Suppl."). The State emphasizes that in *Kolbe*, this Court did not analyze whether the rifles banned under the challenged law were in "common use" to decide whether they were protected arms, but instead crafted a new test based on the ways the Court found the banned rifles to be "like" "M-16 rifles" and concluded, based on that perceived similarity, that "they are among those arms that the Second Amendment does not shield." 849 F.3d at 135. This test has nothing to do with *Bruen*'s requirement that "[w]hen the Second Amendment's plain text covers an individual's conduct," as it certainly does here, "the Constitution presumptively protects that conduct [and t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129–30.

And it is flatly incompatible with *Bruen*'s clear statement that the "historical tradition" of firearm regulation demonstrates that "the Second Amendment protects" arms that are " 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.' " 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). In other words, *Bruen* makes clear that the Second Amendment's protection extends to all arms that are "in common use today." *Id*. The *Kolbe* decision specifically declined to ask whether the banned rifles are "dangerous and unusual weapons" or "in common use," 849 F. 3d at 136 n.10, but that is *the test* under *Bruen*, 142 S. Ct. at 2143. *Kolbe*'s rationale has been entirely undermined and it is not good law.

## II. This Court Should Address the Merits of Plaintiffs' Claim and Hold Maryland's Ban Unconstitutional.

Contrary to the State's claim that "the standard for evaluating prohibitions on particular weapons is still evolving," State Suppl. 27, as Plaintiffs have explained, the standard is set and all the historical work necessary to resolve this case has been done already by the Supreme Court. *See* Pls.' Suppl. 19–20. Under *Bruen*'s analytic framework, because the banned semiautomatic rifles are "Arms" within the plain text of the Amendment, *see Heller*, 554 U.S. at 582, the only question is whether history provides a justification for Maryland's ban. But again, the Supreme Court has explained that it is " 'fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' "

4

*Bruen*, 142 S. Ct. at 2128. Therefore, if a firearm is in common use today, it cannot be banned. As Plaintiffs have conclusively demonstrated, the banned rifles are among *the most* common firearms in the country and overwhelmingly used by law-abiding citizens for lawful purposes. *See* Pls.' Suppl. 29–32. That settles the matter, and this Court should say so.

Defendants seek to defer reaching the unavoidable conclusion from this "objective and largely statistical inquiry." *Kolbe*, 849 F.3d at 153 (Traxler, J., dissenting) (quotation omitted). Instead, they seek to remand this case for fruitless discovery that could not alter the dispositive facts, which are "beyond any reasonable dispute." *Id.*

There is no reason to defer decision, as *Bruen* itself demonstrates. Procedurally, *Bruen* and this case are on all fours. In *Bruen*, as here, Plaintiffs filed a lawsuit that was foreclosed by circuit precedent, so no factual development occurred and the district court entered judgment against the plaintiffs on the pleadings. *See New York State Rifle & Pistol Ass'n, Inc. v. Beach*, 354 F. Supp. 3d 143 (N.D.N.Y. 2018). In holding New York's may-issue licensing scheme violated the Second Amendment, the Supreme Court expressly rejected the argument that it should remand to "giv[e] respondents the opportunity to develop an evidentiary record," because "in light of the text of the Second Amendment, along with the Nation's history of firearm regulation," the conclusion "that a State may not prevent

5

law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense" did not turn on disputed factual questions. *Bruen*, 142 S. Ct. at 2135 n.8. The case turned on disputes over "legislative facts," not the sort of facts found in discovery or "determined in trials." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). As such, the Supreme Court was equally well placed as the trial court to weigh them and the parties were able to adequately present them through briefing. *Heller* itself was on review of a grant of a motion to dismiss, yet the Supreme Court was able to conduct the analysis it needed through the parties' briefing. *See Parker v. District of Columbia*, 311 F. Supp. 2d 103, 109 (D.D.C. 2004) (granting motion to dismiss and denying motion for summary judgment as moot). The same treatment is appropriate here. When Plaintiffs brought this suit, it was foreclosed by *Kolbe* and they sought to have that precedent overturned by a court competent to do so. In *Bruen*, the Supreme Court did just that. As in *Bruen*, there are no issues of adjudicative fact that require remand and this Court should resolve this case on the record that parties have presented in their briefs.[1]

