No. 21-1255

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

DOMINIC BIANCHI, ET AL.,

*Plaintiffs-Appellants*,

v.

ANTHONY G. BROWN, ET AL.,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court for the District of Maryland
No. 1:20-cv-03495
Hon. James K. Bredar, District Judge

_____

## BRIEF OF [PROPOSED] *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANTS-APPELLEES

_____

*Of Counsel:*

Esther Sanchez-Gomez
Leigh Rome
William T. Clark
GIFFORDS LAW CENTER TO PREVENT
GUN VIOLENCE
268 Bush Street #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org
lrome@giffords.org
wclark@giffords.org

Eric B. Bruce
  *Counsel of Record*
Jennifer Loeb
FRESHFIELDS BRUCKHAUS DERINGER US
LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
eric.bruce@freshfields.com
jennifer.loeb@freshfields.com

*(Additional Counsel on Next Page)*

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN
VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street #3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

Aaron R. Marcu
Brandt Henslee
Yulia Dernovsky
Daniel Hodgkinson
Susannah Benjamin
Taylor Jachman
FRESHFIELDS BRUCKHAUS DERINGER US
LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
(212) 277-4000
aaron.marcu@freshfields.com
brandt.henslee@freshfields.com
yulia.dernovsky@freshfields.com
daniel.hodgkinson@freshfields.com
susannah.benjamin@freshfields.com
taylor.jachman@freshfields.com

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 21-1255          Caption: Bianch, et al. v. Brown, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Giffords Law Center to Prevent Gun VIolence, Brady Center to Prevent Gun Violence, and
(name of party/amicus)

March for Our Lives

who is _____ amici curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                     ☐YES☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐YES☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eric B. Bruce                        Date:    February 16, 2024

Counsel for: Giffords, Brady, and MFOL

- 2 -

## **TABLE OF CONTENTS**

I.    **INTEREST OF PROPOSED *AMICI CURIAE*** .................................................1

II.  **INTRODUCTION** ..................................................................................**2**

III. **ARGUMENT** ........................................................................................**3**

   A.  *Bruen*'s Second Amendment Test Requires the Consideration of Empirical Research .................................................................................................3

   B.  Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires a Nuanced Approach ........................5

     1.  The Frequency, Lethality, and Geographic Concentration of Public Mass Shootings Are Novel Societal Concerns. ...........................................5

     2.  The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined. ..........................7

     3.  Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings. ..................................................10

     4.  *Bruen* Requires Nuance in Analyzing Historical Analogues ....................13

   C.  Plaintiffs' Formulation of "Common Use" Is Inherently Flawed Because the Challenged Laws Are Not a Categorical Ban, and Therefore the Common Use Standard Does Not Apply ....................................................................................15

   D.  Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment ....................................18

     1.  Folding Stocks ............................................................................................23

     2.  Flash Suppressors ......................................................................................24

     3.  Grenade Launchers ....................................................................................24

     4.  Detachable Magazines ...............................................................................25

IV. **CONCLUSION** ..................................................................................**26**

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                            **Page(s)**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
   910 F.3d 106 (3d Cir. 2018) ...................................................................2

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023) ........................................................*passim*

*Capen v. Campbell*,
   2023 WL 8851005 (D. Mass. Dec. 21, 2023).............................................11, 16

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)........................................................................*passim*

*Hanson v. District of Columbia*,
   2023 WL 3019777 (D.D.C. Apr. 20, 2023)...............................................2

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ........................................................*passim*

*Libertarian Party of Erie Cnty. v. Cuomo*,
   970 F.3d 106 (2d Cir. 2020) ...................................................................2

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)................................................................................2

*Md. Shall Issue v. Hogan*,
   353 F. Supp. 3d 400 (D. Md. 2018)...................................................2

*Nat'l Ass'n for Gun Rts. v. Lamont*,
   2023 WL 4975979 (D. Conn. Aug. 3, 2023)......................................2

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022)...........................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   990 F. Supp. 2d 349 (W.D.N.Y. 2013)..............................................23

*Peruta v. Cnty. of San Diego*,
   824 F.3d 919 (9th Cir. 2016) .................................................................2

*Richmond Boro Gun Club, Inc. v. City of New York*,
    97 F.3d 681 (2d Cir. 1996) ...................................................................23

*Rupp v. Becerra*,
    401 F. Supp. 3d 978 (C.D. Cal. 2019) ..................................................2

*Staples v. United States,*
    511 U.S. 600 (1994) ............................................................................23

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) ................................................................2

**Statutes**                                                          **Page(s)**

Md. Code Ann., Crim. Law § 4-301 .............................................*passim*

Md. Code Ann., Crim. Law § 4-305 ..............................................1, 23

Md. Code Ann., Pub. Safety § 5-101 ..................................................1

Md. Code Ann., Pub. Safety § 5-117 ................................................14

**Other Authorities**                                         **Page(s)**

*1866 Yellowboy Rifle History*, Uberti USA,
    https://tinyurl.com/3x2wjth3................................................................12

Allen Rostron, *Style, Substance, and The Right to Keep and Bear
    Assault Weapons,* Campbell L. Rev. 301 (2018)...............................24

*Are AR-15 Magazines Interchangeable? Which Ones Are*, Neckbone
    Armory, https://tinyurl.com/hppuzpb2 ...............................................11

*Assault Weapons and Large Capacity Magazines*, Educ. Fund to Stop
    Gun Violence, https://tinyurl.com/yjmaba4k .....................................25

Bonnie Berkowitz, *Double mass shootings over weekend set grim U.S.
    record*, Wash. Post (Dec. 4, 2023), https://tinyurl.com/2p82e2mb......................6

Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow
    with each mass shooting*, Wash. Post (May 9, 2021),
    https://tinyurl.com/537ww9z4 ..............................................................6

Cameron McWhirter & Zusha Elinson, *American Gun: The True Story of the AR-15* 4 (2023) ...............................................................26

Carla Astudillo et al., *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu ...................................13

Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64............................................................11

*Critical Incident Review: Active Shooter at Robb Elementary School*, Dep't of Justice (Jan. 18, 2024), http://tinyurl.com/2s4y5sz6...........................22

Dan Alex, *Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.......................12

Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC News (May 29, 2022), https://tinyurl.com/27hr2p2w ....................................................22

