No. 21-1255

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

DOMINIC BIANCHI, ET AL.,

*Plaintiffs-Appellants,*

v.

ANTHONY G. BROWN, ET AL.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Maryland
(No. 1:20-cv-03495) (Hon. James K. Bredar)
_____

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES
AND AFFIRMANCE**
_____

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8215
wtaylor@everytown.org

*Counsel for amicus curiae*
*Everytown for Gun Safety*

February 28, 2024

**CORPORATE DISCLOSURE STATEMENT**

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE .......................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

ARGUMENT ...........................................................................................................2

I.  Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct.....................................2

II.  The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations ...............................9

  a.  The Proper Focus for Historical Analysis Is 1868 Rather Than 1791 .............................................................................................10

  b.  The Court Should Also Consider Consistent Later History .........19

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. Chiumento*,
89 F. 4th 271 (2d Cir. 2023), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024) ............................................................... 4, 12, 13, 21

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879 (U.S. Feb. 14, 2024), No. 23-880 (U.S. Feb. 15, 2024) ................... passim

*Capen v. Campbell*,
No. 1:22-cv-11431, 2023 WL 8851005 (D. Mass. Dec. 21, 2023), *appeal docketed*, No. 24-1061 (1st Cir. Jan. 17, 2024) ................................................. 10, 24

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
664 F. Supp. 3d 584 (D. Del. 2023), *appeals docketed*, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023) ............................................................. 9, 10, 24

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................... passim

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ............................................................................ 12

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) .............................................................................. 7

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) ............................................................................. 12

*Hartford v. Ferguson*,
No. 3:23-cv-05364, 2023 WL 3836230 (W.D. Wash. June 6, 2023) ................... 24

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ........................................................................ 22

*Kipke v. Moore*,
No. 1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) ........................ 14

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) (en banc) ............................................................... 7

*Lara v. Commissioner Pennsylvania State Police*,
91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81
(3d Cir. Feb. 14, 2024) ........................................................ 14

*McCullen v. Coakley*,
573 U.S. 464 (2014) ............................................................. 22

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ............................................................. 11

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ............................................................. 21

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*,
No. 23-1719 (4th Cir. July 10, 2023) ........................................ 13

*Nat'l Ass'n for Gun Rts. v. Lamont*,
No. 3:22-cv-01118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023), *appeal
docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023) ........................ passim

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346
(11th Cir. 2023) ................................................................... 13

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ............................................................. passim

*Ocean State Tactical, LLC v. Rhode Island*,
646 F. Supp. 3d 368 (D.R.I. 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18,
2023) ................................................................................. 5

*Oregon Firearms Fed'n v. Kotek*,
No. 2:22-cv-01815, 2023 WL 3687404 (D. Or. May 26, 2023) .......... 9

*Oregon Firearms Fed'n v. Kotek*,
No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals
docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.) ........ 4, 5, 6, 9

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) ........................................... 3, 5

*United States v. Berger*,
No. 5:22-cr-00033, 2024 WL 449247 (E.D. Pa. Feb. 6, 2024)...............................5

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ..............................................................................12

*United States v. Meyer*,
No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023)........................18

*United States v. Rowson*,
652 F. Supp. 3d 436 (S.D.N.Y. 2023) .................................................................24

*We the Patriots, Inc. v. Lujan Grisham*,
No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*,
No. 23-2166 (10th Cir. Oct. 20, 2023) ...............................................................14

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ................17, 18

Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Cal L. Rev.
(forthcoming 2025),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4546050 ......................23

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol
Ass'n v. Bruen*, No. 20-843 (U.S.)........................................................................19

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13
Charleston L. Rev. 205 (2018).............................................................................19

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022)....15

Expert Report of Louis Klarevas, *Rocky Mountain Gun Owners v. Town of Superior*,
No. 1:22-cv-02680 (D. Colo. Oct. 20, 2023), Dkt. 78-12.....................................7

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities,
the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to
the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ...................................................15, 16

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15,
2021) (now published at 97 Ind. L.J. 1439),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ...............17, 18

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ....................................................................................... 16

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ........................................................................ 15

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ......................................................................... 16

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ................................... 15

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ....................................................................... 15

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman used an assault weapon to murder twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Maryland's restrictions on assault weapons are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), for the reasons set out in the State's supplemental brief, Dkt. 59 ("State Br."), and as multiple courts have concluded when assessing similar laws. Everytown submits this amicus brief to expand on two methodological