---

[1] *Bruen* also shows that there is nothing to the State's complaint that the joint appendix in this case is less than 50 pages" or that this case implicates "questions that require factual development and expert testimony." State Suppl. 25–26. The Second Circuit JA in *Bruen* was 31 pages and it contained no expert reports. *See* J.A., *N.Y. State Rifle & Pistol Ass'n v. Beach*, No. 19-156, Doc. 39 (2d Cir. Mar. 20, 2019).

The State offers no convincing reason why this case should be treated differently than *Bruen* or *Heller*. First, it argues that remand is "the ordinary course to be followed" in this situation, *see* State Suppl. 23, but where no factual development is necessary it is perfectly ordinary—and protective of judicial resources—for this Court to resolve an issue in the first instance on appeal, *see, e.g.*, *Workman v. United States*, 711 F. App'x 147, 148 (4th Cir. 2018); *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995); *Howard v. Haddad*, 962 F.2d 328, 330 (4th Cir. 1992) (Powell, J., sitting by designation); *see also First Am. Title Ins. Co. v. W. Sur. Co.*, 491 F. App'x 371, 373 (4th Cir. 2012).

Second, the State argues this Court should remand because that is how other appellate courts have treated Second Amendment challenges following *Bruen*. *See* State Suppl. 24. But again, *Bruen* itself demonstrates that there is no wisdom in following the crowd. Nearly every court of appeals got the Second Amendment wrong until *Heller* was decided, and nearly every court of appeals got *Heller* wrong until *Bruen* was decided. *See Bruen*, 142 S. Ct. at 2125–27; *Heller*, 554 U.S. at 638 n.2 (Stevens, J., dissenting). And in any event, decisions to remand following a post-*Bruen* GVR have not been without controversy. *See Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022) (noting dissent from remand order by Judges Bumatay and VanDyke); *Young v. Hawaii*, 45 F.4th 1087, 1090 (9th Cir. 2022) (O'Scannlain, J., dissenting); *Rupp v. Bonta*, 2022 WL 2382319, at \*1 (9th Cir. 2022) (Bumatay, J.,

dissenting). This Court has what it needs to decide this case now, and like the Supreme Court in *Bruen*, it should do so.

Third, the State claims it needs an opportunity to test Plaintiffs' "assertions" regarding the overwhelming popularity of the banned weapons through discovery. *Id.* at 36. But publicly available data establishes that millions of AR-15s and similar banned rifles are owned by Americans. *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation,* NAT'L SHOOTING SPORTS FOUND., INC. (July 20, 2022), https://bit.ly/3QBXiyv. *See generally* Pls.' Suppl. 27–32. Indeed, in 2020 AR-15s and other modern sporting rifles were the best-selling rifles in the nation and accounted for approximately 20% of all firearms sold. *See* NAT'L SHOOTING SPORTS FOUND., INC., 2021 Firearms Retailer Survey Report 9, *available at* https://bit.ly/3gWhI8E. Justice Alito, in his concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), reasoned that stun guns "are widely owned and accepted as a legitimate means of self-defense across the country" when "hundreds of thousands" of them had been sold to private citizens, *id.* at 420. The firearms at issue here are orders of magnitude more common, sold in huge numbers to private citizens who pay, on average, over $1,000 per rifle. NAT'L SHOOTING SPORTS FOUND., INC., Modern Sporting Rifle: Comprehensive Consumer Report 5 *available at* https://bit.ly/3SSrVjM. And the firearms Maryland bans are "common" any way you look at them—they are common categorically as they are all semi-automatic

firearms, they are common characteristically as they are all rifles, and they are common jurisdictionally as they can be legally owned in the vast majority of states and that has been the case since they were invented. *See id.* (noting stun guns were legal in 45 states). And they are "used" all the time—in 2020, more than 20 million adults participated in target or sport shooting with firearms like those Maryland has banned. NAT'L SHOOTING SPORTS FOUND., INC., Sport Shooting Participation in the U.S. in 2020 iii, *available at* https://bit.ly/3sPuEQl.