Dave Campbell, *Back to Basics: Rifle Stock Components & Designs*, NRA American Rifleman (Feb. 15, 2017), http://tinyurl.com/4yt7vwh3. ..............................................23

Decl. of Robert Spitzer, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF No. 21-10 (D. Mass. Jan. 31, 2023)..................................12

*Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, H. Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed ...........................................22

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t...........................................13

*Gun Violence Archive 2024*, Gun Violence Archive, https://tinyurl.com/5t4rrt56.................................................6

Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe ..........................................21

iv

Homes Lybrand, *Two arrested on gun charges after crashing into barricade near the US Capitol, authorities say*, CNN (Nov. 6, 2023) https://tinyurl.com/mssjae43 ................................................. 22

H.R. REP. NO. 103-489 (1994), as reprinted in 1994 U.S.C.C.A.N. 1820 .......................................................................................... 24

*Interim Report 2022*, Tex. H.R. Investigative Comm. on the Robb Elementary Shooting (July 17, 2022), https://tinyurl.com/ssahf6uh ................ 13

*Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022) ........................................................... 8, 9

Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa ...................... 9

James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye ................................................. 11

Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317 (2023) ........................................................ 7

Jonathan Bernstein & Mark Gray, *Five Years Since the Route 91 Massacre No One Knows a Damn Thing*, Rolling Stone (Sept. 21, 2022), https://tinyurl.com/bdjkavk2. ............................................. 10

*Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence (Sept. 2003), http://tinyurl.com/bdzjpuhp ....................................................... 24

Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn ..................................... 6

Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs ............................................. 12

*Meet a Musketeer*, Newcastle Univ. Nat'l Civil War Centre, https://tinyurl.com/heehyjnk ........................................................ 11

Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc ................................................................8

Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b ....................................................20

*One dead as 22 shot near end of Chiefs' victory parade¸* ABC News (Feb. 15, 2024), http://tinyurl.com/jzbk8kvb ...........................................6

Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9 ....................................................................8

*Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23 ..................................................................6

Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths,* 80 J. of Trauma & Acute Care Surgery 6 (2016) ...............................................................................................11

*Pop Culture: 1800*, U.S. Census Bureau (Dec. 9, 2022), https://tinyurl.com/78cxvafx ..................................................................9

*Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army (2003), https://tinyurl.com/3reu38px ........................20

Ryan Hodges, *The 1866 Rifle*, Taylor's & Co. (Aug. 26, 2020), https://tinyurl.com/bp8xebtn................................................................12

Sam Bocetta, *The Complete History of the AR-15 Rifle*, Small Wars J. (July 12, 2017), https://tinyurl.com/2jwemryz ....................................19

Sara Swann, *The history of the AR-15 and how it became a symbol of American gun culture,* Poynter (June 29, 2022), https://tinyurl.com/5bffkafr................................................................19

Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt..................................21

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?,* 49 Hastings Const. L.Q. 145 (2022), https://tinyurl.com/zx2dvsmc ................................................14

Scott Pelley, *What makes the AR-15 style rifle the weapon of choice for mass shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33.................................................12

*TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army (May 2016), https://tinyurl.com/2p963dxd .................................12

Terry Gross, *How the AR-15 became the bestselling rifle in the U.S.*, NPR (Apr. 20, 2023) https://tinyurl.com/3ak32wvp .........................................20

Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.........................................20, 21

Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack,* Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us ................................................9

Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk ...................10

*What is your par time for an AR-15 emergency reload?*, AR15.com (Nov. 22, 2010), https://tinyurl.com/3csjs7kd ...................................11

*What we know so far about the mass shooting in Maine*, AP (Oct. 28, 2023), https://tinyurl.com/5mcr4n6c .........................................6

*Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://tinyurl.com/2zedk6c6 .................................................12

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough Sch. Bus. Rsch. Paper No. 4109494 (May 13, 2022), https://tinyurl.com/yc3fer46 .......................................15, 16

*Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.........................................12

## I.    INTEREST OF PROPOSED *AMICI CURIAE*

*Amici Curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), Brady Center to Prevent Gun Violence ("Brady"), and March for Our Lives ("MFOL") (together, "*Amici*") respectfully submit this Brief in Support of Defendants-Appellees' Supplemental Brief, ECF No. 59 ("Defs. Br.").[1]

Giffords Law Center is a nonprofit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities.

Brady is the Nation's longest-standing non-partisan, nonprofit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.

MFOL is a youth-led nonprofit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives.

Through partnerships with researchers, public health experts, and community organizations, *Amici* conduct research for, draft, and defend laws, policies, and programs proven to reduce gun violence.

---

[1] *Amici* submit this Brief as an attachment to their Motion for Leave to File Out of Time. Additionally, in accordance with <u>Federal Rule of Appellate Procedure 29(a)(2)</u>, all parties have consented to this filing. No party's counsel authored any part of this brief, and no one other than *Amici* contributed to its preparation or submission.

Giffords Law Center, Brady, and MFOL have filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations,[2] and judges have regularly cited the organizations' research and expertise.[3]

## II.     INTRODUCTION

The Maryland laws regulating possession of assault firearms, Md. Code Ann., Crim. Law §§ 4-301, *et seq.* and Md. Code Ann., Pub. Safety § 5-101(r)(2) (together, the "Challenged Laws"), are constitutional under the test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *Bruen* instructs that when a law regulates conduct covered by the plain text of the Second Amendment, courts reviewing the law's constitutionality must determine if the "regulation is consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 17. *Bruen* requires a "nuanced approach" to historical analysis in cases, such as this one, that "implicat[e] unprecedented societal concerns or dramatic technological

---

[2] *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).

[3] *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *12 (D. Conn. Aug. 3, 2023); *Hanson v. District of Columbia*, 2023 WL 3019777, at *10, *14, *16 & nn.8, 10 (D.D.C. Apr. 20, 2023); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 990 (C.D. Cal. 2019); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 121–22 (3d Cir. 2018); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018); *Stimmel v. Sessions*, 879 F.3d 198, 208 (6th Cir. 2018); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring). Giffords Law Center filed the latter two briefs under its former name Law Center to Prevent Gun Violence.

2

changes," to avoid creating a "regulatory straightjacket." *Id.* at 27, 30. The Challenged Laws are constitutional under this test because they are relevantly similar to historical regulations that were designed to address pressing public safety concerns of their times.