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to establish that assault weapons are "Arms" in common use for self-defense within the meaning of the Second Amendment, and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with this Nation's historical tradition of firearm regulation," 597 U.S. at 17—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified. Moreover, 1868 is not a cutoff for the historical analysis; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). And, as *Bruen* instructs, this is particularly so where, as here, the challenged law implicates "unprecedented societal concerns or dramatic technological changes." 597 U.S. at 27.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask "whether the challenger is 'part of "the people" whom the Second Amendment protects,'" whether the item at issue is an "arm" that is "'in common use' today for self-defense," and "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124,

1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 32). If so, the court proceeds to consider whether the government has shown that its regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. *See generally id.* at 31-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, items, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1192 (7th Cir. 2023) (explaining that, if laws do not implicate protected "Arms," then "the Second Amendment has nothing to say about these laws: units of government are free to permit them, or not to permit them, depending on the outcome of the democratic process"), *petitions for cert. filed*, Nos. 23-877, 23-878, 23-879 (U.S. Feb. 14, 2024), No. 23-880 (U.S. Feb. 15, 2024).

The burden to satisfy the initial, textual inquiry is on the party challenging a law. *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 597 U.S. at 17, 44 n.11. The burden shifts to the government only after this threshold analysis. If the burden were on the government throughout—in what would be an unusual departure from ordinary litigation principles—the Court would have said so. Instead, *Bruen* discusses the government's burden only at the

historical step. *See, e.g.*, *id.* at 33-34 ("[T]he burden falls on [the government] to show that [the challenged restriction] is consistent with this Nation's historical tradition of firearm regulation.").

Accordingly, multiple courts—including the Second and Seventh Circuits—have correctly read *Bruen* to place the burden on plaintiffs to establish that the Second Amendment's plain text applies to the people, items, and conduct at issue. *See, e.g.*, *Antonyuk v. Chiumento*, 89 F.4th 271, 383 (2d Cir. 2023) (explaining plaintiffs were "required to show" that proposed conduct "was within the plain text of the Second Amendment"), *petition for cert. filed*, No. 23-910 (U.S. Feb. 20, 2024); *Bevis*, 85 F.4th at 1194 ("[P]laintiffs … have the burden of showing that the weapons addressed in the pertinent legislation are Arms that ordinary people would keep at home for purposes of self-defense[.]"); *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 3:22-cv-01118, 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023) ("*NAGR*") (placing textual burden on plaintiffs), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023); *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *5 n.4 (D. Or. July 14, 2023) ("*OFF*") (same), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.).

Plaintiffs argue that this Court should reach the merits of their claims and conclude that the textual showing has been made because the regulated items are "bearable arms." Dkt. 42 at 18 ("Pls. Br."). They offer little explanation for why the

regulated assault weapons qualify as bearable arms, apparently believing it sufficient that the weapons are firearms. *See* Pls. Br. 18. But whether a weapon or accessory is commonly used for self-defense, *see Bruen*, 597 U.S. at 31-32; whether or not it is "most useful in military service," *Heller*, 554 U.S. at 627; *see also Bevis*, 85 F.4th at 1193-94; and whether it is "dangerous and unusual," *Heller*, 554 U.S. at 627; *see Bruen*, 597 U.S. at 47, are all part of the textual analysis on which Plaintiffs bear the burden. This is apparent from *Bruen* itself, which noted the parties' agreement "that handguns are weapons 'in common use' today for self-defense" in its discussion of the Second Amendment's text. 597 U.S. at 32. Indeed, numerous courts since *Bruen* have located these considerations at the textual step.[2]

Plaintiffs have not carried their burden to show that the regulated assault weapons are in common use for self-defense.[3] They point to flawed and unreliable

_____

[2] *See, e.g.*, *Alaniz*, 69 F.4th at 1128; *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 389-90 (D.R.I. 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023); *United States v. Berger*, No. 5:22-cr-00033, 2024 WL 449247, at *5-7 (E.D. Pa. Feb. 6, 2024); *NAGR*, 2023 WL 4975979, at *15; *OFF*, 2023 WL 4541027, at *5; *see also Bevis*, 85 F.4th at 1194, 1198 (assessing whether assault weapons were "Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service" at textual step but not deciding whether any broader question of "common use" should be considered at step one or two).