The State has offered no sources to refute Plaintiffs. Instead, it suggests more granular data is necessary, because, it claims, it is not clear how many of the (at least) 24 million modern semiautomatic rifles in circulation "would be banned by Maryland's law and how many would be permitted," State Suppl. 26, but the answers to those questions are almost all, and almost none, respectively. In the NSSF report, "modern sporting rifles" (MSRs) are defined as "AR-15 and AK-style rifles." *Commonly Owned*, *supra*. Both AR-15 and AK-47 rifles are banned by name in Maryland, *see* MD. CODE ANN., PUB. SAFETY § 5-101(r)(2)(ii), (xv); MD. CODE ANN. CRIM. LAW § 4-301(b). Other NSSF data shows that a majority of MSRs have features targeted by Maryland's law: 65% of owners have a collapsible or folding stock on their most recently purchased MSR and 84% have some sort of flash suppressor. NSSF Comprehensive Consumer Report, *supra*, at 32, 36. Similarly, the 2021 National Firearms Survey on which Plaintiffs rely specifically asked

respondents whether they had "ever owned an AR-15 or similarly styled rifle?" and found approximately 24.6 million Americans had. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw. The survey specifically noted that respondents should count "any rifles of this style that have been modified or moved to be compliant with local law," but that does not in any way diminish the conclusion that the vast majority of these 24 million Americans reported owning a firearm that is banned in Maryland because AR-15 rifles are banned by name in Maryland. Even if that were not so, any AR-15 or AK-47 type rifles that somehow comply with Maryland's law are still firearms of that same basic type and thus should count in the commonality analysis.

The State also argues "the sparse record does not indicate what percentage of the Nation's population own rifles banned by Maryland's law or how many of the 24 million firearms in circulation are kept by gun enthusiasts and collectors who may own multiple such rifles." State Suppl. 26. But both issues are dealt with in the National Firearm Survey, which notes that 24.6 million Americans own or have owned these rifles (an estimation it arrives at after excluding the largest collectors from the sample) and that the "median owner" identified owned a single rifle. English, *supra* at 33.

Finally, the State suggests the record is deficient for its lack of evidence of banned weapons being used for self-defense. In fact, the National Firearms Survey notes that a majority of AR-15 rifle (or similar) owners owned their firearms for self-defense. *See* English, *supra* at 34 (61.9% reported owning for home defense, 34.6% reported owning for defense outside the home). *Id*; *see also* NSSF Comprehensive Consumer Report, *supra* at 18 (rating "home/self-defense" the second most important reason for owning a modern sporting rifle). Besides that, it is easy to find examples of banned rifles actually being used for self-defense. *See, e.g.*, Elyssa Cherney, *Sheriff: Man who witnessed stabbing used 'threat' of AR-15-style rifle to stop Oswego attack*, CHICAGO TRIBUNE, (Feb. 27, 2018), https://bit.ly/3Na7zRP. But more importantly, these facts are *irrelevant*. It does not matter whether, in fact, AR-15s are frequently or infrequently used for self-defense. What matters is that the American people have adopted the AR-15 as a favored tool for self-defense and other lawful purposes, and it is not up to the state of Maryland, or anyone else, to demand proof that that choice was wise. *See, e.g.*, *Heller*, 554 U.S. at 628; *Caetano*, 577 U.S. at 420 (Alito, J., concurring).