This Court, however, need not even reach the historical regulation question because Plaintiffs' challenge to the laws fails on *Bruen*'s critical threshold element: the weapons and weapon features governed by the Challenged Laws are not covered by the plain text of the Second Amendment because they are uniquely dangerous and are not quintessential self-defense weapons. The weapons regulated by the Challenged Laws are weapons of war, designed to kill large numbers of people quickly or to grievously wound them; these weapons are significantly more lethal than any firearms in the 1700s or 1800s.

In addition, Plaintiffs' version of the common use test is inherently flawed and should be rejected.

## III.   ARGUMENT

### A.   *Bruen*'s Second Amendment Test Requires the Consideration of Empirical Research.

In *Bruen*, the Supreme Court articulated a new standard for determining whether a regulation is constitutional under the Second Amendment. The party challenging a law bears the initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text. The burden then shifts to the

relevant governmental body to demonstrate that the regulation is "consistent with this Nation's historical tradition" of firearms regulation. *Bruen*, 597 U.S. at 34.

Significantly, the Court explained that a modern regulation need not be the "twin" of a historical regulation. *Id.* at 30. The Court recognized that while it is "relatively simple" to analogize modern regulations to "historical" ones in some cases, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 27. The Court also identified two important—but non-exclusive—considerations for lower courts to use in determining if historical and modern regulations are similar: "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (emphases added).

Comparing the motivations (the "whys") and the implementations (the "hows") of modern and historical laws requires courts to consider relevant empirical research on prevailing conditions in modern and historical American society. Such empirical research helps courts contextualize modern and historical laws and the prevailing societal backdrop against which those laws were passed, as *Bruen* requires.

*Bruen*'s analysis of historical analogues thus demands that gun-safety regulations be viewed in light of relevant prevailing societal conditions, and empirical research provides indispensable evidence of these conditions.

4

**B.** **Because the Challenged Laws Address Unprecedented Societal and Technological Conditions, *Bruen* Requires a Nuanced Approach.**

Over the past 200 years, unprecedented societal changes and advances in firearms technology have caused a dramatic rise in the frequency and lethality of mass shootings. This uniquely modern danger motivated the Challenged Laws, which, like many regulations spanning our Nation's history, were designed to protect the public.[4]

**1.** **The Frequency, Lethality, and Geographic Concentration of Public Mass Shootings Are Novel Societal Concerns.**

The United States has experienced a recent, exponential increase in the frequency of public mass shootings. *Amici* could find evidence of only two instances of private mass shootings in America throughout all of the 18th and 19th centuries,[5] both of which occurred in 1891 and neither of which involved fatalities (likely given the limitations of gun technology at the time).[6] One scholar estimates that a total of

---

[4] *See* Defs. Br. at 7 ("Acting shortly after the Sandy Hook Elementary School mass shooting, and in response to the prevalence of assault rifles in mass shootings, the Maryland General Assembly passed the Firearm Safety Act of 2013 [which] contains various measures to enhance public safety."); *see also id.* at 5–6 (discussing purpose of 1994 Assault-Pistols Ban).

[5] As used here, a "mass shooting" is a shooting in which four or more people (other than the perpetrator(s)) are injured and/or killed, where victims are selected indiscriminately, and where the shootings are not attributable to any other underlying criminal activity or circumstance. Regardless of the definition one uses, one thing is certain: mass shootings have skyrocketed in this country.

[6] *See* Maria Hammack, *A Brief History of Mass Shootings*, Behind the Tower (2016), https://tinyurl.com/yc85z9pn.

25 mass shootings occurred between 1900 and 1965.[7] In astonishing contrast, more than 2,500 mass shootings have occurred in the United States just since 2020: 610 in 2020, 689 in 2021, 644 in 2022, and 656 in 2023 – an average of nearly two per day.[8] As of the drafting of this brief,[9] 50 mass shootings have been recorded in the United States in little more than one month of 2024.[10]

This societal threat is remarkable not just because of its swift rise to epidemic proportions in the United States, but also because of the disproportionately high rate of mass shootings in the United States relative to the rest of the world. A recent comprehensive study analyzing the number of mass shooting incidents and fatalities in 36 developed countries found that: half did not have a single mass shooting between 1998 and 2019; only ten had more than one mass shooting; and only five

---

[7] *See* Bonnie Berkowitz & Chris Alcantara, *The terrible numbers that grow with each mass shooting*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4.

[8] *See Past Summary Ledgers*, Gun Violence Archive, https://tinyurl.com/y5s7ax23.

[9] And this number is likely to grow. On Wednesday, 22 people, including at least nine children, were shot at Kansas City's hometown parade celebrating the Kansas City Chiefs' Super Bowl win. *See One dead as 22 shot near end of Chiefs' victory parade¸* ABC News (Feb. 15, 2024), http://tinyurl.com/jzbk8kvb.

[10] *See Gun Violence Archive 2024,* Gun Violence Archive, https://tinyurl.com/5t4rrt56 (last accessed Feb. 16, 2024); *see also* Bonnie Berkowitz, *Double mass shootings over weekend set grim U.S. record*, Wash. Post (Dec. 4, 2023), https://tinyurl.com/2p82e2mb (explaining that by early December 2023, the United States reached a "gruesome milestone," setting a new record for the highest number of mass *killings* (shootings in which four or more victims are killed) in any year since at least 2006).

had more than two incidents.[11] The United States had more than 12 times as many mass shootings as the country with the second-highest mass shooting count and the greatest number of mass shooting fatalities of all developed countries.[12] The United States makes up 33% of the population of developed countries, yet accounts for 73% of all mass shooting incidents and 62% of fatalities.[13]

Together, these figures demonstrate that mass shootings are strikingly more prevalent in modern-day America than at any other time in our history or in any other comparable place in the world.

> **2.    The Rise of Mass Shootings Coincides with Unprecedented Societal Concerns, Which the Founders Could Never Have Imagined.**

Several modern social phenomena coincided with a surge in mass shootings over the 21st century, making the prevention of gun violence especially imperative. The proliferation of social media platforms and transformative urbanization are two poignant examples.