[3] Plaintiffs pose the relevant inquiry (which they incorrectly place at the historical stage of the analysis) as whether the weapon is in common use for "lawful purposes." *See* Pls. Reply Br. 1. But *Bruen* specifically referred (in its discussion of the textual analysis) to whether the regulated weapons were "in common use today for self-defense." 597 U.S. at 32 (quotation omitted). That focused analysis makes sense, given that "self-defense is 'the *central component* of the Second Amendment

evidence on this question.[4] And, even more fundamentally, they erroneously submit that evidence of common *possession* is sufficient. *See* Pls. Br. 27 ("[T]he dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess [the regulated] firearms."). But, echoing concerns this Court previously noted, the Seventh Circuit recently rejected a similar argument when upholding Illinois's and localities' assault-weapon restrictions. *Bevis*, 85 F.4th at 1190. Specifically, the Seventh Circuit deemed it "circular" to focus on possession rather than use because the "law's existence [would be] the source of its own

---

right itself.'" *Id.* (emphasis in original, alteration adopted, and quoting *Heller*, 554 U.S. at 599); *see Bevis*, 85 F.4th at 1192 (acknowledging that weapons may have "other lawful uses" but explaining that "the Arms the Second Amendment is talking about are weapons in common use for self-defense").

[4] For instance, Plaintiffs cite a firearms survey conducted by Professor William English, Pls. Br. 28-29; Dkt. 66 at 10-11 ("Pls. Reply Br."), but that survey's findings are unpublished and were not peer-reviewed, and the survey fails to disclose its funding sources or measurement tools. A different professor closely associated with gun rights advocacy—whom Plaintiffs cite in support of their common-use argument, Pls. Br. 30; Pls. Reply Br. 24—recently testified, in a challenge to a large-capacity magazine law in Oregon: "I don't think you can rely on" English's survey. *OFF*, No. 2:22-cv-01815, Dkt. 175-7 at 12-13 (Gary Kleck testimony). He testified that English is "vague about exactly how he developed his sample. And there's nothing in his report to contradict the assumption that what he had was a self-selected sample …. And that's not a valid sample technique to generate a sample that's representative of the larger US population." *Id.* at 12. When asked "without that information that is missing, you would not rely on that survey for any purpose?," he stated: "That is correct. I would not rely." *Id.* at 12-13. Moreover, even if Prof. English's survey were reliable, it "does not demonstrate that assault weapons ... possess characteristics that make them well-suited for self-defense." *NAGR*, 2023 WL 4975979, at *21.

constitutional validity." *Id.* at 1190 (quoting *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015)); *see Kolbe v. Hogan*, 849 F.3d 114, 141 & n.15 (4th Cir. 2017) (en banc) (under common possession approach, "whether an arm is constitutionally protected depends … on how widely it is circulated" before it is prohibited). For instance, the court explained, only a few civilians owned AR-15s when the federal assault-weapons prohibition was enacted, but the weapons became more widely owned after the federal law expired in 2004. *Bevis*, 85 F.4th at 1199. If the court assessed the law's constitutionality based only on the number of weapons possessed, the law "would have been constitutional before 2004, but unconstitutional thereafter." *Id.* An approach that produces such "anomalous consequences," *id.*, cannot be correct.[5]

Finally, Plaintiffs are also incorrect that *Bruen* abrogated this Court's holding in *Kolbe* that assault weapons are not arms within the meaning of the Second Amendment because they are "'like' 'M-16 rifles,' i.e., 'weapons that are most

---

[5] Even if Plaintiffs' metric were accepted, they have not established common possession. According to the recent testimony of a professor and policy analyst who researches gun violence and has served as an expert in several cases involving firearms restrictions, the National Sport Shooting Foundation data on which Plaintiffs rely, *see* Pls. Br. 28, is likely an over-estimation because it appears to include firearms belonging to law-enforcement agencies and, in any case, the data at best demonstrates that "modern sporting rifles" constitute only 5.3% of all firearms in circulation in America. Expert Report of Louis Klarevas at 11, *Rocky Mountain Gun Owners v. Town of Superior*, No. 1:22-cv-02680 (D. Colo. Oct. 20, 2023), Dkt. 78-12 (expert report in case challenging assault-weapon restrictions by several Colorado localities).

useful in military service.'" 849 F.3d at 136 (quoting *Heller*, 554 U.S. at 627). In

*Bevis*, the Seventh Circuit reached a similar holding under both *Bruen* and *Heller*, 85