Courts—including the Supreme Court in several Second Amendment cases—routinely decide purely legal issues that depend only on the existence of certain "legislative facts" without the sort of "record" the State says must be developed. When the Court in *Heller* declared that handguns are "the most preferred firearm in

the nation to 'keep' and use for protection of one's home and family," 554 U.S. at 628–29, its conclusion ultimately was based on a social science paper, not trial court factfinding. *See* Pls.' Suppl. 34. The State suggests this case is different because, it seems, the legislative facts in this case would be dispositive whereas in *Heller* "the District of Columbia's position was not at all predicated on the extent to which handguns were owned." State Suppl. 27–28. Even if that was not the District of Columbia's position, it was certainly the Supreme Court's basis for its decision. *Heller*'s holding that a handgun ban is invalid makes no sense unless handguns are part of the class of arms "in common use" for lawful purposes that are protected by the Second Amendment. 554 U.S. at 627. If the District of Columbia (or Massachusetts, in *Caetano* about which the State makes the same argument) did not appreciate the importance of a key fact enough to dispute it, that would ordinarily weigh strongly in favor of abstaining from relying on it until it *could* be disputed, if it were the sort of fact that could be "developed" through an ordinary discovery-and-trial factfinding process. *See, e.g.*, *United States v. Beechum*, 582 F.2d 898, 908 (5th Cir. 1978) ("Truth is the essential objective of our adversary system of justice."). But the Supreme Court did not remand *Heller*—even though the United States requested such a remand "to permit further consideration (and any appropriate fact finding or legal determinations)," *see* Br. of United States as Amicus Curiae, *District of Columbia v. Heller*, No. 07-290, 2008 WL 157201, at *9–10 (U.S. Jan. 11,

12

2008)—because these are *not* those sorts of facts "It is beyond any reasonable dispute from the record before [the Court] that a statistically significant number of American citizens possess semiautomatic rifles … for lawful purposes." *Kolbe*, 849 F.3d at 153 (Traxler, J., dissenting). The Court should direct entry of judgment in favor of Plaintiffs.

## III.    The State's Historical Analysis Does Not Justify the Ban on Commonly Possessed Rifles.

In tension with its argument that *Kolbe* remains good law, the State admits *Bruen* created a new framework for resolving Second Amendment cases based on the Amendment's text and an analysis of historical restrictions that have been accepted as constitutional by the American people. But it fails to acknowledge that *Bruen* also established that the only historical tradition that permits banning particular types of arms is the tradition of restrictions on "dangerous and unusual weapons." *See* State Suppl. 34. Instead, the State undertakes a new historical analysis that fails to turn up support for its ban.

### A. The Meaning of the Second Amendment Is Fixed In 1791.

The State errs at the outset, stating that "the most relevant time period for the historical inquiry centers on 1868 and the ensuing decades." State Suppl. 33. This is wrong. The key period for understanding the Second Amendment is the time of its ratification—1791. *See* Mark W. Smith, *"Not all History is Created Equal": In the post-*Bruen *World, the Critical Period for Historical Analogues is when the Second*

13

*Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), *available at* https://bit.ly/3Dm2HEI. While *Bruen* refrained from "addressing" this issue, it is not "open." While the outcome of this case would be the same whether 1791 or 1868 were considered controlling, this Court would have to defy binding Supreme Court precedent to hold that 1868 is the critical year.

Two principles require 1791 to be the focus of this analysis. First, with respect to the federal government, the Supreme Court has always treated 1791 as the key date for determining the meaning of the Bill of Rights. In *Heller* itself, for example, the Court held that "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." 554 U.S. at 634–35 (emphasis added).

Second, the Supreme Court also has held that Bill of Rights provisions, including the Second Amendment, mean the same thing whether applied against a state through the Fourteenth Amendment or against the federal government directly. *See McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010). As *Bruen* stated, "[i]ndividual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137 (collecting cases).