---

[11] Jason R. Silva, *Global mass shootings: comparing the United States against developed and developing countries*, 47 Int'l J. Compar. & Applied Crim. Just. 317, 331 (2023).
[12] *Id.*
[13] *Id.* ("Understood together, this study supports previous research finding mass shootings are a uniquely American problem").

a. *Social Media*

Social media platforms create a means of communication that is exponentially faster, farther-reaching, and more difficult to regulate than anything the Founders could have imagined. Numerous studies correlate social media with increases in anti-social behavior; mental health disorders; political, religious, and social extremism; and ultimately, mass shootings. Social media plays an important role in the radicalization of American extremists, [14] as a mounting body of evidence demonstrates that content-ranking algorithms limit users' exposure to contrary viewpoints, creating "echo chambers" that intensify biases.[15]

Amid such violent and frenetic discourse, many perpetrators of mass shootings have been inspired by what they read online. One example (of far too many) is the May 2022 Tops Buffalo shooting, in which the 18-year-old gunman published a racist manifesto online before broadcasting the shooting live on social media.[16] The New York Attorney General reported that the gunman's "path towards becoming a white supremacist terrorist began upon viewing on the 4chan [social

---

[14] *See, e.g.,* Michael Jensen et al., *Use of Social Media By US Extremists,* Nat'l Consortium for the Study of Terrorism and Responses to Terrorism (2019), https://tinyurl.com/3s9nmbbc.

[15] *See* Pablo Barberá, *Social Media, Echo Chambers, and Political Polarization*, Ch.3 in *Social Media and Democracy*, Cambridge Univ. Press (Aug. 24, 2020), https://tinyurl.com/bdds6wf9.

[16] *See generally Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022*, Off. of the N.Y. State Att'y Gen. (Oct. 18, 2022).

media] website a brief clip of a [previous] mass shooting."[17] The Buffalo shooter also posted material on a different social media platform, Discord, "with the explicit goal of provoking future mass shootings."[18] A *Reuters* article observed that the shooting "appear[ed] to be the latest in a line of 'copycat' gunmen carrying out deadlier mass shootings inspired by previous attackers."[19] Likewise, on May 7, 2023, another mass shooter killed eight people in Allen, Texas, after being influenced by white supremacist materials with which he engaged on social media.[20]

### b.    *Urbanization*

Urbanization has also radically transformed society since the Founders' era. In 1800, the United States averaged 6.1 people per square mile.[21] By 2020, the population had increased by a staggering 1,500% to an average of 93 people per square mile.[22]

This explosion in population density has profoundly changed how people

---

[17] *Id.* at 3.
[18] *Id.* at 15.
[19] Tim Reid, *'Copycat' mass shootings becoming deadlier, experts warn after New York attack*, Reuters (May 15, 2022), https://tinyurl.com/bdzbf8us.
[20] Jake Bleiberg et al., *Source: Investigators examine ideology of Texas gunman*, AP News (May 8, 2023), https://tinyurl.com/3ywej7aa.
[21] *Pop Culture: 1800*, U.S. Census Bureau (Dec. 9, 2022), https://tinyurl.com/78cxvafx.
[22] Because these figures are an average of the population density of all areas of the country, the much lower density in rural areas means that the numbers drastically understate the impact of population density in *urban and suburban* areas, where most mass shootings occur.

associate. People gather in large groups more frequently than could have been possible before urbanization and mass industrialization, including in schools that accommodate thousands of students, tightly packed commuter trains and buses, large office buildings, crowded night clubs, sports arenas and stadiums, concerts, movie theaters, malls, and parades. This change is true even in rural areas where, because of modern transportation capabilities, relatively large groups of a few hundred people can easily gather, such as at a Friday night high school football game. These gatherings create "sitting duck" situations in which mass shooters can efficiently injure or kill large numbers of people in a single event. The Route 91 Music Festival shooting in Las Vegas lasted only 11 minutes but one shooter armed with assault rifles killed 58 concertgoers and injured nearly 1,000 others.[23]

### 3. Advances in Gun Technology Have Combined with Societal Changes to Create the Perfect Storm for Mass Shootings.

Against the backdrop of these and other societal changes, advances in gun technology allow even an inexperienced shooter to kill vastly more people more quickly than ever before.

Modern firearms far surpass their Founding-era counterparts in lethality. The

---

[23] Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://tinyurl.com/3v2aycdk. Two additional victims later died from their injuries. *See* Jonathan Bernstein & Mark Gray, *Five Years Since the Route 91 Massacre No One Knows a Damn Thing*, Rolling Stone (Sept. 21, 2022), https://tinyurl.com/bdjkavk2.

typical Revolutionary-era musket (i) held just one round at a time; (ii) had a maximum accurate range of 55 yards; (iii) had a muzzle velocity of roughly 1,000 feet per second; and (iv) took a "skilled shooter" half a minute to load a single shot.[24] By contrast, a typical AR-15 rifle (i) can hold 30 rounds[25] (30 times more); (ii) can shoot accurately from around 400 yards[26] (7 times as far); (iii) attains a muzzle velocity of around 3,251 feet per second[27] (over three times faster); and (iv) can be reloaded with full magazines in as little as three seconds.[28] *See Capen v. Campbell*, 2023 WL 8851005, at *12 (D. Mass. Dec. 21, 2023) (observing that "[t]he features of modern assault weapons—particularly the AR-15's radical increases in muzzle velocity, range, accuracy, and functionality—along with the types of injuries they can inflict are so different from colonial firearms that the two are not reasonably comparable"). Thus, a shooter wielding an AR-15 is incalculably more lethal than

---

[24] Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://tinyurl.com/mu5ety64. "Muzzle velocity" is the speed of a projectile when leaving the muzzle of a gun, and is a general measure of the power and lethality of a firearm. *Meet a Musketeer*, Newcastle Univ. Nat'l Civil War Centre, https://tinyurl.com/heehyjnk.

[25] AR-15 rifles use the same magazines as M16 rifles, which come in a standard size of 30 rounds. *See Are AR-15 Magazines Interchangeable? Which Ones Are*, Neckbone Armory, https://tinyurl.com/hppuzpb2; *see also* Ingraham, *supra* note 24.

[26] James Miller, *The 5 Best AR-15 Pistols Reviewed: Reports from Range*, Minuteman Review (Apr. 7, 2023), https://tinyurl.com/5n9as9ye.

[27] Peter M. Rhee et al., *Gunshot wounds: A review of ballistics, bullets, weapons, and myths*, 80 J. Trauma & Acute Care Surgery 6, 856 (2016).