F.4th at 1192-97. The court determined, based on the Second Amendment's plain

text and historical understandings of the right to keep and bear arms, that

"'bearable Arms' extends only to weapons in common use for … self-defense,"

which do not include "weapons that are exclusively or predominantly useful in

military service." *Id.* at 1193-94. The court emphasized that this conclusion was

consistent with *Heller*'s statement that "weapons that are most useful in military

service," including M16s "and the like," "may be banned," *id.* at 1193 (quoting

*Heller*, 554 U.S. at 627), and reasoned that assault weapons are "much more like

machine guns and military-grade weaponry than they are like the many different

types of firearms that are used for individual self-defense," *id.* at 1195. *Bevis* thus

demonstrates that this Court's analysis in *Kolbe* of arms covered by the Second

Amendment—which likewise relied on *Heller*'s recognition that M16s and the like

fall outside this scope, *see* State Br. 17-20—is entirely consistent with *Bruen*.

For these reasons, Plaintiffs misstate, and have not carried, their textual

burden. Accordingly, this Court may affirm without proceeding to a historical

analysis.

## II. The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations

If this Court proceeds beyond the textual inquiry, it will next inquire whether Maryland's assault weapon restrictions are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. At that step, the Court may confront the question whether the most relevant time period for that inquiry centers on the Reconstruction era, and the ratification of the Fourteenth Amendment in 1868, or the founding era, and the ratification of the Second Amendment in 1791, *see id*. at 37-38 (recognizing but declining to "address" "an ongoing scholarly debate" on the question).[6]

To be clear, this Court need not resolve that question to uphold Maryland's restrictions. As the State has shown, and several courts have found in upholding similar regulations, historical tradition—from the founding era, to the 19th century, through Reconstruction, into the 20th century, and even up to today—consistently demonstrates the constitutionality of the State's restrictions. *See, e.g.*, State Br. 38-41, Add. A, B, & C; *Bevis*, 85 F.4th at 1201-02 (concluding Illinois' and localities' assault-weapons restrictions are supported by historical tradition dating

---

[6] As the State explains, Plaintiffs' attempt to eliminate the historical inquiry whenever a weapon is in common use for lawful purposes is incorrect. *See* State Br. 34-36; *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 597 (D. Del. 2023) ("*DSSA*") (rejecting similar argument as inconsistent with *Bruen*), *appeals docketed*, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023); *OFF*, 2023 WL 3687404, at *3 (D. Or. May 26, 2023) (same).

back to founding); *Capen v. Campbell*, No. 1:22-cv-11431, 2023 WL 8851005, at *12-13 (D. Mass. Dec. 21, 2023) (same, for similar Massachusetts law), *appeal docketed*, No. 24-1061 (1st Cir. Jan. 17, 2024); *see also, e.g.*, *DSSA*, 664 F. Supp. 3d at 600-01 (finding similar Delaware laws are grounded in historical tradition starting shortly after founding); *NAGR*, 2023 WL 4975979, at *31-33 (same, for similar Connecticut law). Where, as here, the inquiry into the public understanding in 1791 and 1868 yields the same result, the Court need not resolve the issue of the correct time period. *See Bruen*, 597 U.S. at 37-38.

If, however, the Court finds it necessary to decide the question, it should conclude that the most relevant time period for that inquiry centers around 1868. *See* State Br. 33-34. And it should further conclude that the historical inquiry extends thereafter—including into the 20th century—to encompass consistent later restrictions, given the "dramatic technological changes" and "unprecedented societal concerns" present here. *See Bruen*, 597 U.S. at 27.[7]

### a. The Proper Focus for Historical Analysis Is 1868 Rather Than 1791

As between 1791 and 1868, this Court should focus its historical inquiry on 1868 for several reasons. To begin with, in a case challenging the constitutionality

---

[7] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century and 20th-century history to clarify that meaning. *See infra* pp. 19-24.

of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; after all, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, <u>597 U.S. at 37</u>. Thus, because the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. *See* State B<u>r. 33</u>. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, <u>597 U.S. at 34</u> (quoting *Heller*, <u>554 U.S. at 634-35</u>; emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, <u>561 U.S. 742, 770-78</u> (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). As the Second Circuit explained, "[i]t would be incongruous to deem the right to keep and bear arms

fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 89 F.4th at 305. That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