Putting these two principles together, Supreme Court precedent mandates that 1791 be the key date for determining the meaning of incorporated Bill of Rights

14

provisions. And this makes sense: while the time around adoption of the 14th Amendment is key for determining *whether* a provision of the Bill of Rights is incorporated, the *content* of incorporated Bill of Rights provisions was established in 1791. There is only one Second Amendment.

This Court is bound to follow those decisions, even if *Bruen* had cast doubt on them. *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 237 (1997). But *Bruen* does not cast doubt on this precedent. It too treated evidence surrounding 1791 and the Founding as generally dispositive of the contours of incorporated constitutional rights. "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. *Bruen* cautioned that courts "must … guard against giving postenactment history more weight than it can rightly bear." *Id.* "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.' " *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614). As the State recognizes, *Bruen* declined to consider evidence from the late 19th century at all because it "contradict[ed] earlier evidence." *Id*. at 2120–21; *see also* State Suppl. 43. What the State does not explain is how it could possibly be that earlier evidence trumped late 19th century evidence if 1868 is the critical year for understanding the scope of the

15

Amendment. Supreme Court precedent, including *Bruen*, decisively rejects the State's position on the value of history to Second Amendment cases.

## B. Restrictions on "Dangerous" Weapons Do Not Support Maryland's Ban.

Turning to the task of finding analogues for its law, the State points to a tradition of banning "dangerous weapons," identifying laws targeting Bowie knives and sword canes which were perceived to be weapons of criminals, as analogous historical restrictions to its "assault weapon" ban. *See* State Suppl. 48 & Addendum A. There are several problems with classifying these laws in this way. First, and most importantly, Plaintiffs have not identified a single law that would permit a State to outlaw possession of a "dangerous" weapon that was among the most popular contemporary choices of citizens lawfully seeking to exercise their Second Amendment rights. To the extent the State has identified any valid constitutional tradition of regulation at all, it has identified *half* of it. There is no tradition of banning dangerous arms—just a tradition of banning "dangerous *and unusual*" arms. *See Bruen*, 142 S. Ct. at 2128 (emphasis added).

Second, leaving aside that crucial distinction, the laws are not informative about the scope of the Second Amendment. They all come from too late a date to be very informative about the scope of the right—and some are so late they should be disregarded entirely. Of the 37 laws the State collects, more than half of them (20) come from the twentieth century, a period of time *Bruen* did not even bother to

16

analyze because it was too remote from 1791. 142 S. Ct. at 2154, n.28. And of the seven earliest laws—from the three decades leading up to the Civil War, six come from states that would soon secede and join the Confederacy. "It would … be strange to rely on … southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld v. BATFE*, 5 F.4th 407, 440 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). For the ten laws from the period after ratification of the Fourteenth Amendment and before the dawn of the 20th century, one applied only to restrict the use of certain weapons within the city of Nashville, *see* Ordinances of the City of Nashville 244, § 9 (1872), and seven others restricted carry (or in the case of spring guns, "setting") or sale but not possession of the identified weapons, *see* 1868 ALA. LAWS 11; 1868 FLA. LAWS 95, ch. 7, § 11; 1869 MINN. LAWS 50–51, ch. 39 § 1; 1875 MICH. PUB. ACTS 136, No. 97 § 1; 1881 ARK. ACTS 191–92, No. 96 § 1; 1882 W. VA. ACTS 42–22, ch. 85 § 2; N.D. REV. CODE 1259, § 7094 (1895). They therefore did not burden the right in the same way as Maryland's law, which bans possession of the identified firearms. As for the "basis [for these laws] perceived legality," which *Bruen* identified as a relevant consideration impacting the value of a proposed analogue, 142 S. Ct. at 2155, many of the cited laws are at least overbroad, if not unconstitutional, and to the extent they were considered constitutional at the time (something the State offers no evidence

of), that conclusion is at least suspect under *Bruen*, *see id.* at 2153 (abrogating *State v. Workman*, 35 W. Va. 367, 371–74 (1891), which approved the constitutionality of the West Virginia law on which the State relies based on "reasoning that *no* handguns of any kind were protected by the Second Amendment, a rationale endorsed by no other court during this period").