[28] *What is your par time for an AR-15 emergency reload?*, AR15.com, (Nov. 22, 2010), https://tinyurl.com/3csjs7kd.

one with a Revolutionary-era musket.[29]

Even the most advanced firearms of the Civil War era[30] were a far cry from modern weapons such as an AR-15 rifle. For example, the 1866 Winchester rifle had a magazine capacity of 11 to 15 rounds,[31] a maximum effective range of approximately 100 yards (one-fourth of an AR-15 rifle), a muzzle velocity of 1,100 feet per second (one-third of an AR-15 rifle),[32] required the shooter to manually manipulate a lever in between each shot,[33] and could fire only ten shots per minute.[34] Using a semiautomatic assault rifle, a shooter can fire 40 rounds in as little as nine seconds.[35] This meets the U.S. Army definition for "rapid semiautomatic fire."[36]

---

[29] Scott Pelley, *What makes the AR-15 style rifle the weapon of choice for mass shooters?*, CBS (June 23, 2019), https://tinyurl.com/3y97wn33.

[30] The rifles were far from advanced: their exposed magazine was open to dirt and debris, which made it susceptible to jamming, their barrel would become dangerously hot after firing, and they were very heavy when loaded. *See* Ryan Hodges, *The 1866 Rifle*, Taylor's & Co. (Aug. 26, 2020), https://tinyurl.com/bp8xebtn; *Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://tinyurl.com/2zedk6c6.

[31] *Winchester Model 1866 Short 38 Special Lever Action Rifle*, Winchester Gun Store, https://tinyurl.com/yc3cv2zc.

[32] Dan Alex, *Winchester Model 1866: Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://tinyurl.com/p88kcaye.

[33] *See* Decl. of Robert Spitzer ¶ 48, *Nat'l Ass'n for Gun Rts. v. Campbell*, No. 1:22-cv-11431, ECF No. 21-10 (D. Mass. Jan. 31, 2023).

[34] *1866 Yellowboy Rifle History*, Uberti USA, https://tinyurl.com/3x2wjth3 ("The gun's . . . rate of 10 or more shots per minute was a game changer.").

[35] *See* Mark Berman & Todd C. Frankel, *High-capacity magazine bans could save lives. Will they hold up in court?*, Wash. Post (Mar. 27, 2023), https://tinyurl.com/dkzjskxs.

[36] *TC 3-22.9 Rifle and Carbine Manual*, U.S. Dep't of the Army, §§ 8-19–20, (May 2016), https://tinyurl.com/2p963dxd.

Increased firepower, coupled with advanced ballistics,[37] have made modern firearms far more deadly and fundamentally different from their historical predecessors. Current events too frequently illustrate how, with modern technology, a lone individual can commit mass murder in mere seconds before he can be located and stopped. On May 24, 2022, a lone gunman armed with an AR-15-style weapon fired at least 100 rounds in two and a half minutes inside an elementary school in Uvalde, Texas, "likely murder[ing] most of his innocent victims before any responder set foot in the building."[38] The ratifiers of the Second Amendment could not have imagined such rapid, indiscriminate carnage.

### 4.    *Bruen* Requires Nuance in Analyzing Historical Analogues.

In passing the Challenged Laws, the Maryland legislature contended with realities that legislatures of the past did not: mass shootings that were occurring more frequently than ever before,[39] structural shifts in society, and rapid advances in gun technology. These drastic societal and technological changes require this Court,

---

[37] *See, e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://tinyurl.com/2hudma2t.

[38] Carla Astudillo et al, *What we know, minute by minute, about how the Uvalde shooting and police response unfolded*, Texas Tribune (July 28, 2022), https://tinyurl.com/mr4eyjfu (quoting *Interim Report 2022*, Tex. H.R. Investigative Comm. on the Robb Elementary Shooting (July 17, 2022), https://tinyurl.com/ssahf6uh).

[39] *See* Defs. Br. at 7 (Challenged Laws were enacted "in response to the prevalence of assault rifles in mass shootings"); *Kolbe v. Hogan*, 849 F.3d 114, 120 (4th Cir. 2017) (Challenged Laws were enacted "in response to Newtown and other mass shootings").

under *Bruen,* to employ a nuanced analysis when comparing the "hows" and "whys" of the Challenged Laws with those of historical laws.

The motivation behind the Challenged Laws—their ("why")—is, fundamentally, to promote public safety.[40] Many (if not all) gun regulations at the Founding and throughout our history had the same motivation: to protect the public from deadly harm.[41] Thus, there is a strong and easily discernible link between the past and present "whys."

To analogize past and present "hows," this Court must determine whether the Challenged Laws impose a "burden on the right of armed self-defense" that is "comparable" to that imposed by historical laws. *Bruen*, 597 U.S. at 29. The Maryland legislature chose to restrict the use and sale of specific, especially dangerous firearms and accessories to protect public safety, and it has done so without preventing citizens from possessing what *Bruen* categorized as the modern-day quintessential self-defense weapon: handguns.[42] Employing *Bruen*'s nuanced

---

[40] *See* Defs. Br. at 7; *see also id.* at 5–6 (discussing motivation of 1994 Assault-Pistols Ban).

[41] *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 168–69 (2022), https://tinyurl.com/zx2dvsmc; *see also* Defs. Br. at 30–43 (analyzing historic tradition of regulating "novel weapons that pose heightened dangers to public safety.").

[42] *See* Md. Code Ann., Pub. Safety § 5-117 (Maryland statute permitting purchase, rent, or transfer of regulated firearms, including handguns, where person has submitted an application).

approach, *id*. at 27, this Court should conclude that the Challenged Laws are relevantly similar to many historical weapons regulations, and thus are consistent with our Nation's tradition of firearm regulation.[43]

### C. Plaintiffs' Formulation of "Common Use" Is Inherently Flawed Because the Challenged Laws Are Not a Categorical Ban, and Therefore the Common Use Standard Does Not Apply.

Plaintiffs argue that the Challenged Laws constitute an outright ban on arms that are "unquestionably" in common use "according to the lawful choices by contemporary Americans[.]"[44]

Preliminarily, Plaintiffs are incorrect that the arms covered by the Challenged Laws are in common use such that they are presumptively entitled to Second Amendment protection. Plaintiffs assert they are in common use because they are possessed by "millions of law-abiding citizens," as "demonstrated by the AR-15 and other modern semiautomatic rifles."[45] For support, however, Plaintiffs rely on an unpublished, non-peer-reviewed summary of an online survey.[46] The summary itself acknowledges that actual ownership numbers are likely lower than stated because

---

[43] *See* Defs. Br. at 30–43.