Several other circuits reached the same conclusion in analyzing the tradition of firearm regulation at the first, historical step of the pre-*Bruen* Second Amendment framework. *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."). *Bruen* does not alter that conclusion; the Court disapproved the second step (means-end scrutiny) of the pre-*Bruen* framework, but explained that "[s]tep one of [the prior framework] is broadly consistent with *Heller*." 597 U.S. at 19. Accordingly, the step-one analyses in these

cases remain, as a general matter, good law. *See id.* at 37-38 (leaving open the question whether 1868 or 1791 is the correct focus).[8]

Multiple courts after *Bruen* have agreed that, in challenges to state laws, historical evidence from the Reconstruction era is at least as relevant as, if not more relevant than, evidence from the founding. *See, e.g.*, *Antonyuk*, <u>89 F.4th at</u> <u>304</u>, <u>318</u> n.27 (observing that "evidence from Reconstruction … is at least as relevant as evidence from the Founding Era regarding the Second Amendment"); *Nat'l Rifle Ass'n v. Bondi*, <u>61 F.4th 1317, 1323</u> (11th Ci<u>r. 2023</u>) (where the understanding of the right differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States"), *vacated on grant of reh'g en banc*, <u>72 F.4th 1346</u> (11th Ci<u>r. 2023</u>); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, <u>2023 WL 4373260</u>, at *8 (D. Md. July 6, 2023) ("*MSI*") (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10,

---

[8] Similarly, as the State explains, the portion of *Kolbe* that assessed the scope of the Second Amendment (separate from the Court's step-two application of means-end scrutiny) remains good law. *See* State Br. 21-23.

2023); *Kipke v. Moore*, No. 1:23-cv-01293, 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *MSI*); *We the Patriots, Inc. v. Lujan Grisham*, No. 1:23-cv-00771, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with *Bondi* and *MSI* that "that historical sources from … 1868 are more probative of the scope of the Second Amendment's right to bear arms than those from the Founding Era"), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023).[9]

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from radical. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the National Rifle Association's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
>
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and

---

[9] The Third Circuit took a different approach in *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *petition for reh'g en banc filed*, No. 21-1832, Dkt. 81 (3d Cir. Feb. 15, 2024). This Court should not follow *Lara*. Instead of engaging with originalist principles, the Third Circuit based its conclusion on the "general assumption" in several Supreme Court cases cited by *Bruen*, *see* 597 U.S. at 38. *Lara*, 91 F.4th at 133-34. But those cases did not address the significance of the Fourteenth Amendment's ratification for the question of which time period is most relevant to the historical inquiry and cannot have resolved the question that *Bruen* expressly left open. *See Bruen*, 597 U.S. at 37-38; *infra* p. 17-18. Because it failed to recognize that issue and cannot be squared with originalist principles, *Lara* is not persuasive.

the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position of leading originalist scholars. *See, e.g.*, Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655,

662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").[10] In sum, originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

A question raised by that conclusion (though one not directly presented in this case) is what the temporal focus should be in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments. <u>597 U.S. at 37</u> ("[W]e have made

---

[10] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintained (pre-*Bruen*) that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently rejected the possibility of different standards for the state and federal governments, it appears that originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 16-19.

clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, it appears that originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Plaintiffs suggest that pre-*Bruen* doctrine resolves this choice between 1791 and 1868. Pls. Reply Br. 14-16. Not so. *Bruen* noted only that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." 597 U.S. at 37. If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 37-38. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at

97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[11] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained

---

[11] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, <u>597 U.S. at 30</u> (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[12]

For these reasons, if the Court reaches the question whether the founding or Reconstruction era is more relevant to *Bruen*'s historical analysis, it should find the latter the proper center for its inquiry.

### b. The Court Should Also Consider Consistent Later History

In addition to concluding that 1868, rather than 1791, should be the focus of the historical analysis, this Court should also recognize that 1868 is neither a starting line nor a cutoff, and that consistent later history is also highly relevant. *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, <u>554 U.S. at 592-93</u>; *Bruen*, <u>597 U.S. 34-35, 44-50</u>, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text

---

[12] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 597 U.S. at 20 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 597 U.S. at 36, 66 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 35-36 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should recognize that later laws (and other historical evidence of regulatory authority) settle the meaning of the Second Amendment right and demonstrate that the challenged law is constitutional. *See* State Br. 33-34.

Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction, even if this Court were to conclude that 1791 is the correct focus for historical analysis. For instance, if a regulation passed in the

decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later public understanding of the right (as demonstrated through a regulatory tradition or other historical materials from that period) also reflects the founding-era understanding. Here, 19th-century and later laws are convincing evidence of how the right was understood not only when those laws were passed, but also in earlier decades. Plaintiffs have provided no reason to believe that the understanding of the right underwent some startling transformation between 1791 and 1868 (or 1900). *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) ("Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness."); *Antonyuk*, 89 F.4th at 304 (finding it "implausible" that "public understanding would promptly dissipate whenever [one] era gave way to another").[13]

---

[13] Such a presumption also reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same

Furthermore, *Bruen* counsels that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. 597 U.S. at 27; *see* State Br. 31; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period—making the consideration of later history particularly crucial. *See McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("States adopt laws to address problems that confront them.").

Plaintiffs, however, ask this Court to disregard 19th-century and later evidence because *Bruen* declined to consider some late-19th- and 20th-century evidence. *See* Pls. Reply Br. 15-17. But *Bruen* gave less weight to this evidence because it "contradict[ed] earlier evidence," not simply based on its timing. 597 U.S. at 66-67, 66 n.28; *see id.* at 64-66 (finding that Texas's 1871 law and its 1871

---

scope as against the Federal Government." *Bruen*, 597 U.S at 37. For the Supreme Court—which emphasized the importance of original public understanding—to take this position, it must have presumed, at least as a general matter, that constitutional rights maintained a consistent meaning between the two points of their adoption, 1791 and 1868.

and 1875 court decisions were insufficient to justify New York's law not because they came too late, but because they were from a "single state" and "contradict[ed] the overwhelming weight of other evidence"). The Court did not deem such evidence irrelevant where, as here, there is no conflicting evidence, and, instead, as explained, emphasized that post-ratification history is a "critical tool of constitutional interpretation," *Bruen*, 597 U.S. at 35-36 (quoting *Heller*, 554 U.S. at 605), and can "liquidate" and "settle" the meaning of constitutional terms, *Bruen*, 597 U.S. at 35-36; *see also Heller*, 554 U.S. at 618-20 (canvassing, among others, treatises from 1873, 1880, and 1891).

Additionally, as the State explains, Maryland adopted the challenged measure in response to the exponential increase in the lethality of firearms and magazines—*i.e.*, "dramatic technological changes," *Bruen*, 597 U.S. at 27—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See* State Br. 36-37. In fact, assault weapons did not become "reliable enough consumer items to cause problems [until] the twentieth and twenty-first centuries," at which point "regulation quickly followed." Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Cal L. Rev. (forthcoming 2025) (manuscript at 1), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4546050; *see id.* at 11, 48 n.206, 54 (describing same); *see also* State Br. 40, Add. C. Accordingly, a "more nuanced approach" to history, *Bruen*, 597 U.S. at 27, including "a broader search

for historical analogies," is fully warranted, *United States v. Rowson*, 652 F. Supp. 3d 436, 470 (S.D.N.Y. 2023).

Here, state and local laws from the period beginning around Reconstruction and continuing into the Prohibition era and later—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of Maryland's restrictions. *See* State Br. 38-41, Add. A, B, & C (discussing late-19th- and early-20th-century regulation of particularly dangerous weapons, weapon features, and weapon capacities associated with increased violence and lethality, which were consistent with earlier laws); *Bevis*, 85 F.4th at 1201-02 (relying on both late-19th- and 20th-century weapons laws to uphold Illinois and municipal laws restricting assault weapons); *DSSA*, 664 F. Supp. 3d at 600-02 (same, to uphold similar Delaware law); *Capen*, 2023 WL 8851005, at *19 (same, for similar Massachusetts law); *NAGR*, 2023 WL 4975979, at *26, *31-33, 33 n.51 (same, for similar Connecticut laws); *Hartford v. Ferguson*, No. 3:23-cv-05364, 2023 WL 3836230, at *5 (W.D. Wash. June 6, 2023) (same, for similar Washington law). And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like Maryland's.

## CONCLUSION

The Court should affirm the district court's judgment, or, alternatively, remand this case to the district court for further proceedings.

Dated: February 28, 2024

Respectfully submitted,

/s/ William J. Taylor, Jr.
Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(646) 324-8215
wtaylor@everytown.org

*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,422 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2024, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ William J. Taylor, Jr.
William J. Taylor, Jr.
*Counsel for amicus curiae*
*Everytown for Gun Safety*