Third, even accepting these laws represent a tradition of "novel weapons … trigger[ing] novel regulation" the weapons Maryland has banned are not "novel" in any sense. The AR-15 has been in existence since the 1950s, and semi-automatic rifles generally are over a century old and have been sold commercially in the United States since 1903. *See* Dennis P. Chapman, The AR-15 Controversy: Semiautomatic Rifles and the Second Amendment 14–15 (2021). The State *does* point to ten laws from 1927 to 1934 that it argues placed limits on possession of semiautomatic firearms, but these also do not provide support for its law. Four only regulate automatic firearms, *see* 1933 S.D. Sess. Laws 245–47, ch. 206, §§ 1–8 (regulating machine guns from which "more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, *by a single function of the firing device*" (emphasis added))[2]; 1934 S.C. Acts 1288; 1932

---

[2] The reference to "semi-automatic" firing in this statute is confusing, since firing multiple shots with a single trigger pull is, by definition, automatic, not semi-automatic action. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). It would seem to suggest that terms of art have not always been used carefully, or with the same meaning, in these statutes, and perhaps more of the laws identified by the State

LA. ACTS 336; 1931 ILL. LAWS 452. Five more apply only to semiautomatic firearms with a magazine capacity of at least 12 rounds, 1927 R.I. PUB. LAWS 256–57; 1927 MICH. PUB. ACTS 888–89; 47 Stat. 650, H.R. 8754, 72d Cong. (1932); 1933 OHIO LAWS 189–90; 1934 VA. ACTS 137–40, but Plaintiffs do not challenge Maryland's restrictions on magazine capacity. Of the ten laws identified, the State has found just *one* law, from Minnesota in 1933, that would support banning semiautomatic rifles. But that outlier is insufficient under *Bruen*. In any event, even if these sources did indicate that at one point semi-automatic rifles were "dangerous and unusual" and could be banned—and to be perfectly clear, they do not—that would not impact the analysis today. By the mid-1990s, the Supreme Court recognized that semiautomatic rifles "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994) And as discussed above, the banned rifles are among the most popular firearms in the nation today, and the test is "common use *today*." *Bruen*, 142 S. Ct. at 2143 (emphasis added and quotation marks omitted).

The State complains that analyzing the Second Amendment this way "defies logic and common sense" because a law could become unconstitutional over time if it banned a firearm, considered dangerous and unusual at the time of enactment, that

---

in Addendum C were intended only to target automatic weapons. In any event, the South Dakota law is not a good analogue for Maryland's ban. *See Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1150–52 (S.D. Cal. 2019), *vacated and remanded*, *Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022).

later became commonly used across the United States. State Suppl. 35. But it is a commonplace of constitutional analysis that a policy constitutional when enacted may become unconstitutional over time. *See Shelby Cnty., Ala. v. Holder*, 570 U.S. 1006, 536 (2012). And the result Maryland posits follows directly from the Supreme Court's determination that the Second Amendment protects arms in common use by Americans *today*. *See Heller*, 554 U.S. at 629 (noting that handguns are popular with "Americans"). Whether the arms were not in common use at some point in the past is irrelevant. *See Bruen*, 142 S. Ct. at 2143.

Furthermore, the State's federalism concerns are misplaced. The State cites *McDonald* for the proposition that it " 'by no means eliminates' the States' 'ability to devise solutions to social problems that suit local needs and values,' " State Suppl. 36 (quoting *McDonald*, 561 U.S. at 785), but this omits important context. The full quote from *McDonald* supports Plaintiffs: "If a Bill of Rights guarantee is fundamental from an American perspective … that guarantee is fully binding on the states and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 784–85 (emphasis in original). "The [State's] beef is not with [Plaintiffs]—it is with the Supreme Court of the United States." *Kolbe*, 849 F.3d at 153 (Traxler, J., dissenting).