[44] Pl. Br. at 23.

[45] Pl. Br. at 27.

[46] *Id* at 28–29. (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2 (May 13, 2022) ("English Survey"), https://tinyurl.com/yc3fer46).

the survey asked whether respondents had "ever owned" such a rifle or magazine,[47] and its estimate thus does not account for obsolescence, destruction, or transfer of ownership, such as resale, of these weapons.[48] This flaw highlights just one fallacy in Plaintiffs' use of historical ownership statistics to define "common use": the argument necessarily assumes that every individual who has ever owned one of these weapons still owns it, actively uses it, and uses it only for lawful purposes.[49] A recent decision by the U.S. District Court for the District of Massachusetts also highlighted another fallacy inherent in the idea that ownership statistics can insulate a firearm from regulation:

> [Plaintiffs' position] would lead to a host of absurd results . . . the constitutionality of the regulation of different firearms would ebb and flow with their sales receipts. Weapons that unquestionably would have been considered within the ambit of the Second Amendment at the time of ratification . . . would lose their protection because of their relative rarity today. Conversely, an entirely novel weapon that achieved rapid popularity could be rendered beyond the reach of regulation if innovation and sales out[paced] legislation . . . Moreover, the constitutional analysis would be trapped in an infinite circularity: a weapon may be banned because it is not in common use, and it is not in common use because it is banned[.]

*Capen*, 2023 WL 8851005, at *8.

---

[47] *English Survey* at 22, 33.

[48] *Id.* at 33.

[49] *See also* Pl. Br. at 28–29 (contrasting assault weapon ownership and manufacturing statistics with "apparently ubiquitous public e-scooters" and noting that "assault weapons would be more common than either professional or doctoral degrees.").

The Seventh Circuit similarly expounded on this fallacy of the common use argument in *Bevis v. City of Naperville*, ultimately "declin[ing] to base [its] assessment of the constitutionality of these laws on numbers alone. [Because] [s]uch an analysis would have anomalous consequences." 85 F.4th 1175, 1198–1199 (7th Cir. 2023) (cert. denied *Nat'l Ass'n for Gun Rts. v. City of Naperville*, 2023 WL 8635036 (U.S. Dec. 14, 2023)).

The Plaintiffs' approach of using ownership statistics spanning many decades to define "common use" also ignores the additional, immensely important requirement that such weapons must be in common use for *lawful self-defense*, not merely owned or manufactured. *See Bruen*, 597 U.S. at 28 (Second Amendment protects only "instruments that facilitate armed self-defense"); *Bevis*, 85 F.4th at 1193 ("the definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose. That lawful purpose . . . is at its core the right to individual self-defense").

Nor do Plaintiffs compare the Challenged Laws with the regulation at issue in *Heller*[50] or provide any other support to justify its claim that the Challenged Laws

---

[50] In fact, Plaintiffs support their assertion that "AR-15s and other banned rifles are commonly possessed by law-abiding citizens for lawful purposes" by alleging that murder by handgun" is 20 times as common as murder by rifle. Pl. Br. at 31. This argument is not only logically unsound, but fails to address the driving metric behind the Challenged Laws: while mass murder can certainly be carried out by handgun, mass shooters' assault weapons of choice appear to be assault rifles, which facilitate mass murder by design, in a way that handguns do not.

constitute an absolute, categorical ban. Nor could they. Md. Code Ann., Crim. Law § 4-301 does not ban possession of all "rifles" or "semi-automatic rifles." Instead, as Plaintiffs concede, the Challenged Laws regulate only those "semiautomatic centerfire rifles [which have] certain characteristics."[51] Far from a categorical ban, the statute regulates a selection of especially dangerous semiautomatic firearms and features that pose a threat to society.

By restricting only a limited selection of firearms, the Challenged Laws accord with *Heller*'s recognition that the Second Amendment right "is not unlimited" and had never been "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. The Challenged Laws thus stand in contrast to the one the Court invalidated in *Heller*—a total ban on handgun possession in the home that "amount[ed] to a prohibition of an entire class of 'arms.'" *Id.* at 628. They do not constitute a complete ban on an entire class of weapons the Supreme Court has held to be constitutionally protected.

**D.      Assault Weapons Are Uniquely Dangerous and Not "Quintessential Self-Defense" Weapons Protected by the Second Amendment.**

The Supreme Court has held that the Second Amendment right to bear "arms" protects the right of law-abiding, responsible citizens to possess a handgun—the "quintessential self-defense weapon"—inside and outside the home for self-defense.

---

[51] Pl. Br. at 18.

*Heller*, 554 U.S. at 629; *Bruen*, 597 U.S. at 4. The Court expressly cautioned, however, that the Second Amendment should not be understood to bestow a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 597 U.S. at 21 (citing *Heller*, 554 U.S. at 626–27). Instead, it endorsed the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626–27.[52]

The Challenged Laws fit neatly in this historical tradition of prohibiting "dangerous and unusual weapons." They regulate only a limited subset of assault rifles with features that turn them into dangerous military-style firearms designed and suited for use in war. The AR-15, for example, traces its origins to a military-grade rifle designed in the late 1950s.[53] Aside from lacking full automatic-fire capability, the AR-15 is functionally the same as the M16, an automatic weapon designed for military combat that the Supreme Court has recognized can be banned. *See Heller*, 554 U.S. at 627. Just because the AR-15 does not fire automatically does not make it appropriate for civilian use. *Bevis*, 85 F.4th at 1195 (finding weapons such as the AR-15 do not "enjoy Second Amendment protection" because "the AR-

---

[52] *Bruen* makes clear that many regulations implicating Second Amendment rights will survive judicial review. *See Bruen*, 597 U.S. at 30–31.

[53] *See* Sam Bocetta, *The Complete History of the AR-15 Rifle*, Small Wars J. (July 12, 2017), https://tinyurl.com/2jwemryz; Sara Swann, *The History of the AR-15 and How It Became a Symbol of American Gun Culture*, Poynter (June 29, 2022), https://tinyurl.com/5bffkafr.