## C. Restrictions on "Dangerous Modifications" Also Do Not Support the Maryland Ban.

The State's second set of allegedly analogous historical regulations fares even worse. The State asserts that "[b]etween 1771 and 1895, at least five States banned trap guns, spring guns, and guns rigged to discharge by added mechanisms like strings or ropes" and that eight states passed silencer bans in the first part of the 20th century as proof that States can regulate dangerous features of firearms as they are newly developed. State Suppl. 39–40. But as already discussed, the rifles, and features of rifles, which Maryland bans are not newly developed. The AR-15 was invented in the 1950s and has been commercially available since 1964. JOHNSON, ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, LAW & POLICY 1151–52 (2022). Furthermore, the features Maryland focuses on do not make a firearm more dangerous. A flash suppressor makes the firearm safer for lawful operation by reducing the flash of light accompanying shooting and correspondingly reducing the risk that an individual defending herself will be compromised in her efforts and blinded by her own weapon. *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. OF CONTEMP. L. 381, 397–98 (1994). A length of less than 29 inches (but greater than 26 inches) makes the rifle more maneuverable while still being a long way from concealable. And the limit on magazine capacities to 10 rounds, on which the State also relies, *see* State Suppl. 50, is irrelevant here, where Plaintiffs do not challenge restrictions on magazine

capacity. Notably, Christopher Koper, who the State cited at the very beginning of its brief for the proposition that the country has experienced an "upsurge" in the severity of mass shootings carried out with semiautomatic rifles, acknowledged that magazines are "the most functionally important feature of" the banned firearms which otherwise "do not operate differently than other comparable semiautomatics." Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Crim. & Pub. Pol'y 147, 149 (2020). In short, the State's characterization of these firearms as having "ready application in offensive (and military) settings, yet [having] more attenuated application … to civilian self-defense," State Suppl. 41, is entirely wrong. Speaking of the design process of the AR-15 specifically, one author noted:

> None of its features are exclusively military in character, and those of its features that were most groundbreaking at the time of its development [the materials it uses and the caliber of ammunition it fires] owed their existence, not to the dictates of military procurement officers, but to the innovation of civilian firearms enthusiasts and engineers. The AR-15 is not a 'weapon of war.' What it is, rather, is a highly versatile general-purpose rifle well suited to most civilian shooting applications.

CHAPMAN, *supra* at 95.

Finally, the State is wrong to suggest that its law imposes a "comparable burden" to these historical laws, which did not themselves ban any category of firearm, let alone the most popular rifle in contemporary society. In general, the State

22

thinks the wrong way about the "burden" comparison prescribed by *Bruen*, in that it repeatedly suggests it is free to choose a firearm to ban as long as it offers citizens *some* type of firearm that they can legally own. *See, e.g.*, State Suppl. 41–42. "The right to bear other weapons is 'no answer' to a ban on the possession of protected arms." 577 U.S. at 421 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 629).

### D. Mass Shootings Do Not Justify The Ban.

At bottom, the State views the search for analogues as of secondary importance anyway, because it claims its law targets a *new* problem, and so allowances should be made in looking to the historical record. The new problem with which the State is preoccupied is mass shootings, and it suggests banned firearms are "disproportionately used in gang crime, mass shootings, and other crime" and have the ability to "inflict carnage on the human body much worse than bullets from non-assault weapons can." State Suppl. 57. Not only is the State's resort to modern policy considerations out of line with the Supreme Court's articulation of the Second Amendment's protections, the State is wrong on the facts. First, gun violence—even mass gun violence—is not a new problem. James Alan Fox & Monica J. DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 HOMICIDE STUD. 127, 129 (2014), *available at* http://goo.gl/Ji7Yyp (showing a consistent rate of mass shootings from 1976-2011); *see also* RANDOLPH ROTH, AMERICAN HOMICIDE 162, 171, 185 (2012) (giving examples of high rates of