15 is almost the same gun as the M16 machinegun. . . . Both weapons share the same core design, and both rely on the same patented operating system").[54] The AR-15's and M16's gas-impingement system specifically appealed to the military—an innovation that redirects some of the energy from a fired bullet to reload the next bullet in order to reduce recoil and make it easier for a gunman, *i.e.,* a soldier, to maintain aim, increasing accuracy.[55]

It is the AR-15's "phenomenal lethality" that has made versions of it the U.S. military's standard-issue assault rifle since the Vietnam War.[56] The U.S. Army Field Manual instructs soldiers that *semi*automatic fire is "[t]he most important firing technique during modern, fast moving combat," emphasizing that it is "surprising how devastatingly accurate rapid [semiautomatic] fire can be."[57] Indeed, virtually all of the world's armies now use assault rifles that are variants of the AR-15.[58] *See Bevis,* 85 F.4th at 1195 (concluding that the Second Amendment does not protect the weapons and feeding devices covered by the challenged legislation "because

---

[54] *See also* Terry Gross, *How the AR-15 became the bestselling rifle in the U.S.*, NPR (Apr. 20, 2023), https://tinyurl.com/3ak32wvp; *Kolbe*, 849 F.3d at 139-40 ("[The] most popular of the prohibited weapons—the AR-15—is simply the semiautomatic version of the M16 rifle used by our military and others around the world.").
[55] *Id.*
[56] Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://tinyurl.com/4nedm6fa.
[57] *Rifle Marksmanship M16A1, M16A2/3, M16A4, and M4 Carbine*, U.S. Dep't of the Army, §§ 7-7, 7-8 (2003), https://tinyurl.com/3reu38px.
[58] Michael Shurkin, *A Brief History of the Assault Rifle*, The Atlantic (June 30, 2016), https://tinyurl.com/vjac8a3b

these assault weapons and high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense").

As described above, assault weapons are exponentially more lethal than any firearms available during the ratification of the Second or Fourteenth Amendments or throughout most of our Nation's history. When traveling through the body, bullets fired from semiautomatic rifles cause "cavitation," whereby a swath of tissue several inches from the bullet's path ripples away from the bullet and then settles back, dead or seriously damaged, creating a large cavity.[59] These bullets need not hit an artery to cause catastrophic bleeding: "The bullet from an AR-15 passes through the body like a cigarette boat traveling at maximum speed through a tiny canal."[60] Exit wounds can be the size of oranges.[61] Underscoring the carnage that assault-rifle fire wreaks, Peter Rhee, a trauma surgeon at the University of Arizona, has explained that wounds inflicted by a semiautomatic rifle "look[] like a grenade went off in there," whereas wounds inflicted by a 9mm handgun "look[] like a bad knife cut."[62]

---

[59] *See* Heather Sher, *What I Saw Treating the Victims from Parkland Should Change the Debate on Guns*, The Atlantic (Feb. 22, 2018), https://tinyurl.com/2uc4bepe (explaining the difference between injuries inflicted by semiautomatic rifles versus handguns).

[60] *Id.*

[61] *Id.*

[62] Sarah Zhang, *What an AR-15 Can Do to the Human Body*, WIRED (June 17, 2016), https://tinyurl.com/5d5prxmt; *see also* Dickinson, *supra* note 56 (quoting the

The effects of assault weapons are particularly devastating in mass shootings involving child victims. Roy Guerrero, a pediatrician in Uvalde, Texas, recalled victims with "[o]pen chest wounds," "war wounds," and wounds akin to "decapitation," "as if things exploded once the bullets hit the bodies."[63] In his Congressional testimony, Dr. Guerrero recalled seeing children "whose bodies had been so pulverized, decapitated by the bullets fired at them, over and over again, whose flesh had been so ripped apart, that the only clue as to their identities were the blood-spattered cartoon clothes still clinging to them."[64]

Yet Plaintiffs maintain that assault weapons "are not distinguishable for being more dangerous than rifles that the State does not ban,"[65] reasoning that the features regulated by the Challenged Laws are merely "cosmetic."[66] Assault weapons are weapons of war,[67] and the features regulated by the Challenged Laws—such as

---

Navy trauma surgeon who operated on former Congresswoman Gabrielle Giffords saying that while handgun wounds are comparable to "stabbing with a bullet," shooting someone with an AR-15 is "as if you shot somebody with a Coke can").

[63] Danielle Campoamor, *Uvalde's only pediatrician shares the horror of treating school shooting victims*, NBC News (May 29, 2022), https://tinyurl.com/27hr2p2w.

[64] *Dr. Guerrero's Testimony at Oversight Hearing on Gun Violence Crisis*, H. Comm. on Oversight and Reform (June 8, 2022), https://tinyurl.com/y98a4wed. *See also Critical Incident Review: Active Shooter at Robb Elementary School*, Dep't of Justice at 255 ("Families were asked to provide descriptions of their children, but due to the condition of the victims' bodies, families were also asked for descriptions of their children's clothing[.]")

[65] Pl. Br. at 25.

[66] Pl. Br. at 26.

[67] As the Seventh Circuit explained, while the plain text of the Amendment covers

folding stocks, flash suppressors, grenade launchers, and detachable magazines—increase their lethality, placing them far outside the category of "quintessential self-defense weapons" at issue in *Heller* and more like machine guns,[68] which the Supreme Court has recognized are beyond the Second Amendment's reach.[69]

As this Court previously observed in *Kolbe*, and *Bruen* has done nothing to upset, "[t]he very features that qualify [these] firearm[s] as . . . banned assault weapon[s] . . . 'serve specific, combat-functional ends'" that citizens would not require for ordinary self-defense. *Kolbe*, 849 F.3d at 137.

### 1.     Folding Stocks[70]

A typical rifle stock provides a shooter with control over the assault weapon by bracing the weapon against the shooter's shoulder.[71] A folding or collapsible stock combines this control with a greater ability to conceal or carry the rifle. The stock can fold in and decrease the length of the gun, thus allowing undetected

---

"Arms that ordinary people would keep at home for purposes of self-defense," it does not protect "weapons that are exclusively or predominantly useful in military service." *Bevis*, 85 F.4th at 1194.

[68] While not challenged here, Md. Code Ann., Crim. Law § 4-305.1 bans rapid fire trigger activators, including "bump stocks," a further attachment meant to increase a weapons lethality. As explained by the Seventh Circuit, "[t]he similarity between the AR-15 and the M16 only increases when we take into account how easy it is to modify the AR-15 by adding a 'bump stock' . . . thereby making it, in essence, a fully automatic weapon." *Bevis*, 85 F.4th at 1196.