homicide in the latter half of the 1700s). Second, the banned firearms do not have greater firepower than many legal firearms—in fact, they have significantly less than many legal hunting rifles. The energy of a bullet is a function of both its mass and velocity, and shots from an AR-15, which typically fires relatively light .223 ammunition, are actually three or four times less powerful than shots from many common deer hunting rifles that use .30-06 caliber ammunition. *See* Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue:* Stenberg *Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1303–04 (2009). Third, contrary to the State's claims, the banned rifles are almost never used in crime generally and only a small fraction of mass shooters (an exceedingly rare form of crime) use them. One recent analysis found that "less than 2% of crime guns are 'assault weapons' … and well under 1% are 'assault rifles.' " GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (2006). A 2004 study sponsored by the Department of Justice similarly found that "assault weapons" accounted for just "between 1% and 6% of guns used in crime" and that most of these, "by a ratio of 3 to 1," were handguns, not rifles. Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban*, JERRY LEE CTR. OF CRIM. UNIV. OF PA. 7 (June 2004), https://goo.gl/iVZvt. With respect to mass shootings, a Congressional Research Service report concluded that "offenders used firearms that could be characterized as 'assault weapons' in … 9.78% [of mass

shootings]." WILLIAM J. KROUSE & DANIEL J. RICHARDSON, CONG. RSCH SERV., R44126, MASS MURDER WITH FIREARMS: INCIDENTS AND VICTIMS, 1999-2013 29 (2015), *available at* https://goo.gl/XuSffG. And it is clear that the vast majority of banned rifles are not used in *any* type of murder. From 2015 through 2019, for example, the FBI reports that a total of 1573 murders were committed with *any* type of rifle (compared to over 33,000 with handguns). *2019 Crime in the United States, Expanded Homicide Data Table*, DEPT. OF JUST., CRIM. JUST. INFO. SERVS. DIV., at 8 (last visited Oct. 28, 2022), https://bit.ly/3Nfj8r9.

Not only is the State's pointing to mass shootings to justify its law not founded in fact, it is improper under *Bruen*, which warned against "engag[ing] in independent means-end scrutiny under the guise of an analogical inquiry." 142 S. Ct. at 2133 n.7. The state attempts to cast its ban as part of a history of regulations that responded to new developments—and consequent problems—with firearms, as a means of turning the Court's focus to the problems Maryland's legislature was concerned with when it passed the ban in the hope that the Court will defer to the State's "difficult empirical judgment[]," but "it is not deference that the Constitution demands here." 142 S. Ct. at 2131. Instead, it is the "balance—struck by the traditions of the American people—that demands [the Court's] unqualified deference." *Id.* The American people have selected the banned rifles as their favored tools for self-defense and other lawful purposes, and that controls this case.

25

## CONCLUSION

For the foregoing reasons, this Court should reverse and order entry of judgment in Plaintiffs' favor.

Dated: October 31, 2022

Respectfully submitted,

Raymond M. DiGuiseppe
law.rmd@gmail.com
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite
300 Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705

/s/ David H. Thompson
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600 / (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing Plaintiffs-Appellants' Supplemental Reply Brief complies with the requirements of Federal Rule of Appellate Procedure 32(a). The brief is prepared in 14-point Times New Roman font, a proportionally spaced typeface; it is double-spaced; and it contains 6,498 words (exclusive of items listed in Rule 32(f)), as measured by Microsoft Word.

<u>/s/ David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that on October 31, 2022, I electronically filed the foregoing brief with the Clerk of the Court by using the appellate CM/ECF system. Service on counsel for all parties has been accomplished via ECF.


<u>/s/ David H. Thompson</u>
David H. Thompson

*Counsel for Plaintiffs-Appellants*