[69] *Staples v. United States*, 511 U.S. 600, 611–12 (1994).

[70] Md. Code Ann., Crim. Law § 4-301(h)(1)(i)(1).

[71] Dave Campbell, *Back to Basics: Rifle Stock Components & Designs*, NRA American Rifleman (Feb. 15, 2017), http://tinyurl.com/4yt7vwh3.

transport for deadly shootings.[72] This Court has previously noted folding stocks to be "military features" that "serve specific, combat-functional ends," *Kolbe*, 849 F.3d at 125, 137, a sentiment previously expressed by Congress when it enacted the 1994 Assault Weapons Ban.[73]

### 2.    Flash Suppressors[74]

Flash suppressors render firearms more accurate at long distances, and thus more lethal, because they "reduce the extent to which a shooter's vision will be impaired by muzzle flash at night."[75] Flash suppressors also render shooters more dangerous because they help conceal a shooter's location.[76] Similar to folding stocks, this Court previously designated flash suppressors as serving "specific, combat-functional ends." *Kolbe*, 849 F.3d at 137.

### 3.    Grenade Launchers[77]

Grenade launchers change the function of semiautomatic rifles and render them more deadly—in ways unthinkable in the civilian context—by allowing the

---

[72] *See Killing Machines: The Case for Banning Assault Weapons*, Educ. Fund to Stop Gun Violence (Sep. 2003), http://tinyurl.com/bdzjpuhp.

[73] H.R. REP. NO. 103-489, at 18 (1994), as reprinted in 1994 U.S.C.C.A.N. 1820 (folding stocks are "military features . . . that differentiate[] [banned rifles] from the traditional sporting rifles.").

[74] Md. Code Ann., Crim. Law § 4-301(h)(1)(i)(3), (j).

[75] Allen Rostron, *Style, Substance, and The Right to Keep and Bear Assault Weapons*, Campbell L. Rev. 301, 321 (2018).

[76] *See id.*; *Kolbe*, 849 F.3d at 125 ("flash suppressors . . . are designed to help conceal a shooter's position by dispersing muzzle flash.").

[77] Md. Code Ann., Crim. Law § 4-301(h)(1)(i)(2).

user to launch grenades, which are obviously weapons of war totally irrelevant to lawful self-defense.

### 4. Detachable Magazines[78]

Detachable magazines equip firearms with a drastically higher ammunition capacity because the number of rounds a detachable magazine can hold is not limited by the size of the gun.[79] Detachable magazines can hold as many as one hundred rounds without a shooter having to reload.[80] They also allow shooters to replace an empty magazine with a pre-loaded, full magazine in a few seconds, with little practice.[81] When combined with other features regulated by the Challenged Laws,[82] detachable magazines thus render weapons uniquely dangerous. They are especially lethal when used in combination with firearms that have "features that allow [for] enhanced control while firing multiple rounds."[83]

\* \* \*

Assault rifles and weapons outfitted with the regulated features are uniquely dangerous and unusual weapons. They are not the "quintessential self-defense weapons" that the Second Amendment protects. These "rifles were designed to

---

[78] Md. Code Ann., Crim. Law § 4-301(h)(1)(i), (i).

[79] *See Assault Weapons and Large Capacity Magazines*, Educ. Fund to Stop Gun Violence, https://tinyurl.com/yjmaba4k.

[80] *Id.*

[81] *See id.*

[82] *See* Md. Code Ann., Crim. Law §§ 4-301(h)(1).

[83] Educ. Fund to Stop Gun Violence, *supra* note 79.

achieve a simple goal: fire a lot of bullets fast to kill or maim as many enemy soldiers as possible."[84] And until the public availability of these destructive weapons is curtailed, as is the constitutionally permissible purpose of the Challenged Laws, they will continue to be used as horrific offensive weapons to commit mass killings of innocent civilians, just as they were in Parkland, Orlando, Uvalde, Highland Park, Buffalo, Las Vegas, and many other domestic massacres.

## IV.   CONCLUSION

For the reasons set forth above and in the Defendants' Brief, the Challenged Laws are constitutional, and this Court should again affirm the judgment of the District Court.

Dated: February 16, 2024              Respectfully submitted,

                                      /s/ *Eric B. Bruce*
                                      Eric B. Bruce
                                        *Counsel of Record*
                                      Jennifer Loeb
                                      FRESHFIELDS BRUCKHAUS DERINGER US LLP
                                      700 13th Street NW, 10th Floor
                                      Washington, DC 20005
                                      (202) 777-4500
                                      eric.bruce@freshfields.com
                                      jennifer.loeb@freshfields.com

                                      *(Additional Counsel on Next Page)*

---

[84] Cameron McWhirter & Zusha Elinson, *American Gun: The True Story of the AR-15* 4 (2023).

Aaron R. Marcu
Brandt Henslee
Yulia Dernovsky
Daniel Hodgkinson
Susannah Benjamin
Taylor Jachman
FRESHFIELDS BRUCKHAUS DERINGER US LLP
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
(212) 277-4000
aaron.marcu@freshfields.com
brandt.henselee@freshfields.com
yulia.dernovsky@freshfields.com
daniel.hodgkinson@freshfields.com
susannah.benjamin@freshfields.com
taylor.jachman@freshfields.com
*Counsel for Amici Curiae*
Giffords Law Center to Prevent Gun Violence,
Brady Center to Prevent Gun Violence, and
March for Our Lives

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because this brief contains 6494 words/uses a monospaced typeface and contains 617 lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: February 16, 2024          */s/ Eric B. Bruce*
                                  Eric B. Bruce

                                  *Counsel for Amici Curiae*
                                  Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives

## CERTIFICATE OF SERVICE

I certify that, on February 16, 2024, a true and correct copy of the foregoing Brief of *Amici Curiae* in Support of Defendants-Appellees was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

I also certify that, should this brief be accepted by the Court, 16 identical paper copies of the foregoing shall be filed with the Office of the Clerk, United States Court of Appeals for the Fourth Circuit, within 5 days of the notice of acceptance.

Dated: February 16, 2024      */s/ Eric B. Bruce*
                        Eric B. Bruce

                        *Counsel for Amici Curiae*
                        Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives